IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 02-cv-01662-RPM-MJW

ROBERT HUNTSMAN and
CLEAN FLICKS OF COLORADO, L.L.C.,

    Plaintiffs,

and

CLEANFLICKS, LLC;
ASR MANAGEMENT CORPORATION d/b/a CLEANFILMS f/k/a MYCLEANFLICKS;
FAMILY SHIELD TECHNOLOGIES, LLC;
CLEARPLAY INC.;
CLEAN CUT CINEMAS;
FAMILY SAFE MEDIA;
EDITMYMOVIES;
FAMILY FLIX, U.S.A., L.L.C.; and
PLAY IT CLEAN VIDEO

    Counterclaim Defendants,

vs.

STEVEN SODERBERGH;
ROBERT ALTMAN;
MICHAEL APTED;
TAYLOR HACKFORD;
CURTIS HANSON;
NORMAN JEWISON;
JOHN LANDIS;
MICHAEL MANN;
PHILLIP NOYCE;
BRAD SILBERLING;
BETTY THOMAS;
IRWIN WINKLER;
MARTIN SCORSESE;
STEVEN SPIELBERG;
ROBERT REDFORD;
SYDNEY POLLACK;
METRO-GOLDWYN-MAYER STUDIOS, INC.;
TIME WARNER ENTERTAINMENT CO. L.P.;
SONY PICTURES ENTERTAINMENT;

DISNEY ENTERPRISES, INC.;
DREAMWORKS L.L.C.;
UNIVERSAL CITY STUDIOS, INC.;
TWENTIETH CENTURY FOX FILMM CORP.; and
PARAMOUNT PICTURES CORPORATION,

    Defendants and Counterclaimants,

and

THE DIRECTORS GUILD OF AMERICA,

    Defendant in Intervention and Counterclaimant in Intervention

---

**BRIEF AMICUS CURIAE OF ELECTRONIC FRONTIER FOUNDATION**

---

**INTEREST OF AMICUS**

    Amicus Electronic Frontier Foundation (EFF) is a membership-supported, nonprofit public interest organization devoted to maintaining the proper public/private balance in copyrights as more material moves to the digital arena. The EFF represents the interests of both individual hobbyists and technology stalwarts whose freedom to innovate could be stifled by overbroad application of copyright laws as well as digital media editors, writers, and producers who depend on copyright law's fair use doctrine to create new works. One of the copyright claims in this case threatens to impinge upon the rights of innovators and consumers, upsetting the delicate statutory balance set out by Congress and maintained by the Courts. EFF files this brief because, as discussed below, the ability to make full reproductions of copyrighted works as an intermediate step toward the production of transformative non-infringing final works is paramount to achieving two of the primary goals of the Copyright Act: promoting technological advancement and driving the creation of new copyrighted works. Therefore, Amicus respectfully requests that the Court consider this brief as it determines the copyright claims in this case.

2

## I.   INTRODUCTION

The Copyright Act has one principle goal: to foster the proliferation of new creative work.  The digital age has seen an explosion of new creative endeavors—from the award-winning documentary that weaves archival film with high-definition footage to the software program that lets family members swap photos by phone. To achieve many of these new creative and transformative applications in the digital world, it is necessary to make what are called "intermediate copies" – copies of a first work into a computer's memory or onto a computer's hard drive in order to extract the material needed to create fair use of that work and transform it into a new, second, non-infringing product.

In their Opening Brief in Support of Their Motion for Partial Summary Judgment ("MPAA Brief"), the Motion Picture Studios argue that the Mechanical Editing Parties have violated three separate exclusive rights under 17 U.S.C. § 106: (1) the exclusive right to make reproductions of their movies, (2) the exclusive right to prepare derivative works of their movies, and (3) the exclusive right to distribute their movies. *See* MPAA Brief at 21-23. The basis for violation of both the "distribution" and "derivative" rights is the creation and distribution of the final edited film products at issue in the case. The basis of the main "reproduction" claim, however, is the allegation that copies of movies made onto computer hard drives as part of the process of *making* the final edited movie were also infringing. *Id.* at 21. This last claim as to intermediate copies being per se illegal is erroneous and must not stand without scrutiny.

