**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. **02-M-1662 (MJW)**

ROBERT HUNTSMAN, et al.,

      Plaintiffs,

and

TRILOGY STUDIOS, INC., et al.,

      Counterclaim Defendants,

v.

STEVEN SODERGERGH, et al.,

      Defendants and Counterclaimants,

and

THE DIRECTORS GUILD OF AMERICA,

      Defendant-in-Intervention and Counterclaimant-in-Intervention.

---

**COUNTERCLAIM DEFENDANT CLEANFILM INC.'S RESPONSE BRIEF TO DEFENDANT MOTION PICTURE STUDIOS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

ROMERO MONTAGUE P.S.
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
(425) 450-5000

        *Attorneys for Counterclaim Defendant CleanFilms, Inc.*

## **TABLE OF CONTENTS**

**Page(s)**

TABLE OF CONTENTS……………………………………………………......i-iii

TABLE OF AUTHORITIES………………………………………………..iv-vi

STATUTES……………………………………………………………........vi

CONGRESSIONAL MATERIALS…………………………………………vi

INTRODUCTION ...………………………………………………………1-3

STATEMENT OF FACTS…………………………………………......…3-7

ARGUMENT ………………………………………………………………7-18

     I.     SUMMARY JUDGMENT STANDARD…..…………………....7-8

     II.    CLEANFILMS IS NOT INFRINGING THE STUDIOS'
          COPYRIGHTS…………………………………………….......8-18

        A.  The Studios admit that CleanFilms is not copying or making
            derivative works of their copyrighted materials…………………8

        B.  The "First Sale Doctrine" defeats the Studios' claim against
            CleanFilms for infringement based on distribution……..…...8-18

            1.  The Studios have misinterpreted the term "unlawfully"
                 made," and the First Sale Doctrine preempts summary
                 judgment because the edited movies do not infringe
                 the Studios' copyrights……………………..………...9-17

                i.     The edited movies are not derivative
                     works……………………………………...9-14

                 ii.    The edited movies do not violate the right
                    of reproduction…………………………15-17

               2.     All the Mechanical Editing Parties did was
                   Repackage the movies…………………….………17-18

III.   AT A MINIMUM, FAIR USE PRECLUDES SUMMARY
       JUDGMENT ON THE STUDIOS' CLAIM FOR
       INFRINGEMENT…………………………………………18-30

       A.  Relevant Law and Burden of Proof………………….…….…18-20

       B.  First Factor –Commercial gain in and of itself is insufficient
           to decide the first element of fair use in the Studios' favor,
           and because CleanFilms and the other Counterclaim Defendants
           are openly criticizing the objectionable content contained in
           the Studios' original movies and offering suitable viewing
           alternatives by editing out that content, the benefit to the public
           greatly outweighs any commercial gain...………………….20-23

           C.  Third Factor –Because the amount of material edited out of
           the Studios' films comprises but a miniscule percentage of the
           total content in those films, the Court should decide the third fair
           use factor in CleanFilms' favor……………………………23-25

       D.  Fourth Factor –CleanFilms use of the edited versions of the
           Studios' movies have in fact helped, not hurt the Studios
           economically as the Studios have offered no evidence, other
           than a conclusory statement contained in a footnote, that they
           intend to enter the market in which CleanFilms is currently
           engaged…………………………………………………25-30

           1.  The Studios have failed to show current market
               Impact………………………………………….25-27

           2.  The Studios have failed to present evidence of
               potential market impact sufficient to create a lack
               of genuine issue of material fact with respect to
               CleanFilms' fair use defense……………………..27-28

           3.  The Studios have likely benefited from CleanFilms'
               business…………………………………….………28-30

           4.  Discovery is pending that will prove the Studios
               suffered no damage……………………….…..……..30

IV.   UNDER THE CIRCUMSTANCES OF THIS CASE, THE
      FAMILY MOVIE ACT (2005) SHOULD APPLY TO
      MECHANICAL AS WELL AS ELECTRONIC EDITING..30-33

V.      THE COUNRT SHOULD DENY THE STUDIOS'
        SUMMARY JUDGMENT MOTION TO DISMISS
        CLEANFILMS' OTHER AFFIRMATIVE DEFENSES…...33-34

VI.     UNDER NO CIRCUMSTANCES SHOULD A PREMANENT
        INJUNCTION BE ENTERED AGAINST CLEANFILMS...34-36

CONCLUSION/REQUEST FOR ORAL ARGUMENT……………………….36

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Page(s)</u>

*Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988)……………………..35

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)……………………..7

*Annie Lee v. Deck the Walls, Inc.*, 925 F. Supp. 576 (E.D. Ill. 1996)……....11, 16

*Basquiat v. Baghoomian,* 1991 U.S. Dist. LEXIS 16647 *(S.D.N.Y. 1991),* Copy. L. Rep. (CCH) P26, 824…………………………………………………...26

*Brilliance Audio, Inc. v. Haights Cross Communs., LLC*, 2004 U.S. Dist. LEXIS 26999 (D. Mich., 2004)………………………………………………...17

*C.M. Paula Co. v. Logan,* 355 F. Supp. 189 (N.D. Texas 1973)………………16

*Campbell v. Acuff-Rose Music, Inc.,* (1994) 510 U.S. 569, 584, 114 S. Ct. 1164, 1174……………………………………………………………………20, 24

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 127 L.Ed. 2d 500, 114 S. Ct. 1164 (1994)………………………………………………….....24, 35

*Celotex Corp. v. Catrett*, 91 L.Ed.2d 265, 275 (1986)…………………………33

*Chicago Board of Education v. Substance, Inc.* 354 F.3d 624 (7th Cir. 2003)……………………………………………………………………21, 22

*Comics, Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2nd Cir. 1982)……...……19

*Conoco Inc. v. J.M. Huber Corp.,* 148 F. Supp. 2nd 1157, 1165 (D. Kan., 2001)…………………………………………………….....20, 33

*Feist Publications, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 358-59, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991)…………………………………10, 13

*Gilliam v. American Broadcasting Co.*, 538 F.2d 14, 20 (2d Cir., 1976)……….13

*Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983)…………….10

*Harper & Row Publishers, Inc. v. Nation Enterprises* (1985) 471 U.S. 539, 600, 105 S. Ct. 2218, 222……………………………………………………………19

*Harper & Rowe, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)…………………………………………..24, 25

*L.A. News Serv. v. CBS Broad.*, Inc. (9th Cir. 2002) 313 F.3d 1093……………19

*L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 490 (2d Cir.) (in banc), cert. denied, 429 U.S. 857, 50 L. Ed. 2d 135, 97 S. Ct. 156 (1976)……………10

*Lamb v. Starks*, 949 F. Supp 753 (N.D. Cal. 1996)……………………………..14

*Lantern Press, Inc. v. American Publishers Company,* 419 F. Supp. 1267, 1272 (E.D.N.Y. 1976)…………………………………………………………..12

Llewellyn Joseph Gibbons, *Digital Bowdlerizing: Removing the Naughty Bytes*, 2005 Mich. St. L., Rev. 167, 185-186…………………………………...27

*Narell v. Freeman,* 872 F. Supp. 907, 910, (9th Cir. 1989)……………………..19

*New Era Publications International v. Henry Holt and Co., Inc.,* 695 F. Supp. 1493, 1506-07 (S.D.N.Y. 1988)…...……………………………………………..20

*N.Y. Times Co. v. Tasini*, 533 U.S. 483 (U.S., 2001)………………..…………35, 36

*Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.*, 724 F. Supp. 808 (D. Kan. 1989)…………………………………………………………11

*Rosemont Enterprises, Inc. v. Random House, Inc.* 366 F.2d 303, 307 (2nd Cir. 1966)…………………………………………………………………..20, 21

*SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1088 (D. Cal., 2001)……………………………………………………...…..17, 18

*Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 478-79 (U.S., 1984)…...………………………………………………….....15, 21, 28

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985)……...7

*Storm Impact, Inc. v. Software of the Month Club*, 1997 U.S. Dist. LEXIS

13669 at #23, 44 U.S.P.Q.2D (BNA) 1441……………………………………..26

*Suntrust Bank v. Houghton Mifflin Co*. 268 F.3d 1257, 1276 (11th Cir. 2001)…20

*Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967
(8th Cir. 2005)……………………………………………………….........35

*Ty, Inc. v. Publ'ns Int'l*, 292 F.3d 512, 518 (7th Cir. 2002)……………………24

*UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350
(D.N.Y., 2000)…………………………………………………………………..15

*U.S. v. Elcom*, 203 F. Supp. 2d 1111 at 1135 (N.D. Cal. 2002)………………...16

*U.S. v. Lange*, 466 F.2d 1021, 1026 (9th Cir. 1972)……………………………7

*U.S. v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970)……………………………...7

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 192 F.
Supp.2d 321 (D.N.J. 2002)…………………………………………………14