Because of its interests as amicus and the fact-intensive nature of this case, EFF takes no position on whether the final product at issue – the edited movies – are derivative works or illegal distributions. Rather, this brief is solely focused on the question of whether the intermediate hard drive copies allegedly to create those final products violate a copyright holder's exclusive right of reproduction under 17 U.S.C. 106(1). EFF urges this court to hold that the legality of the intermediate copying, e.g., reproducing works onto a hard drive, depends on

the legality of the final product, and that such copying is a non-infringing fair use when it is done as a necessary step toward producing a transformative non-infringing final product.

Amicus advocates this position for two reasons. First, courts have ruled consistently that intermediate copying en route to the creation of non-infringing products is fair use in the context of software. *Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 1999); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992). Courts have also begun to recognize this in cases involving other forms of digital fair use, such as the creation of "thumbnail" images for use in Internet searches for photographs. *See Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003). This court should ensure that well-established copyright law regarding intermediate copying is applied uniformly to all copyrighted works, including those at issue in this case. Documentary filmmakers and video editors should not be treated differently under the law of copyright than software developers or engineers. By holding that an intermediate reproduction leading to non-infringing final result constitutes fair use, this court will preserve the balance intended by Congress and upheld by courts before it.

Second, as a practical matter, it is essential that artists, editors, and producers of new copyrighted works in digital formats be able to use intermediate copies as part of their creative process. To hold otherwise would tie the hands of these artists and prevent them from using modern technology as part of their craft. Before digital works came along, it was possible for those who wished to make fair use to utilize the original work purchased for their transformative purpose without an intermediate copy. For example, an artist might cut an ad out of a magazine to use in a collage critiquing consumer culture. However, with the advent of digital media, intermediate copies become an essential component of any transformative use. For example, if a teacher wants to show a series of 30-second clips from several DVDs to his film class, he will need to make copies of each segment from each DVD onto his hard drive and them compile them together in a row to burn to a new DVD. This whole process will require making

4

numerous intermediate copies in order to achieve the final fair use. Outlawing intermediate copies per se, as the MPAA Brief demands, would outlaw this practice and fair use generally in the digital age. Therefore, the MPAA's argument must be rejected.

## II.   ARGUMENT

### A.   U.S. Courts have long held that necessary intermediate copying is fair use

U.S. courts have consistently held that intermediate copying is fair use—if such reproductions are necessary in the course of making a final non-infringing product. *Sega*, 977 F.2d at 1526-7; *Sony*, 203 F.3d at 598; *Kelly*, 336 F.3d at 816. In doing so, courts have allowed intermediate copying even when it involved multiple reproductions. *Id*. They also have permitted developers to copy entire copyrighted works onto a hard drive or into computer memory. *Id*.

The fair use doctrine requires courts "to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity [the] law is designed to foster." *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 577 (1994). In determining whether use of a copyrighted work is fair use, courts generally weigh four statutory factors: 1) the purpose and character of the use, including whether it is transformative or merely supersedes the original; 2) the nature of the copyrighted work; 3) the amount and significance of the portion used in relation to the original work as a whole; and 4) the use's effect on the potential market for or value of the copyrighted work. *Id.; see also* 17 U.S.C. § 107. Additionally, when the use is transformative, "market harm may not be so readily inferred." *Id.* at 591.

The *Sega* court provided the seminal decision on creating intermediate copies, employing the four factors and holding that intermediate copying is a fair use of copyrighted work, as long as the resulting product was not infringing. *Sega*, 977 F.2d at 1526-7. In that case, Accolade, a maker of independent video games, created programs that were compatible with Sega's Genesis game player console. To ensure its games would play on Sega's console, Accolade copied Sega's