*Weissmann v. Freeman,* 868 F.2d 1313, 1320 (2d Cir.), cert. denied, 493
U.S. 883, 107 L. Ed. 2d 172, 110 S. Ct. 219 (1989)………………………11, 13

*Williams & Williams Co. v. United States* 487 F.2d 1345, 1359
(U.S. Court of Claims 1973)……………………………………………...27, 28

*Woods v. Bourne*, 60 F.3d 978, 989 (2d Cir. 1995)……………………………..10

## STATUTES

**Page(s)**

17 U.S.C. §101…………………………………….…………………………10

17 U.S.C. §107…………………………………….…………………………19

17 U.S.C. §109…………………………………….…...……………….…8, 9

17 U.S.C. §502(a)…………………………………….………………....34, 35

## CONGRESSIONAL MATERIALS

**Page(s)**

151 Cong. Rec. at 501……………………………………………………………31

151 Cong. Rec. at 502……………………………………………………………31

Family Movie Act of 2005…………………………………………………..passim

House of Rep. Comm. Of Jud. Report 109-33 (April 2005)…………………31

P.L. 105-304, The Digital Millennium Copyright Act of 1998 ("DMCA"),
Senate Report No. 105-190 May 11, 1998………………………………...32

## SECONDARY SOURCES

**Page(s)**

Benny Evangelista, *The Digital Censor: Utah Firm Locked in Legal Battle Over Software that Blocks Out Sex and Violence on DVDs,* S.F. CHRON., Jan. 20, 2003, at E1……………………………………………………..……23

Carrie A. Beyer, Fighting for Control: Movie Studios and the Battle Over Third-Party Revisions, *2004 U. Ill. L. Rev. 967, 999*………..…………23

http://www.copyright.gov/docs/regstat72000.html..........................................32

1 *Nimmer on Copyrights, 3.03*……………………………………………..11

## INTRODUCTION

Anyone who goes to see a movie on occasion will tell you that many of today's films contain scenes of gratuitous sex, violence, nudity and foul language that, for many people (particularly families with small children) are unacceptable.  For these people, the number of motion pictures that DO NOT contain this objectionable content are ever decreasing.  Unless these people are willing to limit themselves to either (a) not participating in a very prominent part of American culture (motion pictures) or (b) viewing only those edited films the motion picture industry agrees to release on public television, airplanes and trains (edited to Studio standards instead of a family's desired standard), their choices for a "clean" viewing experience are getting fewer and farther between.  Enter CleanFilms Inc. ("CleanFilms").

CleanFilms, a for-profit corporation based on a social cause, was created with the sole goal of providing the viewing public, particularly families, with a way to view popular motion pictures without having to be subjected to the objectionable material contained in a large percentage of those films.  Although those companies who edit the Studios' motion pictures (the "Mechanical Editing Parties") edit out a very, very small percentage of the total footage of any given film, the transformative impact of those changes is enormous.  Because the entire character of a film is changed from one that is unacceptable to many viewers to one those same viewers are more than willing to share with their families, CleanFilms and the Mechanical Editing Parties have opened up an entire market to which the Studios have provided no evidence that they presently, or in the future will market. (And because of the one-to-one, copy-to-original ratio, as described below, the edited copies of the films do not replace originals that would have otherwise been absorbed into the marketplace.)  In the process of providing clean viewing

1

alternatives to the public, CleanFilms and, by viewing those movies edited by the Mechanical Editing Parties, the public are engaging in the highest form of criticism. By editing out objectionable material from the Studios' films, and then providing those edited versions to its members, CleanFilms and its members are effectively criticizing the unnecessary use of sex, violence, nudity and obscene language by the film industry in today's motion pictures.

For every edited version of a film CleanFilms provides to its members/subscribers, it keeps one or even more copies of the original, unedited and commercially available version of that film in its inventory. This one-to-one, original-to-copy ratio means that there is no difference between, as the Studios put it, "mechanical" and "electronic" editing under the Family Movie Act of 2005 (the "Act"), which distinguishes between those two forms of editing. Congress, however, expressly disclaimed any intent to opine as to whether one form of editing would constitute infringement of a copyright over the other, and because copyright law is, as this Court knows, supposed to be technologically neutral, the Court should apply the Act specifically, not generally, to the facts of this case and conclude that the two forms of editing are one in the same. Doing so, the Court should then find that CleanFilms' edited use of the Studios' movies is exempted under the Act.

CleanFilms' defenses to the Studios' lawsuit and their Summary Judgment Motion are wrapped up in the "First Sale" and "Fair Use" doctrines, as well the Act itself. If this Court grants the present Summary Judgment Motion, it will not only put CleanFilms out of business, but will also deprive the public of their right to view films without having to be subjected to gratuitous sex, violence, nudity and obscene language. Equally, and perhaps even more importantly, the Court will stifle CleanFilms' and the

public's right to criticize the motion picture industry for including such material unnecessarily in their films.  Although this Court should deny the Studios' Summary Judgment Motion and, as a matter of law, exercise its authority and rule in favor of CleanFilms and the other Counterclaims Defendants; at the very least the Court should conclude that genuine issues of material fact exist with respect to CleanFilms' first sale and fair use defenses (as well as its other defenses), and deny the Summary Judgment Motion accordingly.

## STATEMENT OF FACTS[1]

CleanFilms, a Utah corporation duly organized on June 25, 2002, was created as a for-profit company to distribute motion picture DVDs that have been edited to remove selected instances of sex, nudity, profanity, vulgar language, and violence.  CleanFilms was created in response to a desire shared by a large number of the viewing public, particularly families who wish to view popular entertainment without influences they feel are improper.

CleanFilms currently rents and sells motion picture DVDs originally produced by, among others, the Studios that have been edited to remove selected instances of sex, nudity, profanity, vulgar language, and violence.  Maintaining a library of these edited motion picture DVDs, CleanFilms offers one or more of these movies to its subscribers (and only to its subscribers) similar to the way a library provides materials for its registered patrons.

Purchasing its edited motion pictures from a variety of different independent film-editing companies, and not the Studios themselves, CleanFilms currently offers

---

[1] Unless otherwise specified, all facts set forth in this Statement of Facts section can be found in the Declaration of Mark Elder, corporate officer for CleanFilms.

approximately 900 different edited motion pictures to its subscribers for home viewing only.  Since the footage removed by the film-editing companies often amounts to only 30 seconds to 2 minutes of footage, many of the films have approximately the same "run time" as the original motion pictures.

For every edited motion picture CleanFilms provides to its members/subscribers, it maintains, in a one-to-one ratio, a commercially available, original motion picture DVD in its inventory.  Because CleanFilms has thousands of excess unedited original motion picture DVDs in its inventory, the actual ratio of unedited, original movies to edited movies is much higher in favor of the originals.  This ratio is reflective of the fact that, to date, CleanFilms has spent in excess of $500,000 purchasing authorized versions of original motion picture DVDs for the purpose of maintaining a one-to-one ratio for each edited motion picture DVD it rents or sells to its members/subscribers.

The purchase of original motion picture DVDs by CleanFilms has resulted in a substantial financial windfall to the Studios.  This is because the majority of CleanFilms' members/subscribers, if not most of those members/subscribers, would not have purchased the Studios' movies without the removal of the objectionable instances of sex, violence, nudity and language.  *See* Exhibits A and C attached to the Declaration of Mark Elder and filed concurrently with this Response.  These exhibits are true and correct copies of letters from CleanFilms' customer representatives expressing dissatisfaction with the viewing alternatives currently being offered by the motion picture industry, including the Studios.  In Exhibit A, for instance, the customer states that without the editing services being provided by CleanFilms, his family would never have rented and/or purchased the original motion picture for viewing in their home.  These letters represent but a couple of the approximately 3,000 letters CleanFilms has received from

its members.  All of these approximately 3,000 letters share similar viewpoints, and all of them are available for the Court's review if the Court is so inclined to see them.

From the information we have, the Studios have not entered, nor have they shown any interest in entering the market for edited motion pictures other than for television broadcasts or airline offerings.  Although the Studios have created edited versions of their motion pictures for the airline industry for the past 30 years (versions which would meet the needs of *most* families working to keep objectionable material out of their homes), and despite the advent of video and DVD movie capability, they have refused to make those edited versions generally available to families for public purchase.  Unable to obtain these movies from the Studios due to the Studios' unwillingness to provide them, these families have purposefully sought out CleanFilms' website and paid a fee to become a CleanFilms' subscriber so that they can have access to CleanFilms' library[2] of edited motion pictures.  Because the public seeks out CleanFilms for a viewing alternative the Studios do not provide, CleanFilms does not compete with the Studios in the marketplace.

More than providing families with a "clean" viewing alternative, CleanFilms and many of its customers see the services CleanFilms provides as the highest form of criticism, criticism about the unnecessary inclusion of sex, nudity, profanity, vulgar language, and violence in many of the motion pictures currently being made by the Studios.  By offering edited versions of the Studios' motion pictures, CleanFilms has made, and continues to make an overt statement that the public does not need gratuitous sex, nudity, profanity, vulgar language, and violence in order to enjoy motion pictures,

---

[2]  This library consists of edited motion pictures provided by the Mechanical Editing Parties.

and that a significant percentage of the public is no longer willing to tolerate that type of gratuity in their homes.