games onto its computers and reverse engineered them to learn about how they played. Sega sued for copyright violations, claiming that the intermediate copies necessary to reverse engineer its console were infringing. The Ninth Circuit rejected these arguments, noting that notwithstanding the fact that Accolade's reverse engineering amounted to "wholesale copying" the intermediate copying was fair because it was part of a process "necessary in order to understand the functional requirements for … compatibility," a non-infringing use. *Id.* at 1525-6. Even Accolade's commercial purpose did not undermine its fair use defense because the company's actions actually would lead to more independently created video games. As the court said, "[i]t is precisely this growth in creative expression . . . that the Copyright Act was intended to promote." *Id.* at 1523. Moreover, if reverse engineering were "per se an unfair use, the owner of the copyright gains a de facto monopoly" over the work, an extension of copyright law that Congress specifically denied. *Id.* at 1526. Thus, the court recognized that intermediate copying for legitimate purposes sparked the very creativity copyright law was designed to promote.

The Ninth Circuit reaffirmed the legality of intermediate copying in *Sony,* holding that a company could duplicate copyrighted software while creating a new platform for video games. 203 F.3d at 596. In that case, software developer Connectix created the Virtual Game Station ("VGS"), a program that allowed people to play Sony video games on their computers instead of on Sony's PlayStation console. To create the program, Connectix developers bought a Sony PlayStation console. They then "repeatedly copied Sony's Copyrighted BIOS during a process of 'reverse engineering' to find out how PlayStation worked." *Id.* at 598. The court held that the repeated copying was a permissible fair use because it was "necessary" in order for Connectix to create a non-infringing product. *Id.* at 599. Thus, although Connectix reproduced multiple replicas of the entirety of Sony's copyrighted software, the court viewed these copies as a legitimate means to a desirable end: a new transformative copyrighted work (the VGS software program) that untethered gamers from their PlayStation platform and provided a new market for

6

the games. As the court said, "[t]his innovation affords opportunities for game play in new environments, specifically anywhere a Sony PlayStation console and television are not available." *Sony*, 203 F. 3d at 606.

In their motion for summary judgment in this case, Plaintiffs make the blanket statement that "unauthorized copies stored on a computer are infringements." MPAA Brief at 21. This is not the law. In fact, circuit courts have repeatedly found that copies stored on computers are legal when the resulting product does not infringe. *See Sony*, 203 F.3d 596; *Sega*, 977 F.2d 1510; *Kelly,* 336 F.3d 811; *see also* 17 U.S.C. § 117 (allowing intermediate copies into computer memory for purposes of computer maintenance, repair, and ordinary use). The two cases cited by plaintiffs to support their sweeping and simplified allegations do not involve copies that yielded non-infringing works. Thus, those cases are not relevant here. Instead of relying on plaintiffs' unrelated cases, this court should look at the established authority specifically addressing the issue of intermediate copying—authority that uniformly deems it fair use for legitimate purposes.

Here, this court should also find that intermediate copying is a non-infringing fair use if the resulting product does not infringe. Just as it was necessary for Accolade and Connectix developers to reproduce copyrighted works in order to make compatible software, it may have been necessary for the creators of the products at issue here to reproduce copies of movies in the course of making non-infringing edited versions.[1] Thus, the court should reject any arguments that maintain these intermediate copies are per se illegal. Instead, the court should apply the uniform test for intermediate copies of copyrighted works to the facts of this case. To hold otherwise would stifle innovation, extend copyright monopolies beyond what Congress intended, and cause a split in copyright law as applied to software on the one hand and media on the other.

---

[1] Amicus EFF takes no position on whether or not the final products at issue are infringing. However, if the court does find them non-infringing, the issue of any intermediate reproductions should be decided as discussed herein.

### B.     Intermediate copies of digital media encourage transformative works.

Software was the first class of copyrighted work to go digital. It will, of course, not be the last. These days, droves of artistic work such as books, movies, and music are following this move to the digital arena. As a result, more artists than ever will rely on intermediate copying to create their non-infringing works. Courts must honor this evolution and strive to maintain a consistent approach to the application of copyright law across all mediums and disciplines. To hold otherwise would create two tiers for copyright artists—software writers who can make intermediate copies for fair use and media artists who cannot. Forcing media artists to turn off their computers and forgo the great advances of digital technology because of potential copyright liability from intermediate copies leading to fair uses is fundamentally inconsistent with the purpose of the Copyright Act.