CleanFilms both provides an alternative viewing experience and expresses its public criticism of today's motion picture content by providing to its members motion pictures that have been transformed in both character and purpose from their original versions. The slight critical transformation of the original motion picture, and subsequent offering of an edited version of that picture, is similar to the transformation that occurs when an original motion picture with a MPAA rating of R, PG-13, etc., is edited for alternative audiences, including television broadcasts and airline passengers. Although slight in terms of physical alterations of the original motion pictures, the slightly transformed character of CleanFilms' edited movies allows the company's members to view movies that were once unacceptable, even unpalatable. (*See* Exhibit B attached to the Declaration of Mark Elder and filed concurrently with this Response. Exhibit B is a true and correct copy of a representative posting from the CleanFilms' website (www.cleanfilms.com). In this posting, a CleanFilms' customer expresses his dissatisfaction with the content of a recently released motion picture and explains the value of the transformed movie in providing an alternative viewing experience for his family.)

In their Motion for Summary Judgment, the Studios make a distinction between "mechanical" and "electronic" editing. Under the circumstances of this case, however, there is no difference in the end product (insofar as the viewer is concerned) between electronically edited films and films edited for and provided by CleanFilms —namely the removal of objectionable material from the motion picture so that the family can watch the movie without seeing nudity, sexual content, extreme violence or profanity.

If this Court grants the Studios' Summary Judgment Motion, not only will CleanFilms be put out of business and thousands and thousands of Americans will lose their right to watch and enjoy popular movies without being subjected to gratuitous amounts of sex, violence and profanity; but this Court will quash CleanFilms' and the viewing public's most poignant right to criticize the use of that material in movies by opting not to view the particular scenes in movies that contain that material.[3]

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD.

In evaluating the Studios' Motion for Summary Judgment, the Court is required to view the evidence in a light most favorable to CleanFilms and draw all reasonable, factual inferences in CleanFilms' favor. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When the record, including documents and pleadings, establishes one or more facts that give rise to contradictory inferences, one of which supports the party opposing the motion, summary judgment is inappropriate. *U.S. v. Lange*, 466 F.2d 1021, 1026 (9th Cir. 1972); *U.S. v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970). In the case at Bar, there are genuine issues of material fact that preclude summary judgment, and thus the Studios are not entitled to judgment as a matter of law. Accordingly, the Studios' motion should be denied.

### II. CLEANFILMS IS NOT INFRINGING THE STUDIOS' COPYRIGHTS.

---

[3] The well-recognized adage of - "actions speak louder than words" - is applicable to this case. CleanFilms and its customers could publicly criticize the Studios and Hollywood for putting objectionable materials in many popular movies today by merely speaking out. But words can get lost and are not as effective as action. CleanFilms and its customers have not just publicly criticized the Studios and Hollywood about the objectionable material, they have "put their money where their mouth is" and actually created a viable enterprise that illustrates that many members of the public do not want objectionable material in popular movies and that the offensive material can be done away with and the movies can still be commercially viable.

A.   **The Studios admit that CleanFilms is not copying or making derivative works of their copyrighted materials.**

Although the Studios claim that other Mechanical Editing Parties are allegedly violating their rights to reproduce (*Motion, p. 21*) and make derivative works (*Motion, p. 22*) of their copyrighted materials, the Studios have not alleged that CleanFilms has violated either of these two rights.  Because CleanFilms at no time has ever edited any of the Studios' movies (*See* Elder Decl., ¶9), the Studios allege only that CleanFilms has infringed their right to distribute their copyrighted materials.  Accordingly, unless the Studios can prove, *under a summary judgment standard,* that CleanFilms unlawfully distributed the motion pictures edited by the Mechanical Editing Parties, this Court must deny the Studios' Motion for Summary Judgment.  After considering the facts of this case, in the context of the statutory and case law cited in this response, the Court should not only deny the Studios' Summary Judgment Motion, but should exercise its discretion under FRCP 56 and dismiss their infringement claims against CleanFilms altogether.

B.   **The "First Sale Doctrine" defeats the Studios' claim against CleanFilms for infringement based on distribution.**

Contrary to what the Studios would have this Court believe, a copyright holder's right to distribute its copyrighted work is not unlimited.  Indeed Congress codified a limitation to a copyright holder's unfettered right to distribute its work under 17 U.S.C. §109 called the "first sale doctrine."  This doctrine states:

> [the] owner of a particular copy or phonorecord *lawfully made under this title*, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. §109(a) (emphasis added).  Simply put, the owner of a copy may distribute the copy as it sees fit so long as the copy was lawfully made (i.e. not counterfeit, stolen, etc.).

Acknowledging this, the Studios seek to circumvent the first sale doctrine in this case by arguing that the doctrine applies only if the copies in question were lawfully made. *Motion, p. 25.*[4]  The issue before this Court, therefore, is quite simple:  construing all of the facts (and all reasonable inferences from those facts) in a light most favorable to CleanFilms, did CleanFilms distribute "**un**lawfully made" movies?  Although the Court should answer this question in the negative and dismiss the Studios' claim against CleanFilms altogether, the Court should at least conclude that the answer to this question cannot be decided on summary judgment as a matter of law.

>    1.   **The Studios have misinterpreted the term "unlawfully made," and the First Sale Doctrine preempts summary judgment because the edited movies do not infringe the Studios' copyrights.**

The Studios argue that the edited motion pictures were not "lawfully made" because they allegedly violate two of their rights under the Copyright Act: the right to create derivative works and the right to make reproductions.  Both arguments fail.

>    i.   **The edited movies are not derivative works.**

The Copyright Act defines what qualifies as a derivative work:

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

---

[4] The Studios do not contend that CleanFilms illegally obtained the movies.  They acknowledge that the unedited or original movies were properly purchased, that there was a one-to-one purchase (that only one edited version was made for every one movie purchased), and that they received revenues from the sale of the movies to the Mechanical Editing Parties.

17 U.S.C. §101.  In deciding whether the edited movies in this case are derivative works, the Court must read the first sentence of this definition in conjunction with the second— the work must be a translation, arrangement, dramatization, etc. *and* must "represent an *original work of authorship*."  *Woods v. Bourne*, 60 F.3d 978, 989 (2d Cir. 1995).  The standard for what constitutes an original work of authorship has been set forth by the U.S. Supreme Court in *Feist Publications, Inc. v. Rural Telephone Serv. Co.*, which stated:

> Originality requires only that the author make the selection or arrangement independently . . . and that it display some minimum level of creativity. Presumably, the vast majority of compilations will pass this test, but not all will.  There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent.

*Feist Publications, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 358-59, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).  The Court further explained that "while the standard for originality is low, it does exist." *Id.* at 362.  Applying this originality standard, both the circuit and district courts have held that there must be a "substantial variation" and a "sufficiently gross difference" between the original and the subsequent works in order for the subsequent work to be considered derivative.  See  *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.) (in banc), cert. denied, 429 U.S. 857, 50 L. Ed. 2d 135, 97 S. Ct. 156 (1976) and *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983). The 2nd Circuit Court of Appeals has even held that the originality must be such that the derivative work is independently copyrightable.  *Weissmann v. Freeman,* 868 F.2d 1313, 1320 (2d Cir.), cert. denied, 493 U.S. 883, 107 L. Ed. 2d 172, 110 S. Ct. 219 (1989). This approach to the originality requirement appears to embody the common view as the leading treatise on copyrights and proclaims that a derivative work must be "a

meaningful variation that itself could support copyright protection."   1 *Nimmer on Copyrights*, 3.03.

Applying originality/independently copyrightable standard, the District Court for the Eastern District of Illinois in *Annie Lee v. Deck the Walls, Inc.*, ruled that the placing of copyrighted notecards on ceramic tiles did not create derivative works.  925 F. Supp. 576 (E.D. Ill. 1996).  In *Annie Lee*, the defendant legally obtained copies of plaintiff's copyrighted notecards, affixed the cards to ceramic tiles with epoxy resin, then sold the tiles for commercial gain.  The plaintiff argued that this was a creation of derivative works, which violated the plaintiff's rights under the Copyright Act.  The district court found that the "mundane act of placing notecards onto a ceramic tile falls into the narrow category of works in which no creative spark exists." *Id.* at 581.  Since there was no creativity involved in the transfer of the notecard to the tile, the court held that the tiles were not derivative works.