The Ninth Circuit has already recognized this reality in the *Kelly* case. In *Kelly*, the court permitted search engine Arriba Soft to download copyrighted pictures and display thumbnail images of the photographs to users searching its site for photographs on the Internet. The court allowed the search engine to display a "thumbnail" of each photographer's copyrighted works even though "Arriba obtained its database of pictures by copying images from other web sites" and "reproduced [photographers'] exact images and added nothing." 336 F3d. at 815, 818. Arriba created intermediate copies of 35 full images in the course of creating its directory of thumbnails. The court deemed Arriba's actions legal because the resulting product was transformative and "created a new purpose for the image" –namely, "improving access to information on the internet." *Id.* at 819. What's more, the intermediate copying was "necessary" to create the final, non-infringing product. *Id.* at 821.

The Ninth Circuit also has allowed intermediate copying of songs during the transfer of music to a digital player. In upholding the public's ability to store personal copies of music on an MP3 player, the court in *Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys. Inc.*, noted

that the device "reproduce[s] files from a computer hard drive via a cable linking the two devices." 180 F.3d 1072, 1080 (9th Cir. 1999). Thus, despite the undisputed fact that the songs on the hard drive were intermediate copies of copyrighted works, the court affirmed the conduct of both the individuals making the copies and the company providing the tools for such copies to be made. *Id.*[2]

Other federal courts also have recognized the critical nature of intermediate copying in the digital age. The U.S. District Court for the Western District of Virginia recently held that police officers could legally reproduce full-scale copyrighted digital pictures in order to assist with a homicide investigation. *Shell v. City of Radford*, 351 F. Supp. 2d 510 (W.D. Va. 2005). In that case, police retrieved digital pictures of a homicide victim from the computer and Web site of a man suspected of the killing, a man who was also a professional photographer. *Id.* The officers then repeatedly made intermediate copies of the pictures onto police computer hard drives in order to distribute and display them during their investigation. *Id.* at 511. The suspect sued the department for copyright infringement, alleging officers had illegally copied his photos of the victim without permission. However, the court disagreed, ruling that the copying of the pictures—in their entirety—constituted fair use because the end use, a criminal investigation, was legitimate. *Id.* at 513. Had the *Radford* court not recognized the "intermediate copy" rule, the police would have been liable for every hard drive reproduction they made in furtherance of their investigation, no matter how legitimate their purpose.

Other courts also have implicitly endorsed intermediate copies—albeit in the offline world. See *Nunez v. Caribbean International News Corp.* 235 F.3d 18 (1st Cir. 2000)

---

[2] Amicus notes that the *Diamond* case was primarily decided on the basis of whether the MP3 player at issue fell within the scope of the Audio Home Recording Act of 1992. However, the Ninth Circuit and the plaintiff Recording Industry Association of America were well aware of the intermediate copying that took place during the music transfer process and the question of its legality.

(intermediate copies necessary to make non-infringing transformative use of photograph); *Higgins v. Detroit*, 4 F. Supp. 2d 701 (E.D. Mich. 1998) (intermediate copies necessary for Detroit Public Television to make fair use of 35-second clip of a copyrighted song in an educational anti-drug video); *Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442 (S.D.N.Y. 2001) (intermediate copies used by cable channel to create legal clips of a campy sci-fi movie and trailer in a documentary about an actor). As more newspapers, videos, and other forms of art go digital, editors performing the transformative processes in these cases may need to make copies on their hard drives in order to efficiently perform their work. In fact, digital video editors frequently create intermediate copies during the editing process in order to correct for color and integrate older footage with high-definition tape. *See*, Iain Blair, *Making Stock Footage Work*, Film & Video Magazine (June 18, 2005), available at <http://www.digitalvideoediting.com/articles/viewarticle.jsp?id=33168> (noting that the editors of documentaries such as "Enron: The Smartest Guys in the Room" create intermediate copies of archival footage in order to standardize the look of the film). Plaintiffs would have this court hold intermediate copying per se illegal. However, this holding would choke off creativity and deny artists the tools of their trade.