Similarly, in *Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.*, the Kansas District Court found that adding commercials at the beginning of videocassettes did not create derivative works.  724 F. Supp. 808 (D. Kan. 1989).  In that case, the defendant was engaged in the business of placing commercials at the beginning of videocassettes containing motion pictures, which videos were then rented to the public. Plaintiff motion picture studio brought suit against the defendant for copyright infringement, claiming that the videos plus commercials were derivative works. Disagreeing with the plaintiff, the district court ruled that the addition of commercials to the original movies did not create an "original work of authorship." *Id.* at 821.  The court went on to rule that in the absence of a derivative work, the plaintiff's distribution claim was barred by the first sale doctrine. *Id.*

In yet a third illustrative case, the District Court for the Eastern District of New York ruled that the plaintiff's infringement claims against the defendant, who purchased books from the plaintiff, rebound then in hardcover form, and then sold them to schools and libraries, was barred by the first sale doctrine because the defendant had lawfully purchased the books. *Lantern Press, Inc. v. American Publishers Company,* 419 F. Supp. 1267, 1272 (E.D.N.Y. 1976). Besides finding that the first sale doctrine preempted the plaintiff's infringement claims, the district court ruled that it was irrelevant to the copyright issue that the plaintiff's sales of its own hardcover editions of the book might be affected by the defendant's actions. The court reasoned that such an argument raised issues of unfair competition, not copyright law. *Id.* at 1273.

The facts of this case, taken in a light most favorable to CleanFilms, in the context of the above-cited authority, at least create genuine issues of material fact that the motion pictures obtained by CleanFilms were not derivative works. Nothing "new" was added to the motion pictures, and the editing out of profanity, nudity, and violence was a non-creative, mundane act similar in simplicity of execution to placing notecards onto ceramic tiles. Many of the edited motion pictures have approximately the same "run time" as the original motion pictures, since the footage removed often only amounts to 2 minutes or less. *See* Elder Decl, ¶9 . This process falls into the narrow category outlined by the Supreme Court "in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Feist* 499 U.S. at 359. In other words, the edited motion pictures are not different enough from the original motion pictures to satisfy the originality requirement, and thus they are not independently copyrightable. *Weissmann*, 868 F.2d at 1320.

In their efforts to show that the edited motion pictures are derivative works, the Studios cite to *Gilliam v. American Broadcasting Co.* This reliance, however, is misplaced. In *Gilliam,* the plaintiff Monty Python Group, which owned the copyrights for its scripts, licensed those scripts to BBC on the condition that BBC would make no changes to the scripts (the television program itself) without the Group's approval. BBC, in turn, licensed the scripts to defendant ABC, which subsequently edited the scripts without the Group's consent. In deciding that ABC had infringed the Group's copyrights, the 2nd Circuit Court of Appeals reasoned that ABC was held to the same license conditions as BBC, and thus ABC's editing of the program was an infringement because the original license to BBC prohibited such editing without the Group's permission. *Gilliam v. American Broadcasting Co.*, 538 F.2d 14, 20 (2d Cir., 1976). This was not a case where the court made an independent analysis of the edited works' originality. In this case, the parties agreed by contract that the Group's works were not to be edited without permission. In short, this case was more of a contract case than it was a copyright case.[5]

Along with their misplaced reliance on *Gilliam*, the Studios rely on two distinguishable cases involving the editing of motion pictures into "clip previews." See *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 192 F. Supp.2d 321 (D.N.J. 2002) and *Lamb v. Starks*, 949 F. Supp 753 (N.D. Cal. 1996). Although the courts in both cases found that the short movie previews created by the defendants constituted derivative works, they reached their respective conclusions because, in their minds, the creation of a 5-minute movie preview from a full-length motion picture is

---

[5] In addition, the editing involved in this case reduced a 90-minute program by almost a third. The editing done by Clean Flicks and one or more of the other Defendants cannot be viewed on the same scale and did not require the same amount of discretion and creativity as the editing done in the *Gilliam* case.

significantly different than the editing that took place in the case at bar.  Cutting a full-length motion picture into a five-minute preview involves a great deal of creativity and artistic discretion.  To make such a preview, the editor must exercise a great deal of thought and judgment in selecting and arranging scenes that will entice viewers to see, rent or purchase the full length, copyrighted film.  In contrast, the editing that took place in this case involved nothing more than muting offensive language and deleting nudity, violence and sex, which may have amounted to removing less than 1% of the actual movie picture.  In the latter form of editing, no, or very little, discretion is involved.  If there is a sex scene, it is taken out.  If there is a scene with nudity, it is taken out.  And if there is a scene with graphic violence, it is taken out.  Whereas the former form of editing results in a new, original work, the latter form produces an edited version that lacks the originality to classify it as a derivative work.

In sum, since the edited pictures do not involve the requisite amount of creativity and originality they do not constitute derivative works.  And because they do not constitute derivative works, the first sale doctrine applies to this case and preempts the Studios' Summary Judgment Motion against CleanFilms.

### ii.    The edited movies do not violate the right of reproduction.

The second and last argument the Studios make to try to circumvent the first sale doctrine is that the other Mechanical Editing Parties violated the Studios' rights to reproduce their copyrighted works.  This argument is in error.

Courts have defined the "right to reproduce" under the Copyright Act as "the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be perceived, reproduced, or otherwise." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (U.S., 1984).  In

*UMG Recordings, Inc.*, cited by the Studios, the defendant kept permanent copies of audio recordings on its computer Internet server so that its customers could access the recordings any time they were connected to the Internet.  *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350 (D.N.Y., 2000).  Though it did not address this point specifically, the district court in that case implied that because the copies of the recordings were fixed on the servers, there was infringement.  The facts of that case, however, are distinguishable from the facts of this case.

For every master edited film CleanFilms acquires from its suppliers (some of which are among the other Mechanical Editing Parties), CleanFilms makes copies of that master edited version and couples to each of those copies a purchased, Studio-version of the film. When CleanFilms SELLS one of its edited films to a member/subscriber, the company sells the edited version along with a purchased original version (a couplet), disabling the original before providing the couplet to the member/subscriber.  When CleanFilms merely RENTS one of edited films (where no transfer of ownership takes place), CleanFilms maintains a commercially viable purchased original version in its library.  The serialized rental copy is attached to a purchased original. In short, at all times CleanFilms maintains a one-to-one ratio between each edited film that it either sells or rents, and the original, Studio version of the film.[6]

It is important to note that CleanFilms, and the other Mechanical Editing Parties, possess only one copy of an edited motion picture for each original motion picture purchased.  Accordingly, this one-to-one ratio preempts a finding of infringement in this

---

[6] The Courts recognize that the purchaser of a copyrighted work can make a back up of it in case the original is destroyed or can no longer be used.  *U.S. v. Elcom*, 203 F. Supp. 2d 1111 at 1135 (N.D. Cal. 2002).  Actively, this is all CleanFilms does, although it disables, essentially at its members'/subscribers' request, the originals it SELLS to the members/subscribers as they do not want to have the objectionable material accessible in their homes.  CleanFilms therefore does not distribute two viable copies emanating from the same original.

case.   In *C.M. Paula Co.*, the defendant purchased copyrighted artwork and, through a chemical process, transferred the art to ceramic plaques.   *C.M. Paula Co. v. Logan,* 355 F. Supp. 189 (N.D. Texas 1973).   The defendant then coated the plaques with glaze to give them a crackled appearance.   Because each plaque made required the purchase of one "original" piece of artwork (as it were a one-to-one ratio), the court reasoned that the transfer process did not constitute reproduction under the copyright laws.   *Id.* at 434. This reasoning was applied also in *Annie Lee*, supra, in which the court found that the defendant had not infringed the plaintiff's copyright because it had purchased one notecard for each ceramic tile it created.   *Annie Lee,* 925 F. Supp. at 582.

Although there is a difference between editing digital movies and transferring artwork to ceramic tiles, this Court must apply copyright principles the same no matter what form the artistic expression takes.   And because the Mechanical Editing Parties have purchased one copy of the Studios' original works for each edited version copy of said works, and because CleanFilms maintains that one-to-one ratio (by maintaining one original version of a film for each edited version it either sells or rents), there are at least genuine issues as to whether the Mechanical Editing Parties violated the Studios' rights to reproduce their copyrighted works.   Because those genuine issues exist, there is also a genuine issue as to whether the first sale doctrine applies to this case.   In light of these genuine issues, the Court should deny the Studios' Summary Judgment Motion and let this matter proceed to trial to be decided by the trier of fact.

4**.**     **All the Mechanical Editing Parties did was repackage the movies.**

Distilled to its essence, all the Mechanical Editing Parties did was repackage the Studios' movies into a format that expanded the Studios' customer base and brought them in additional revenue.   *See* Elder Decl, Ex. A (a representative sample letter of the

over 3,000 letters from CleanFilms customers stating that they would not have purchased and/or rented certain movies but for the ability to rent the movies as edited by the Mechanical Editing Parties and provided to them by CleanFilms).   Two cases will illustrate this argument: *Brilliance Audio, Inc. v. Haights Cross Communs., LLC* and *SoftMan Prods. Co. v. Adobe Systems.*

In *Brilliance Audio*, the plaintiff Brilliance Audio, Inc. produced copyrighted audio books (books on tape), which the defendant Haights Cross Communs LLC ("HCC") legally purchased, repackaged, and labeled as "library editions."   HCC, in turn, rented, leased, and sold these editions for commercial advantage.  *Brilliance Audio, Inc. v. Haights Cross Communs., LLC*, 2004 U.S. Dist. LEXIS 26999 (D. Mich., 2004).   The Michigan District Court in that case ruled that the first sale doctrine precluded the plaintiff's copyright infringement claim.