In short, circuit and district courts have consistently recognized an important modern trend: that copyrighted material may occasionally be copied on the road to creating a non-infringing, transformative product. Amicus urges this court to follow suit, should it find that the edited movies in this case do not infringe. That is, this court should hold that creating intermediate copies during the process of developing non-infringing works is fair use—a ruling that is consistent with both accepted fair-use doctrine and copyright law's basic goal: to encourage creative expression.

### III. CONCLUSION

For the foregoing reasons, Amicus Electronic Frontier Foundation respectfully requests the Court to affirm that, when intermediate copies are necessary in order to develop transformative, non-infringing final products, those intermediate copies are themselves non-infringing.

Respectfully submitted this 22nd day of August, 2005.

/s     Carolyn J. Fairless
Carolyn J. Fairless
Wheeler Trigg Kennedy LLP
1801 California Street, Suite 3600
Denver, CO  80202
Telephone:     (303) 244-1800
Fax:              (303) 244-1879
E-mail:          fairless@wtklaw.com

Cindy A. Cohn, Esq. (SBN.145997)
Fred von Lohmann, Esq. (SBN.192657)
Jason M. Schultz, Esq. (SBN 212600)
454 Shotwell Street
San Francisco, CA 94110
Telephone:    (415) 436-9333
Facsimile:      (415) 436-9993
Attorneys for Amicus Electronic Frontier Foundation

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on August 22, 2005 I electronically filed the foregoing BRIEF AMICUS CURIAE OF ELECTRONIC FRONTIER FOUNDATION with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- **Christopher P. Beall**
  cbeall@faegre.com treed@faegre.com
- **Andrew P. Bridges**
  abridges@winston.com esakultanapanich@winston.com;efranko@winston.com
- **Cameron T. Chandler**
  ctc@benningtonjohnson.com ram@benningtonjohnson.com
- **Bennett L. Cohen**
  bcohen@stklaw.com
- **Kathleen E. Craigmile**
  kec@benningtonjohnson.com lmt@benningtonjohnson.com
- **Erika Zimmer Enger**
  enger.erika@dorsey.com goodner.vicky@dorsey.com
- **Carolyn J. Fairless**
  fairless@wtklaw.com hart@wtklaw.com
- **Natalie Marie Hanlon-Leh**
  nhanlon-leh@faegre.com dcamp@faegre.com
- **Thomas P. Howard**
  thoward@thowardlaw.com lderby@thowardlaw.com
- **James W. Hubbell**
  jhubbell@khgk.com randerson@khgk.com
- **Thomas Buchan Kelley**
  tkelley@faegre.com cruder@faegre.com
- **Nathan Michael Longenecker**
  longenecker@twhlaw.com fisk@twhlaw.com
- **Scott Joseph Mikulecky**
  Smikulec@sah.com efiling@sah.com
- **Darwin (D.J.) K. Poyfair**
  djpoyfair@stklaw.com hroyall@stklaw.com
- **David N. Schachter**
  dschachter@sah.com
- **Mark A. Wielga**
  wielga@twhlaw.com fisk@twhlaw.com
- **Jonathan Zavin**
  jzavin@loeb.com ,

and

I hereby certify that I deposited the document in the U.S. Mail, sufficient postage prepaid to the following non CM/ECF participants:

Ernest J. Getto
Latham & Watkins-San Francisco California
505 Montgomery Street, #1900
San Francisco, CA 94111

Jennifer Anne Schaffner
Shughart, Thomson & Kilroy, P.C.
1050 17th Street, #2300
Denver, CO 80265

/s  Carolyn J. Fairless by Janean C. Hart
Carolyn J. Fairless
Attorneys for Amicus Electronic Frontier Foundation
Wheeler Trigg Kennedy LLP
1801 California Street, Suite 3600
Denver, CO  80202
Telephone:    (303) 244-1800
Fax:          (303) 244-1879
E-mail:       fairless@wtklaw.com