Similarly, in *SoftMan Prods. Co.*, the defendant SoftMan, acquired "bundles" of Adobe products, which it unbundled and sold individually.   The District Court for California rejected Adobe's argument that distribution of individual parts was per se copyright infringement.   In rejecting Adobe's argument, the court further ruled that the first sale doctrine allowed SoftMan to distribute the individual products as it saw fit. *SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1088 (D. Cal., 2001).

It is beyond dispute that the Mechanical Editing Parties do not make an "extra" copy of the copyrighted work.   The edited movie replaces the original as a result of the editing process.   It is beyond dispute that the Mechanical Editing Parties add nothing to the Studios' movies, which precludes the edited movies from being copyrighted and disqualifies them as derivative works.   And it is beyond dispute that the Mechanical Editing Parties remove only a very small amount of footage from the original motion

17

picture.  These facts and all other facts, taken in a light most favorable to CleanFilms and taken in the context of the above-cited authority, demonstrate that the Studios' infringement claim against CleanFilms is without merit and should therefore be dismissed.  At the very least, the facts highlight the existence of genuine issues of fact sufficient to overcome the Studios' Summary Judgment Motion.  The Court should dismiss the motion accordingly.

III.    **AT A MINIMUM, FAIR USE PRECLUDES SUMMARY JUDGMENT ON THE STUDIOS' CLAIM FOR INFRINGEMENT.**

A.    <u>**Relevant Law and Burden of Proof.**</u>

Although courts analyze many factors in determining whether a particular use of a copyrighted work is fair, the overriding considerations are whether the use hurts the market for the original product and whether the use benefits the public.  Here, the edited versions of the Studios' movies provide a great benefit to the public and in fact have a positive economic impact on the Studios.

17 U.S.C. § 107 requires this Court to decide the applicability of fair use on a case-by-case basis, and the statute notes four *nonexclusive* factors that the Court should consider when making that determination in these proceedings."  *Harper & Row Publishers, Inc. v. Nation Enterprises* (1985) 471 U.S. 539, 600, 105 S. Ct. 2218, 222. These factors include*:*

> (1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2)    the nature of the copyrighted work;
> (3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4)    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  These four *non-exclusive* factors should be but a part of this Court's analysis of the equities involved in this particular case.  *L.A. News Serv. v. CBS Broad.*, *Inc.* (9th Cir. 2002) 313 F.3d 1093.

Fair use is a mixed question of law and fact, and because the four factors listed in § 107 raise essentially factual issues, those issues are best left for a jury.  *Harper & Row Publishers, Inc,* 471 U.S. 600; *Comics, Inc. v. Reel Fantasy, Inc*., 696 F.2d 24, 28 (2nd Cir. 1982) (reversing summary judgment).  Since such is the case, this Court cannot grant summary judgment in the Studios' favor as a matter of law if a reasonable trier of fact could reach more than one conclusion as to the applicability of the doctrine and import of the enumerated and non-enumerated factors.  *Narell v. Freeman,* 872 F. Supp. 907, 910, (9th Cir. 1989).

Although a defendant normally has the burden of proof as to affirmative defenses, this is not the case where the moving party seeks injunctive relief.  In that case, the burden remains on the party seeking restraint to demonstrate the likelihood of success on the merits.  Thus, where a *prima facie* fair use defense is presented, the party seeking restraint must show that the fair use factors are insufficient to support such a defense." *Suntrust Bank v. Houghton Mifflin Co*. 268 F.3d 1257, 1276 (11th Cir. 2001) (reversing preliminary injunction).  In the context of summary judgment, the moving party, the Studios in this case, must show a lack of genuine issue of material fact regarding CleanFilms' fair use affirmative defense.  *Conoco Inc. v. J.M. Huber Corp.,* 148 F. Supp. 2nd 1157, 1165 (D. Kan., 2001).

**B.**     **First Factor –Commercial gain in and of itself is insufficient to decide the first element of fair use in the Studios' favor, and because CleanFilms and the other Counterclaim Defendants are openly criticizing the objectionable content contained in the Studios' original movies and offering suitable**

**viewing alternatives by editing out that content, the benefit to the public greatly outweighs any commercial gain.**

The commercial nature of an alleged infringer's use does not create a presumption against fair use.  *Campbell v. Acuff-Rose Music, Inc.,* (1994) *510* U.S. 569, 584, 114 S. Ct. 1164, 1174. If such a presumption existed, it would "swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research." *Id.*  In fact, an analysis of the case law regarding this first element of the fair use analysis makes it clear that "commercial use" is frequently but a short hand for any use that does not benefit the public.  As reasoned by the District Court for the Southern District of New York, "[t]his issue is often of limited value to the fair use analysis.  Even the most valuable educational books are generally published by commercial establishments for profit."  *New Era Publications International v. Henry Holt and Co., Inc.,* 695 F. Supp. 1493, 1506-07 (S.D.N.Y. 1988). See also *Rosemont Enterprises, Inc. v. Random House, Inc.* 366 F.2d 303, 307 (2nd Cir. 1966) (stating that "whether an author or publisher has a commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes a fair use.")  Oftentimes the rights of a copyright holder must subordinate to the interests of the public, if the allegedly infringing use is for a "socially laudable purpose." *Chicago Board of Education v. Substance, Inc.* 354 F.3d 624 (7th Cir. 2003); *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 478-79 (1984).  There are two very important public concerns addressed by CleanFilms' and the Mechanical Editing Parties' use of the Studios' copyrighted motion pictures: 1) public criticism of the

20

objectionable content found in today's motion pictures, and 2) the availability of family oriented alternatives to that objectionable content.

The Court may take judicial notice that movies these days contain increasing amounts of content that would have been prohibited 20, 10, or even 5 years ago.  With the advent of Digital Video, this content has gained much easier entrance into the homes of families across America.  Where viewers before had to make an effort to go see an R-rated, what now would be considered PG-13 rated movies, those movies now come into families' homes through television, video, cable, and even Internet forms of media.  For parents seeking to keep their young children, and even themselves away from what most consider content not suitable for children, finding and selecting movies appropriate for their families has become a nearly impossible, at best extremely difficult, endeavor. Enter CleanFilms and the Mechanical Editing Parties. By editing out objectionable material from R and PG-13 rated movies, and then providing those edited movies to discerning parents, families and individuals, CleanFilms and the Mechanical Editing Parties not only provide those discerning viewers with a "clean" viewing alternative that is undoubtedly of great public benefit, but they are engaging in the most effective forms of public comment with respect to, and criticism of, the current motion picture and film industry –also undoubtedly of great public significance. [7]

According to the 7th Circuit Court of Appeals in *Chicago Board of Education v. Substance, Inc.*, "[c]opyright should not be a means by which criticism is stifled with the

---

[7] Besides taking judicial notice of these facts and resulting conclusions, please see the Declaration of Mark Elder, which references over 3,000 CleanFilms' customers who took the time and effort to express their opinions that a number of the Studios' movies contain objectionable material that they find offensive, that but for CleanFilms' service they would not have purchased or rented the movies and that they have a strong desire to continue to be able to purchase and rent CleanFilms' edited movies in the future for their families.

backing of the court." Although the court in that case found that fair use did not apply after balancing all of the factors, it did note something particularly relevant to the case at hand; it noted that, with respect to the amount of an original work copied, "there is no per se rule against copying in the name of fair use an entire copyrighted work if necessary." *Id.* at 629.

In the *Chicago Board of Education* case, the defendant (alleged infringer) teacher published in a newspaper copies of the plaintiff's standardized tests in order to highlight what she felt were poor questions contained in the tests. At no time did the teacher make affirmative critical statements about the tests, but instead let the tests speak for themselves. Unlike the teacher in that case, Mechanical Editing Parties alter the Studios' original works, and CleanFilms distributes those edited works, only as much as is necessary to illustrate the point that a large percentage of the viewing public wants a "clean" choice with respect to the viewing content they bring into their homes. The fact that the Mechanical Editing Parties achieve some amount of commercial gain in the process only highlights the public demand for the edited versions they are making and providing.

This case implicates many important public issues, including the effect on children of being exposed to violence and the rights of parents to control what they and their families see. One article has called the technology at issue in this case "the digital equivalent to your mom slapping her hand over your eyes in the theater . . ." Benny Evangelista, *The Digital Censor: Utah Firm Locked in Legal Battle Over Software that Blocks Out Sex and Violence on DVDs,* S.F. CHRON., Jan. 20, 2003, at E1. This Court should not stifle the Mechanical Editing Parties' ability to openly criticize the motion picture industry by providing the public with movies edited to remove the objectionable

material it does not want families to see.  If this Court were to do so, it would be the family, as well as CleanFilms and the Mechanical Editing Parties, who would suffer as a result of that decision.

**C.**    **Third Factor -Because the amount of material edited out of the Studios' films comprises but a miniscule percentage of the total content in those films, the Court should decide the third fair use factor in CleanFilms' favor.**

The majority of courts considering misappropriation of movies generally dealt with the taking of small pieces of films for use elsewhere instead of the deletion of pieces of the films.  With particular respect to the digital filtering and physical cut and splice techniques at issue in this case, it may be more proper to analyze the third fair use factor with respect to the amount of film removed. Carrie A. Beyer, *Fighting for Control: Movie Studios and the Battle Over Third-Party Revisions*, *2004 U. Ill. L. Rev. 967, 999.*

In deciding whether the third fair use factor favors the copyright owner or the alleged infringer, the courts look to the transformative nature of the alleged infringing work.  See generally *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 127 L.Ed. 2d 500, 114 S. Ct. 1164 (1994).   The Studios would have this Court believe that "transformative" means that the alleged infringing work must be substantially different than the original, and argue that merely deleting objectionable scenes and dialogue does not cause a new work to be transformative. (Studios' Motion at 28).  This interpretation of the transformative analysis, however, misses the point entirely.

According to the Supreme Court, a work is transformative if it adds something new with a further purpose or a different character. That is to say, if the work goes beyond the value that inheres in the original, then it is said to be transformative. *Campbell*, 510 U.S. at 579, 127.   With the Supreme Court's perspective in mind, the key

inquiry is not whether the work itself is new and original, but that the purpose and character of the work is changed as a result of the physical changes to the work, no matter how big or small those physical changes are. According to the 7th Circuit Court of Appeals, the opposite of a transformative work is a work that has the same purpose and character as the original. *Ty, Inc. v. Publ'ns Int'l*, 292 F.3d 512, 518 (7th Cir. 2002).

While the Studios argue that the edited versions of their movies are not transformative because very little content was taken out of the movies, it is not the quantity of content extracted, but the nature of the content extracted that matters. By taking the objectionable content out of the original films, the Mechanical Editing Parties entirely changed those films from movies that are patently offensive to a large percentage of the population to movies that are not. If that does not constitute a wholesale change to the character of the Studios' original works, then it is difficult to contemplate what amount or form of editing would constitute such a change. See *Harper & Rowe, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (although reversing the circuit court of appeals' reversal of the trial court's finding of infringement, the court, in analyzing the third fair use factor, focused on the quality, not quantity of the copied work).

CleanFilms has not provided movies in substitution of the movies that the Studios would have otherwise sold. Due to the change in the character of the movies, CleanFilms instead has provided movies to a vast audience who would not have otherwise purchased and viewed the movies (as evidenced by the thousands of letters CleanFilms has received in support). Not only does this fact play in favor of the transformative, complementary nature of the edited versions of the Studios' movies, but it also plays in CleanFilms' favor

with respect to the fourth fair use factor, the effect the edited movies have on the Studios' potential market for their copyrighted works.

**D.    <u>Fourth Factor –CleanFilms use of the edited versions of the Studios' movies have in fact helped, not hurt the Studios economically as the Studios have offered no evidence, other than a conclusory statement contained in a footnote, that they intend to enter the market in which CleanFilms is currently engaged.</u>**

### 1.    The Studios have failed to show current market impact.

The single most important factor that courts consider in making a fair use determination is the effect on the market for the copyright holder's work.  *Harper & Row Publishers, Inc. v. Nation Enterprises  471 U.S. 539, 566, 105 S. Ct. 2218, 2233* (1985) (stating that the last factor is "undoubtedly" the single most important factor in a fair use analysis).   Applying this priority, the District Court for the Southern District of New York held that even though the alleged infringer's use was purely commercial and the copyrighted works were reproduced in their entirety, summary judgment was inappropriate where questions of fact remained with respect to market effect.  *Basquiat v. Baghoomian 1991 U.S. Dist. LEXIS 16647* (S.D.N.Y. 1991*), Copy. L. Rep. (CCH) P26, 824.*  Likewise, in *Storm Impact, Inc. v. Software of the Month Club*, the court denied the plaintiff's summary judgment, holding that even though the factors overall weighed in favor of the plaintiff, there was a question of fact on the most important issue of market effect.  *Storm Impact, Inc. v. Software of the Month Club*, 1997 U.S. Dist. LEXIS 13669 at #23, 44 U.S.P.Q.2D (BNA) 1441.

There is strong evidence in this case that CleanFilms' use of the edited films helps, not hurts, the Studios in the DVD and VHS marketplaces.   For starters, the Mechanical Editing Parties purchase one original version of each of the Studios' movies

for every edited version of that movie that is sold or rented to the public.  Because the Studios have presented no evidence to even suggest that they currently market similarly edited versions of their movies to the general public, the Court should rightfully infer that the Studios, via CleanFilms and the Mechanical Editing Parties, in fact sell copies of their movies that they would not otherwise sell.[8]  (At the very least, the Court should conclude that genuine issues remain with respect to this material fact.)  Following this same logic, the Studios would break even, even if the Court were to make the unsupported assumption that each and every person who purchases an edited version of the Studios' movies from CleanFilms would have purchased the original anyway.

The policy to protect a copyright holder against market substitution and the holders' right to create derivative works is not adversely implicated under the circumstances of this case.  In this case, there is a one-to-one correspondence between consuming the pre-existing work (the original movie) and the use of the replacement work (the edited version of that movie).  The Studios receive additional sales without any additional investment as they are able to sell DVD and VHS copies of their copyrighted movies that they would otherwise be unable to sell.  In this case, the Studios' incentives to invest in making movies is not diminished, but because of CleanFilms and the Mechanical Editing Parties, are in fact increased.  See Llewellyn Joseph Gibbons, *Digital Bowdlerizing: Removing the Naughty Bytes*, 2005 Mich. St. L. Rev. 167, 185-186.

> **2.  The Studios have failed to present evidence of potential market impact sufficient to create a lack of genuine issue of material fact with respect to CleanFilms' fair use defense.**

---

[8] The only evidence the Studios have offered in support of market impact is a self-serving statement couched in a footnote that they may, in the future, enter the market in which CleanFilms is now providing versions of the Studios' movies, edited to remove the objectionable content.  As the Court knows, self-serving, conclusory statements of fact are insufficient to support a motion for summary judgment.

In seeking an injunction, the burden is the Studios' alone to present evidence of economic harm –either present or potential.  As set forth above, there is clearly a disputed issue of fact as to any present economic/market harm the Studios claim to have suffered.  Besides present harm, they have presented nothing but conjecture as to future, potential economic harm.[9]   The court in *Williams & Williams Co. v. United States* based its decision that there was no copyright infringement in that case largely on a similar lack of proof:

> To us it is very important that plaintiff has failed to prove its assumption of economic detriment, in the past or potentially for the future. One of the factors always considered with respect to "fair use," *see supra*, is the effect of the use on the owner's potential market for the work. This record simply does not show a serious adverse impact, either on plaintiff or on medical publishers generally, from the photocopying practices of the type of NIH and NLM. In the face of this record, we cannot mechanically assume such an effect, or hold that the amount of photoduplication proved here "must" lead to financial or economic harm. This is a matter of proof and plaintiff has not transformed its hypothetical assumption, by evidence, into a proven fact.

*Williams & Williams Co. v. United States* 487 F.2d 1345, 1359 (U.S. Court of Claims 1973). The Studios in this case have faired no better than the plaintiff in *Williams & Williams Co*. at producing evidence sufficient to establish this most important of the fair use factors in their favor.   Because the Studios have produced no credible, non-conclusory evidence to support potential (or, as set forth above, present) market harm, the Court must conclude that a genuine issue of material fact exists with respect to the fourth fair use factor.  Although the first, third and fourth fair use factors favor CleanFilms in

---

[9] Interestingly enough, the Studios have not pled in their Complaint actual economic damages.  Why?  The answer is because they have suffered no actual economic damages as a result of CleanFilms' or the Mechanical Editing Parties' actions.  Constructively, their pleading concedes the disputed nature of the fourth fair use factor.

this case, the existence of the fourth factor in and of itself in CleanFilms favor is sufficient to overcome the Studios' Summary Judgment Motion.

### 3.   The Studios have likely benefited from CleanFilms' business.

The Studios argument that they may in the future be damaged by CleanFilms' business is very similar to the argument made by them over two decades ago when they unsuccessfully tried to prevent the video cassette recorder ("VCR") from entering the marketplace.  In *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774 (1984), Universal Studios asserted that Sony's production of VCRs infringed - or better put, *allowed others to infringe* - their copyrights because it allowed the end user to make copies of television programs and/or edit out objectionable content (in this case commercials).  Note that the then new technology of video taping actually enabled viewers for the first time to do what are essentially the subjects of this lawsuit: (a) make a fixed copy of a copyrighted material to customize the experience for the viewer, and (b) fast forward (on their own without the Studios' permission) through undesirable sections of the content.  This striking similarity of new technology enabling families to skip objectionable content should not be lost in this argument.  The court, in rejecting Universal Studios' argument, held:

> Harm from time-shifting is speculative and, at best, minimal. . .  It is not implausible that *benefits could also accrue to plaintiffs*, broadcasters, and advertisers, as the Betamax [the type of VCR] makes it possible for *more persons to view their broadcasts*.  No likelihood of harm was shown at trial, and plaintiffs admitted that there had been no actual harm to date.  Testimony at trial suggested that Betamax may require adjustments in marketing strategy, but it did not establish even a likelihood of harm. Television production by plaintiffs today is more profitable than it has ever been, and, in five weeks of trial, there was

> no concrete evidence to suggest that the Betamax will change the studios' financial picture.

*Id. at 454* (emphasis added).

Similar to VCRs, that allowed the end user to make a copy of a program/movie, and then eliminate at their discretion objectionable content (in that case commercials), CleanFilms allows its customers to have an edited copy of a movie that eliminates objectionable content.[10]  As the *Sony Corp.* court pointed out, this "time shifting" did not damage, and likely benefited the studio because it gave it a larger audience.  This is *exactly* the case with CleanFilms – its business does not harm the Studios and it has actually *increased* the Studios' audience and, more importantly for the Studios, its gross revenues by selling DVDs that it would not have otherwise sold.  Furthermore, because CleanFilms' and the Mechanical Editing Parties' technology is similar to the VCR in that it allows audiences to avoid undesirable content, the Studios should do as the testimony before the *Sony Corp.* court suggested and adjust their marketing strategy around this new technology.

### 4.   Discovery is pending that will prove the Studios suffered no damage.

Until their Summary Judgment Motion, the Studios had never asserted that they had any real or potential economic damages from CleanFilms' business activities.  *See*

---

[10] The advent of the VCR enabled viewers to, for the first time, fast forward through undesirable sections of film content on their own and without the Studios' permission.  Furthermore, this was done with a fixed copy derived from a taping of a broadcast or cable presentation, such as a presentation from Home Box Office ("HBO").  When they filed their lawsuit against Sony, the Studios did not yet release VHS tapes of movies, and this was the business model the *Sony* court so prophetically referenced.  Like Sony did, the Studios in this case need to address new technological capabilities not through the court system and not by attempting to limit a family's right to protect its children, but instead by transforming –adapting- their business model to the new technology.  Such a business model adaptation would be completely within the realm of business logic, as set forth by the Senior Vice President and Chief Technology Officer of Walt Disney Internet Group, Douglas Parrish, in a presentation he gave a couple of years ago entitled: *Yo Ho Yo Ho, A Pirate's Life For Me: Digital Transformation of Media Companies.* This talk can be viewed at the website  http://ebiz.byu.edu/video/Douglas_Parrish_files/default.htm.   In this talk, Mr. Parrish stated Disney's position that it would have to adapt its business model to the emergence of new technologies related to the media industry.

Wright Declaration dated August 8, 2005.[11]   While CleanFilms believes this absence of claim is because no such claim exists, the Studios have now created a brand new issue of fact that requires discovery.   While the Court has already denied CleanFilms' Motion for a Continuance under FRCP 56(f), CleanFilms does believe that the discovery that will be produced by the Studios in response to the pending discovery, and the depositions that will follow, will prove that the Studios have suffered no economic damage and, in fact, have profited by CleanFilms' and the other Mechanical Editing Parties' activities and services to the public.  *Id.*

## IV.   UNDER THE CIRCUMSTANCES OF THIS CASE, THE FAMILY MOVIE ACT (2005) SHOULD APPLY TO MECHANICAL AS WELL AS ELECTRONIC EDITING.

Congress made quite clear their intent not to allow film editors to create a fixed copy of the edited version of a motion picture:

> No 'fixed copy' of the altered version of the motion picture may be created by the computer program or other technology that makes imperceptible portions of the audio or video content of the motion picture.   This provision makes clear that services or technologies that make a fixed copy of the altered version are not afforded the benefit of this exemption.

151 Cong. Rec. at 501.  But Congress also made clear its acceptance under the Act of ClearPlay technology:

> While not benefiting Clean Flicks and certain other defendants, the bill is specifically designed to legalize ClearPlay technology.

House of Rep. Comm. Of Jud. Report 109-33 (April 2005). These two statements represent the self-contradictory nature of the Act -self contradictory because, as the Court

---

[11] The Declaration of Mark F. Wright in Support of CleanFilms Inc.'s Motion for FRCP 56(f) Continuance of Defendants Studios' Motion for Partial Summary Judgment, dated August 8, 2005, is already on file with the Court.

knows, copyright law is supposed to be technologically neutral.  *See* Footnote 12.

Recognizing this issue, Congress made it quite clear that the Act was in no way intended

to be a commentary on whether a fixated edited work, as contemplated under the Act,

violated the copyright law's prohibitions against infringement:

> [D]uring consideration of this legislation in the House there were conflicting expert opinions on whether fixation is required to infringe the derivative work right under the Copyright Act, as well as whether evidence of Congressional intent in enacting the 1976 Copyright Act supports the notion that fixation should not be a prerequisite for the preparation of an infringing derivative work. This legislation should not be construed to be predicated on or to take a position on whether fixation is necessary to violate the derivative work right, or whether the conduct that is immunized by this legislation would be infringing in the absence of this legislation. 151 Cong. Rec. at 502 ("Section-by-Section Analysis of the Family Movie Act of 2005, Amended and Passed by the Senate").

151 Cong. Rec. at 502.  Interpreted logically, it is clear that by the Act, Congress

intended to curtail pirated copies rather than mechanical editors, all with the goal of

ensuring that copyright owners receive remuneration for their copyrighted works.  In

short, Congress made the distinction between fixated and non-fixated editing but, in the

end, Congress did not say that fixated editing would necessarily infringe upon copyrights.

Congress was wise to disclaim any such intended distinction as copyright law is, by its

nature, supposed to be technologically neutral.[12]

---

12 P.L. 105-304, The Digital Millennium Copyright Act of 1998 ("DMCA"), Senate Report No. 105-190 May 11, 1998.  Referring to the bill leading up to the Digital Millennium Copyright Act of 1998 (the "DMCA"), the Senate stated: "[t]he Committee determined that no change to section 107 was required because section 107, as written, is technologically neutral, and therefore, the fair use doctrine is fully applicable in the digital world as in the analog world."  P.L. 105-304, The Digital Millennium Copyright Act of 1998 ("DMCA"), Senate Report No. 105-190 May 11, 1998.  The technological neutrality of the fair use doctrine was further reiterated by the Register of Copyrights, Mary Beth Peters, on July 20, 2002 when she commented to the Web-Based Education Commission during the 2nd session of the 106th

As set forth above, the Mechanical Editing Parties purchase one copy of the Studios' movies for each edited version they create. And because CleanFilms maintains that one-to-one ratio in all of the movies it either rents or sells, no unlawful duplicate of the original is created. In essence, neither CleanFilms nor the Mechanical Editing Parties create a fixated "copy," and therefore Congress' intent, as interpreted from the Act, is manifest. Under the facts and circumstances of this case, and for purposes of the Act, "mechanical editing" (as the Studios have used the term) in this case is virtually the same thing as "electronic editing," and there is no distinction between the two. Because the copyright laws (including the Act) should apply the same no matter what technology is at issue, this Court should find that the Act applies in this case and that CleanFilms' and the Mechanical Editing Parties' edited motion pictures are non-infringing under the Act.

## V. THE COURT SHOULD DENY THE STUDIOS' SUMMARY JUDGMENT MOTION TO DISMISS CLEANFILMS' OTHER AFFIRMATIVE DEFENSES.

Although there is nothing to say that the Studios cannot use a footnote in their opposition of CleanFilms' other affirmative defenses, the Studios, by placing the entirety of their argument against those other affirmative defenses in a footnote, are not somehow

---

Congress on the nature of fair use and the role it plays in web-based, distance learning technologies. With respect to fair use as it related to those technologies, Ms. Peters stated: "[b]ecause there is confusion and misunderstanding about the fair use doctrine, including the function of guidelines, we believe it is important for Congress to provide some clarification. The statutory language of section 107 is technology-neutral, and does not require amendment. But if any legislative action is taken with regard to distance education, we recommend that report language explicitly address certain fair use principles. First, the legislative history should confirm that the fair use doctrine is technology-neutral and applies to activities in the digital environment. It might be useful to provide some examples of digital uses that are likely to qualify as fair. It should be explained that the lack of established guidelines for any particular type of use does not mean that fair use is inapplicable. Finally, the relationship of guidelines to fair use and other statutory defenses should be clarified. The public should understand that guidelines are intended as a safe harbor, rather than a ceiling on what is permitted." http://www.copyright.gov/docs/regstat72000.html.

relieved of their obligation to set forth a prima facie, summary judgment showing – to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 91 L.Ed.2d 265, 275 (1986).   As held by the *Conoco* court, the prima facie burden applies to affirmative defenses as well:

> [T]he moving party must show the absence of genuine issues of fact regarding each of the affirmative defenses specifically reserved by the non-moving party. The party moving for summary judgment must establish its entitlement beyond a reasonable doubt.

*Conoco Inc. v. J.M. Huber Corp.*, 148 F. Supp. 2d 1157, 1165 (D. Kan., 2001).

In their moving papers, the Studios place their entire argument against CleanFilms other affirmative defenses in a footnote:

> The Counterclaim Defendants have also alleged a variety of other garden variety "affirmative defenses," including laches, waiver and estoppel.   The Studios also seek summary judgment as to these defenses because the Counterclaim Defendants cannot establish elements of any of them as a matter of law.

Studios' Motion at 24.  That is it; that is all the Studios have argued in support of their request that this Court dismiss CleanFilms other affirmative defenses.

As this Court knows, it is not CleanFilms' burden in these summary judgment proceedings to prove their affirmative defenses, but rather the Studios' burden to create a lack of genuine issue of material fact as to each of those defenses.   See *Conoco*, supra. Although there is nothing prohibiting the Studios from setting forth in a footnote their argument demonstrating a lack of genuine issue of fact, their simple, conclusory statement that CleanFilms cannot establish elements necessary to support its defenses is

inadequate to meet their prima facie burden.[13]  For this reason, the Court should deny the Studios' request for dismissal of CleanFilms' other affirmative defenses.

## VI.     UNDER   NO   CIRCUMSTANCES   SHOULD   A   PERMANENT INJUNCTION BE ENTERED AGAINST CLEANFILMS.

The Studios argue that if the Court finds CleanFilms infringed their copyrights, and the use was not a fair use, that it must, as a matter of law, permanently enjoin CleanFilms.  That argument, however, ignores the discretionary nature of this Court's ability to permanently enjoin parties in litigation.

17 U.S.C. § 502(a) is discretionary, not mandatory, in that the court "may enjoin" the infringer.  This discretion rests in the well-established copyright law that a permanent injunction is a 'harsh and drastic' discretionary remedy, never an absolute right."  *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988).  Because of its drastic nature, many Circuits employ a balancing test to determine if an injunction should be entered, *even if the court finds infringement and no legal defense to it*.  See *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967 (8th Cir. 2005) ("To determine whether permanent injunctive relief is warranted, we balance three factors: (1) the threat of irreparable harm to the moving party; (2) the balance of harm between this harm and the harm suffered by the nonmoving party if the injunction is granted; and (3) the public interest.")

For the following reasons, this Court should not enter a permanent injunction against CleanFilms, even if it were to find CleanFilms infringed the Studios' right of distribution and even it if were to conclude that CleanFilms' use was not Fair Use:

- The Studios will not suffer irreparable economic harm if the injunction is not granted.

---

[13] If the Studios try to introduce new arguments or evidence in their Reply Brief to try to meet their burden on summary judgment, the Court should reject such efforts since CleanFilms will not have an opportunity to reply.

- CleanFilms customers will be deprived from having "clean films" to view with their families even though many have paid a fee for the privilege of being able to check out edited movies from CleanFilms.
- The general public will be deprived of having the ability to purchase or rent popular movies without the sex, nudity, violence and profanity that many of them find highly offensive.

In *N.Y. Times Co. v. Tasini*, 533 U.S. 483 (U.S., 2001) the plaintiff authors sought to enjoin the NY Times from including their copyrighted articles in a database.   The Supreme Court held that while the publishers were liable for infringement, a permanent injunction should not be entered, reasoning as follows:

> It hardly follows from today's decision that an injunction against the inclusion of these Articles in the Databases . . . must issue. See 17 U.S.C. § 502(a) (court "may" enjoin infringement); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, n. 10, 127 L. Ed. 2d 500, 114 S. Ct. 1164 (1994) (goals of copyright law are "not always best served by automatically granting injunctive relief"). The parties (Authors and Publishers) may enter into an agreement allowing continued electronic reproduction of the Authors' works; they, and if necessary the courts and Congress, may draw on numerous models for distributing copyrighted works and remunerating authors for their distribution.

*Id.* at 505.   Like *N.Y. Times Co v. Tasini*, this Court should also conclude that it may become necessary for the courts and Congress take further action to address this important public benefit acknowledged in the Family Movie Act of 2005 of allowing families in our Country to view popular motion pictures without the sex, nudity, violence and profanity found in them.

Not only do the equities weigh against a permanent injunction in this case, but the Family Movie Act of 2005 calls into question whether sometime soon either the courts (by interpretation) or Congress (by an act) will treat the mechanical editing of motion pictures the same as electronic editing (as they should under the Copyright Act which is

to be technologically neutral).  For all of these reasons, this Court should refrain from enjoining CleanFilms in this case.

## CONCLUSION/REQUEST FOR ORAL ARGUMENT

As seen above and as will hopefully be argued in oral argument that is respectfully requested by CleanFilms, CleanFilms has not infringed the Studios' copyrights.  Further, even assuming arguendo that it had, it has asserted defenses that give rise to an analysis of facts which, when considered in the light most favorable to CleanFilms, cannot result in summary judgment in favor of the Studios.  Accordingly, this Court should dismiss the Studios' copyright infringement claim against CleanFilms or at a minimum, deny the Studios' Motion for Summary Judgment and allow this matter to proceed to trial on the merits.

Respectfully submitted this 22nd day of August 2005.

  s/H. Troy Romero        
H. Troy Romero, WSBA #19044
ROMERO MONTAGUE P.S.
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000
(425) 450-0728 facsimile
E-mail: tromero@romeromontague.com

  s/Michael E. Wiggins       
Michael E. Wiggins, WSBA #31921
ROMERO MONTAGUE P.S.
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000
(425) 450-0728 facsimile
E-mail: mwiggins@romeromontague.com

ATTORNEYS FOR COUNTERCLAIM-
DEFENDANT CLEANFILMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2005, I electronically filed with the Clerk of the Court using the CM/ECF system, which will send e-mail notifications of such filing to parties of record, and I hereby certify that true and correct copies of COUNTERCLAIM DEFENDANT CLEANFILM INC.'S RESPONSE BRIEF TO DEFENDANT MOTION PICTURE STUDIOS' MOTION FOR PARTIAL SUMMARY JUDGMENT and DECLARATION OF MARK W. ELDER IN SUPPORT OF COUNTERCLAIM DEFENDANT CLEANFILMS, INC.'S OPPOSITION TO DEFENDANT STUDIO PARTIES' MOTION FOR SUMMARY JUDGMENT were deposited in the U.S. Mail, postage prepaid, addressed to the non-participants indicated below:

Mark Wiegla, Esq.
Erika Zimmer Enger, Esq.
Nathan M. Longenecker, Esq.
Temkin Wielga & Hardt LLP
1900 Wazee Street, Suite 303
Denver, CO  80202

Ernest J. Getto, Esq.
Daniel Scott Schecter, Esq.
Catherine S. Bridge, Esq.
Anthony N. Luti, Esq.
Latham & Watkins
633 W. Fifth Street, Suite 4000
Los Angeles, CA 90071

David N. Schachter, Esq.
Sherman & Howard, LLC
633 – 17th Street, Suite 3000
Denver, CO  80202

Scott J. Mikulecky, Esq.
Sherman & Howard, LLC
90 South Cascade Ave., Suite 1500
Colorado Springs, CO  80903

Jonathan Zavin, Esq.
Jacques Rimokh, Esq.
Christian D. Carbone, Esq.
Loeb & Loeb LLP
345 Park Avenue
New York, NY  10154

Thomas B. Kelley, Esq.
Christopher Beall, Esq.
Natalie Hahlon-Leh, Esq.
Faegre & Benson LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203

Jeffrey N. Aldous, Esq.
Leefe, Gibbs, Sullivan, Dupre & Aldous
4262 Imperial Way
Provo, UT  84604

Andrew P. Bridges, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA  94304-1050

Thomas P. Howard, Esq.
245 Century Circle, Suite 206
Louisville, CO  80027

D.J. Poufair, Esq.
Jennifer Schaffner, Esq.
Shughart Thomson & Kilroy, PC
1050 – 17th Street, Suite 2300
Denver, CO  80265

  s/Kathy Koback
Kathy Koback, Legal Assistant
ROMERO MONTAGUE P.S.
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000
(425) 450-0728 facsimile
E-mail: kkoback@romeromontague.com