IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. **02-M-1662 (MJW)**

ROBERT HUNTSMAN, et al.,

Plaintiffs,

and

TRILOGY STUDIOS, INC., et al.,

Counterclaim Defendants

v.

STEVEN SODERBERGH, et al.,

Defendants and Counterclaimants

and

THE DIRECTORS GUILD OF AMERICA,

Defendant-in-Intervention and Counterclaimant-in-Intervention,

and

METRO-GOLDWYN-MAYER STUDIOS, Inc., et al.,

Co-defendants and Counterclaimants.

---

**THE MOTION PICTURE STUDIOS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE MECHANICAL EDITING PARTIES**

---

FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
(303) 607-3500

LOEB & LOEB LLP
345 Park Avenue
New York, New York
(212) 407-4000

*Attorneys for the Studio Defendants/Counterclaimants*

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 3

I. THE FIRST SALE DOCTRINE DOES NOT APPLY TO DEFENDANTS' INFRINGING ACTIVITIES .......... 5

A. The First Sale Defense Does Not Apply Because Defendants Admit That They Are Distributing Copies of the Motion Pictures That Are Different From the Particular Tangible Copies They Claim to Have Lawfully Purchased .......... 5

B. The First Sale Defense Also Fails on the Grounds That the Copies Defendants Sell Are Not "Lawfully Made" .......... 8

(1) Defendants Admit That They Make Unauthorized Reproductions of the Studios' Motion Pictures .......... 8

(2) CleanFlicks and Family Flix Are Clearly Making Infringing Derivative Works Based Upon the Studios' Motion Pictures .......... 13

II. DEFENDANTS' INFRINGING BUSINESSES ARE NOT PROTECTED BY THE FAIR USE DEFENSE .......... 16

A. Defendants, Not the Studios, Have the Burden of Proof of Establishing Each Element of Their Affirmative Defense of Fair Use .......... 16

B. Defendants' Distribution of Non-Transformative Edited Motion Pictures for Admittedly Commercial Purposes Weighs Heavily Against Fair Use .......... 17

(1) Defendants' Use is Directly Commercial .......... 17

(2) Defendants' Sale of Edited Movies Is Not "Criticism" .......... 19

(3) The Purported "Public Benefit" of Providing "Clean" Versions of the Studios' Motion Pictures Does Not Further the Purposes of Copyright Law .......... 21

(4) Defendants' Edited Motion Pictures Are Not Transformative .......... 23

C. The Nature of the Copyrighted Work Weighs Against Fair Use .......... 25

**Page(s)**


D. The Amount and Substantiality of the Portion Used by Defendants – Virtually the Entirety of the Studios' Motion Pictures – Weighs Against Fair Use ....................25

E. The Edited Motion Pictures Serve as Direct Market Substitutes for the Studios' Motion Pictures and Usurp the Studios' Exclusive Right to Develop The Market for Authorized Edited Versions of Their Motion Pictures....................27

(1) The Mechanical Editing Parties' Argument of Public Benefit Does Not Eliminate Their Burden of Showing Lack of Effect on the Market ....................27

(2) A Showing of an Alleged Benefit to the Studios is Irrelevant to Fair Use....................29

(3) Defendants' "One-to-One" Theory of Lack of Market Harm Fails as a Matter of Law and Fact....................29

(4) The Williams & Wilkins Case Does Not Affect Defendants' Burden on the Fourth Factor ....................32

F. Aggregate Assessment of Fair Use Factors ....................33

III. THE DEFENDANTS HAVE NOT MET THEIR BURDEN OF PROOF ON THEIR AFFIRMATIVE DEFENSES OF ESTOPPEL, LACHES AND WAIVER ....................33

IV. THE DEFENDANTS' CREATION AND DISTRIBUTION OF EDITED MOTION PICTURES HAS NOT BEEN LEGALIZED BY THE FAMILY MOVIE ACT ....................33

V. THE IMMEDIATE ISSUANCE OF A PERMANENT INJUNCTION IS WARRANTED....................36

CONCLUSION....................39

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ....28, 31

*Abend v. MCA, Inc.*,
863 F.2d 1465 (9th Cir. 1988) ....36

*Allison v. Vintage Sports Plaques*,
136 F.3d 1443 (11th Cir. 1998) ....5

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1995)....23, 24

*Basquiat v. Baghoomian*,
No. 90-Civ-3853 (LJF), 1991 WL 253334 (S.D.N.Y. Nov. 19, 1991)....27

*Ben Ezra, Weinstein, and Co., Inc. v. America Online Inc.*,
206 F.3d 980 (10th Cir. 2000) ....34

*Bonneville Int'l Corp. v. Peters*,
347 F.3d 485 (3d Cir. 2003)....12

*Bowe v. SMC Electrical Prods., Inc.*,
935 F. Supp. 1126 (D. Colo. 1996)....33

*Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*,
No. 1:04-CV-396, 2004 WL 3132255 (W.D. Mich. Dec. 30, 2004)....7

*C.M. Paula Co. v. Logan*,
355 F. Supp. 189 (N.D. Tex. 1973) ....10

*Cablevision Systems Development Co. v. Motion Picture Ass'n of Am., Inc.*,
836 F.2d 599 (D.C. Cir. 1988) ....12

*Cadence Design Systems, Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997) ....37, 38

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).... *passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*,
150 F.3d 132 (2d Cir. 1998).... *passim*

*Chicago Bd. of Education v. Substance, Inc.*,
354 F.3d 624 (7th Cir. 2003) ....17

Page(s)

*City and County of Denver v. Continental Air Lines, Inc.*,
712 F. Supp. 834 (D. Colo. 1989) .......... 34

*College Entrance Examination Bd. v. Pataki*,
889 F. Supp. 554, *modified*, 893 F. Supp. 152 (N.D.N.Y. 1995) .......... 16

*DC Comics Inc. v. Reel Fantasy, Inc.*,
696 F.2d 24 (2d Cir. 1982) .......... 28, 32

*Data Prods., Inc. v. Reppart*,
No. 89-1291-K, 1990 WL 198610 (D. Kan. Nov. 29, 1990) .......... 6, 8

*Depew v. United States*,
50 F. Supp. 2d 1009 (D. Colo. 1999) .......... 16

*Design Options, Inc. v. BellePonte, Inc.*,
940 F. Supp. 86 (S.D.N.Y. 1996) .......... 10

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) .......... 19

*Feist Pub, Inc. v. Rural Tele. Serv. Co.*,
499 U.S. 340 (1991) .......... 15

*In re Geneva Steel Co.*,
281 F.3d 1173 (10th Cir. 2002) .......... 34

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985) .......... *passim*

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) .......... 26

*Infinity Broadcast Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) .......... 19, 23

*JMV Music, Inc. v. Cichran*,
No. 00-4094-SAC, 2000 WL 1863478 (D. Kan. Nov. 16, 2000) .......... 36

*Kelly v. Arriba Soft Corp.*,
280 F.3d 934 (9th Cir. 2002) .......... 18

*Lee v. Deck the Walls, Inc.*,
925 F. Supp. 576 (N.D. Ill. 1996), *aff'd*, 125 F.3d 580 (7th Cir. 1997) .......... 11

*Los Angeles News Service v. Reuters Television Int'l, Ltd.*,
149 F.3d 987 (9th Cir. 1998) .......... 21

Page(s)


*Los Angeles Times v. Free Republic*, 54 U.S.P.Q. 2d 1453 (C.D. Cal. 2000)....29, 32

*Maljack Productions, Inc. v. UAV Corp.*, 964 F. Supp. 1416 (C.D. Cal. 1997), *aff'd on different grounds sub. nom, Batjac Productions, Inc. v. GoodTimes Home Video Corp.*,160 F.3d 1223 (9th Cir. 1998)....15

*Micro Star v. FormGen, Inc.*, 154 F.3d 1107 (9th Cir.1998)....18, 31, 32

*Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208 (E.D.N.Y. 1994)....6

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988)....6

*National Football League, v. Primetime 24 Joint Venture*, No. 98 Civ. 3778(LMM), 1999 WL 760130 (S.D.N.Y. Sept. 27, 1999)....38

*New Era Publications Int'l v. Henry Holt & Co., Inc.*, 695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989)....17

*New Mexico Cattle Growers Ass'n. v. United States Fish and Wildlife Serv.*, 248 F.3d 1277 (10th Cir. 2001)....34

*New York Times Co. v. Tasini*, 533 U.S. 483 (2001)....37

*On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001)....18

*Pacific & Southern Co., Inc. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984)....20

*Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998)....37

*Paul v. Monts*, 906 F.2d 1468 (10th Cir. 1990)....33

*Peker v. Masters Collection*, 96 F. Supp. 2d 216 (E.D.N.Y. 2000)....6, 9-10

*Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996)....21

Page(s)

*Red Baron-Franklin Park, Inc. v. Taito Corp.*,
883 F.2d 275 (4th Cir. 1989) ....................6

*Ringgold v. Black Entm't Television, Inc.*,
126 F.3d 70 (2d Cir. 1997)....................28

*Rogers v. Koons*,
751 F. Supp. 2d 474 (S.D.N.Y. 1990)....................22

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992)....................21

*Rosemont Enters., Inc. v. Random House, Inc.*,
366 F.2d 303 (2d Cir. 1966)....................17

*Salinger v. Random House, Inc.*,
811 F.2d 90 (2d Cir. 1987)....................31

*Softman Products Co., LLC v. Adobe Systems Inc.*,
171 F. Supp. 2d 1075 (C.D. Cal. 2001) ....................7

*Sony Corp. of America v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).................... 27-28

*Stewart v. Abend*,
495 U.S. 207 (1990)....................22

*Storm Impact, Inc. v. Software of the Month Club*,
13 F. Supp. 2d 782 (N.D. Ill. 1998) ....................29

*Storm Impact, Inc. v. Software of the Month Club*,
No. 95 *C 2154*, 1997 WL 566378 (N.D. Ill. Sept. 8, 1997)....................27

*SunTrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) ....................16

*Symantec Corp. v. CD Micro, Inc.*,
286 F. Supp. 2d 1265 (D. Or. 2003) ....................6

*Taylor Corp. v. Four Seasons Greetings, LLC*,
403 F.3d 958 (8th Cir. 2005) ....................36, 37

*Too, Inc. v. Kohl's Department Stores, Inc.*,
No. 2:01-CV-1256, 2002 WL 31409852 (S.D. Ohio Sept. 4, 2002) ....................6

*Triad Systems Corp. v. Southeastern Exp. Co.*,
64 F.3d 1330 (9th Cir. 1995) ....................18

Page(s)

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)....................22

*United States v. Elcom Ltd.*,
203 F. Supp. 2d 1111 (N.D. Cal. 2002)....................9

*Universal City Studios, Inc. v. Sony Corp. of America*,
659 F.2d 963 (9th Cir. 1981)....................32

*Veeck v. Southern Bldg. Code Congress Intern. Inc.*,
241 F.3d 398 (5th Cir. 2001)....................36

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003)....................16, 18

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989)....................15

*Williams & Wilkins Co. v. United States*,
487 F.2d 1345 (Ct. Cl. 1973), *aff'd*, 420 U.S. 376 (1975)....................32

*Woods v. Universal City Studios, Inc.*,
920 F. Supp. 62 (S.D.N.Y. 1996)....................37

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000)....................24, 26

**STATUTES & RULES**

17 U.S.C. § 101....................9

17 U.S.C. § 107(3)....................25

17 U.S.C. § 110....................33

17 U.S.C. § 110(11)....................34

17 U.S.C. § 202....................9

**OTHER AUTHORITIES**

House Report, H.R. Rep. No. 102-836 at 3 & n.3 (August 11, 1992)
(available at 1992 WL 199748)....................16

House Report, H.R. Rep. No. 109-33(I) at 6-7 (April 12, 2005)
(available at 2005 WL 858196)....................35

Page(s)

Family Movie Act of 2004, Amended and Passed by the Senate, 151 Cong. Rec. at 502 (Jan. 25, 2005) (available at 2005 WL 182071)......................35

1 M. Nimmer & D. Nimmer, Copyright §§ 1.08 [C][1], 2.01[A] (1990)..........................15

4 M. Nimmer & D. Nimmer, Copyright, § 13.05 [E][4][c] (1996) ............................ 32-33

The Motion Picture Studios[1] (the "Studios"), by their attorneys Loeb & Loeb LLP and Faegre & Benson LLP, respectfully submit this reply memorandum of law in further support of their motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking an Order: (1) granting the Studios partial summary judgment on their claims for copyright infringement against Plaintiff-Counterclaim Defendant Clean Flicks of Colorado, L.L.C. ("Clean Flicks of Colorado"), and Counterclaim Defendants CleanFlicks, LLC ("CleanFlicks"), ASR Management Corporation d/b/a CleanFilms f/k/a MyCleanFlicks ("CleanFilms"), Family Flix, U.S.A., L.L.C. ("Family Flix") and Play It Clean Video, L.L.C. ("Play It Clean") (for ease of reference, Plaintiff and Counterclaim-Defendants, formerly referred to as the "Mechanical Editing Parties," are hereinafter referred to collectively as "Defendants")[2]; (2) granting the Studios summary judgment dismissing Defendants' affirmative defenses; and (3) issuing a permanent injunction barring Defendants from creating, distributing or otherwise exploiting unauthorized edited versions of the Studios' copyrighted motion pictures.

---

[1] The Co-Defendant Motion Picture Studios are Metro-Goldwyn-Mayer Studios Inc., Warner Bros. Entertainment, Inc. (as successor-in-interest to the copyright interests of named counterclaimant Time Warner Entertainment Company, L.P.), Sony Pictures Entertainment Inc., Disney Enterprises, Inc., DreamWorks L.L.C., Universal City Studios LLLP, Twentieth Century Fox Film Corporation, and Paramount Pictures Corporation (collectively, together with their subsidiaries and affiliates).

[2] Defendants CleanFlicks and CleanFilms submitted opposition papers to the current motion. Defendants Family Flix and Play It Clean joined in the opposition. Clean Flicks of Colorado did not respond to the motion other than to advise the Court of the parties' agreement, in principle, to settle the matter.

**PRELIMINARY STATEMENT**

Defendants' creation, duplication and distribution of edited motion pictures (the "Edited Motion Pictures") presents a straightforward case of copyright infringement that should be permanently enjoined. Building their for-profit businesses on the commercial exploitation of the Studios' copyrighted works (the "Motion Pictures"), Defendants now seek to hide behind their customers in an attempt to justify their clear-cut infringement under the guise of "social cause," "the highest form of criticism," and the public's "right" to watch edited movies. As Defendants are well aware, however, this action does not concern the public's right to view edited movies in the privacy of their homes, but rather Defendants' usurpation of a right to make and commercially exploit copies of altered versions of the Studios' Motion Pictures, which is a right the copyright law has expressly granted exclusively to the copyright owner.

If they so desire, there are many ways that members of the film-viewing public can avoid what they may deem "objectionable content." Though Defendants attempt to portray the Studios as the purveyors of solely violent and sexually explicit motion pictures that would have been "prohibited ... even five years ago," Defendants concede, as they must, that the Studios in fact release numerous G-rated and PG-rated motion pictures each year. In addition, Defendants admit that the Studios release "edited" motion pictures for public broadcast on network and cable television. With the passage of the Family Movie Act, there is now a specific exemption in the copyright law that gives consumers the choice to use technology to skip and mute through portions of Motion Pictures that they choose not to view. Finally, of course, the consumer can exercise his or her right not to view a film or purchase a DVD at all.

Claimed "consumer demand" does not permit or justify the creation of unauthorized alternate versions of another's copyrighted work. Under such a theory, Defendants

could create and sell versions of the Studios' Motion Pictures that removed characters of certain ethnic types or of a certain race because some consumers preferred their films that way. Similarly, Defendants could create and sell versions of the Studios' Motion Pictures that removed sad endings, because some consumers wanted their films to end happily, or Defendants could create and sell abridged versions, because some consumers preferred films no longer than one hour long. Such an interpretation of the copyright laws would result in a near-total evisceration of a copyright holder's rights.

Defendants' assertions of "public benefit" are dressed in the guise of the "first sale" and "fair use" defenses to copyright infringement. The first sale defense permits the owner of a "particular," "lawfully made" copy of a work to sell or otherwise dispose of that particular copy without violating the copyright holder's exclusive right of distribution. As shown herein, the first sale doctrine is completely inapplicable to the Defendants' activities. Defendants acknowledge that they are not selling the particular copies of the Motion Pictures that were lawfully made by the Studios, but rather their own unauthorized edited copies. Their claim (and as will be seen, it is just that, only a claim), that they purchase an authorized copy of a Motion Picture for each unauthorized copy that they make and sell has never been held to be a valid defense to an infringement claim, nor does this illusory "defense" satisfy either the intended purpose or the requirements of the first sale doctrine.

The Defendants similarly torture the analysis of the fair use defense to try to justify their actions. As only one example of this, they now, for the first time in three years of this litigation, claim that their commercial editing and sale of the Studios' Motion Pictures is intended as "criticism." This *ex post facto* rationalization, proffered by Defendants solely in an attempt to bolster their fair use defense, cannot cloak the fact that Defendants' activities were

always intended to be purely commercial. Defendants do not even begin to explain how the creation, duplication and commercial exploitation of edited films to the public for a premium constitutes protected "criticism." Defendants' arguments as to the balance of the fair use factors are equally flawed.

This case is really very simple – the Defendants are reproducing large numbers of copies of unauthorized derivative works based on the Studios copyrighted works, and then commercially distributing these copies to the public. There is no viable defense to this activity, and it should be enjoined as a matter of law.

## ARGUMENT

## I. THE FIRST SALE DOCTRINE DOES NOT APPLY TO DEFENDANTS' INFRINGING ACTIVITIES

Defendants' arguments in support of their invocation of the first sale defense are based on distortions of both fundamental copyright law and undisputed (and indisputable) facts. The first sale doctrine is straightforward and does not apply here.

### A. The First Sale Defense Does Not Apply Because Defendants Admit That They Are Distributing Copies of the Motion Pictures That Are Different From the Particular Tangible Copies They Claim to Have Lawfully Purchased

The first sale doctrine, codified in § 109 of the Copyright Act (17 U.S.C. § 101 *et seq.*), permits the owner of a "particular," "lawfully made" copy of a work to sell or otherwise dispose of that particular copy without violating the copyright holder's exclusive right of distribution. The underlying policy behind the first sale doctrine was to give effect to the common law rule against restraints on the alienation of tangible property. *See, e.g., Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1447-48 (11th Cir. 1998). Thus, for example, the first sale doctrine allows a purchaser of a lawfully made DVD (containing a motion picture) sold by

the Studios to resell that particular tangible DVD. The unambiguous language of § 109 simply does not allow a purchaser to make and sell or distribute a copy of the work on a different DVD, nor does it allow the sale of an edited copy of the original work.[3]

Courts uniformly hold that the first sale doctrine applies only to the re-distribution of the lawful, "particular" and original tangible copy of a copyrighted work sold:

> We recognize that, under the 'first sale' doctrine . . . , appellant can purchase a copy of [plaintiffs' copyrighted] book and subsequently alienate its ownership in that book. However, the right to transfer applies only to the particular copy of the book which appellant has purchased and nothing else.

*Mirage Editions*, 856 F.2d at 1344 (emphasis added); *see also Symantec Corp. v. CD Micro, Inc.*, 286 F. Supp. 2d 1265, 1271-72 (D. Or. 2003); *Data Prods., Inc. v. Reppart*, No. 89-1291-K, 1990 WL 198610, at *4 (D. Kan. Nov. 29, 1990) (the "[re-distribution] right on the part of the purchaser only extends to the transfer of the original copy; it does not extend to the making of unauthorized copies of the [original]") (emphasis added).[4]

The cases relied upon by defendant CleanFilms are not to the contrary. (CleanFilms Opp. at 17.) Rather, those cases confirm that "the first sale doctrine in copyright

---

[3] Thus, as a threshold matter, it is firmly established that first sale is no defense to the Studios' claims that CleanFlicks and Family Flix are infringing the Studios' exclusive derivative work and reproduction rights. *See* Studios' Opening Br. at 25; *Red Baron-Franklin Park, Inc. v. Taito Corp.*, 883 F.2d 275, 280-81 (4th Cir. 1989) (holding that "the first sale doctrine has no application to the rights of the owner of a copyright guaranteed by § 106 except the right of distribution"); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1344 (9th Cir. 1988) (holding that first sale doctrine was not a defense to infringement of exclusive right to prepare derivative works); *Peker v. Masters Collection*, 96 F. Supp. 2d 216, 221 (E.D.N.Y. 2000) (rejecting first sale as a defense to infringement of the right of reproduction).

[4] Moreover, because the first sale doctrine only applies to the re-distribution of the copyright holder's authorized, original copy, "[t]he alleged infringer bears the burden of tracing the chain of title to prove that the first sale doctrine applies." *Too, Inc. v. Kohl's Department Stores, Inc.*, No. 2:01-CV-1256, 2002 WL 31409852 at *3 (S.D. Ohio Sept. 4, 2002); *see also Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208, 212 (E.D.N.Y. 1994) ("Defendants have the burden of tracing the chain of title to show their authority to sell [plaintiff's products] flows from the copyright holder."). No such showing has been or could be made here for the admittedly different copies being distributed by Defendants.

law … gives the owner of a particular copy of a copyrighted work the right to dispose of that copy without the permission of the copyright owner." *Softman Products Co., LLC v. Adobe Systems Inc.*, 171 F. Supp. 2d 1075, 1083 (C.D. Cal. 2001) (first sale doctrine applied where defendant unbundled original copies of plaintiff's copyrighted computer programs and re-sold the original programs individually); *see also Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*, No. 1:04-CV-396, 2004 WL 3132255, at *3 (W.D. Mich. Dec. 30, 2004) (holding that first sale applied where defendant merely re-distributed the lawfully-purchased copies of plaintiff's compact discs in new packaging).[5]

Defendants admit that they distribute copies of the Studios' Motion Pictures that are not the particular, tangible, lawfully made Studio DVDs they allegedly purchased.[6] Pursuant to the established case law, the first sale defense does not apply, and the analysis of the defense should be at an end. Nevertheless, Defendants also try, improperly, to rely on the first sale doctrine by arguing that these additional copies are "lawfully made."

---

[5] Far from merely "repackaging" the Studios' Motion Pictures, Defendants here are admittedly distributing a new, edited film in the Studios' original packaging. *See* CleanFilms Opp. at 16-18.

[6] For example, CleanFilms describes its distribution as follows:

> "For every master edited film CleanFilms acquires from its suppliers (some of which are among the other Mechanical Editing Parties), **CleanFilms makes copies of that master edited version** and couples to each of those copies a purchased, Studio-version of the film. When CleanFilms SELLS one of its edited films to a member/subscriber, the company sells the edited version along with a purchased original version (a couplet), disabling the original before providing the couplet to the member/subscriber." (CleanFilms Opp. at 15; emphasis added).

Thus, CleanFilms admits that it receives an unauthorized edited copy from a supplier, makes further unauthorized copies of that edited copy, and distributes those unauthorized copies (made from an unauthorized copy), allegedly together with an authorized Studio DVD. *See also* Zavin Decl. Ex. A (CleanFlicks Answer) at ¶ 37 ("Counterclaim-Defendant CleanFlicks admits that they currently provide the customer with both the original, unaltered DVD and the recordable DVD containing the edited copy of the Studio's film."); *id.* Ex. F (Family Flix Answer) at ¶ 37

**B. The First Sale Defense Also Fails on the Grounds That the Copies Defendants Sell Are Not "Lawfully Made"**

Defendants attempt to show that the tangible copies they make and distribute, which they admit are not the same physical copies they allegedly lawfully purchase, are "lawfully made" because they are not (1) unlawful copies; or (2) infringing derivative works. Both of these arguments are meritless. While Defendants' arguments as to infringement of the reproduction and derivative work rights are more properly made in an analysis of whether the works are infringing, because Defendants present such arguments in the context of the first sale doctrine, the Studios will respond to them in the same context.

(1) Defendants Admit That They Make Unauthorized Reproductions of the Studios' Motion Pictures

Despite admitting that they make unauthorized reproductions of the Motion Pictures, Defendants assert that they have not violated the Studios' exclusive reproduction right because they purportedly buy one authorized copy for every unauthorized copy they make and distribute – their purported "one-to-one" argument.[7] *See* CleanFlicks Opp. at 15; CleanFilms Opp. at 15-16. This argument defies logic and asks this Court to condone blatant, illegal copying.[8]

---

("Family Flix admits that it provides its customer with the original DVD, rendered unusable, along with the edited version of the DVD.").

[7] Contrary to CleanFilms' representation (CleanFilms Opp. at 9 n. 4), the Studios have never "acknowledge[d] that the unedited or original movies were properly purchased, that there was a one-to-one purchase that only one edited version was made for every one movie purchased, [or] that [the Studios] received revenues from the sale of movies to the Mechanical Editing Parties."

[8] The Court need not concern itself with the arguments raised in the EFF amicus brief regarding intermediate copying. First, the EFF misconstrues the Studios' claims. The primary violation by Defendants of the right of reproduction of the Studios' works is not the making of an intermediate copy, but the making of hundreds or thousands of copies of the Studios' Motion Pictures, which are reproduced virtually in their entirety. Second, the EFF argues that temporary intermediate copies used to create otherwise non-infringing products are themselves non-infringing. The EFF has missed the point that the intermediate copies made by the Defendants are neither temporary (unlike in the cases cited by the EFF), nor used for the purpose of creating

Section 106(a) of the Copyright Act provides that the copyright owner has the exclusive right to "to reproduce the copyrighted work in copies or phonorecords." Section 101 of the Act defines "copies" as:

> material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

Copyright Act, 17 U.S.C. § 101.

Defendants' admitted duplication[9] of the Motion Pictures constitutes an obvious infringement of the Studios' exclusive reproduction right. Even if Defendants purchased one authorized original DVD for every edited copy they made, which is an issue the Court need not decide in order to grant the Studios summary judgment, the purchase of an authorized original does not excuse Defendants' large-scale manufacturing and distributions of copies.[10] *See* Copyright Act, 17 U.S.C. § 202 ("Transfer of ownership of any material object ... does not itself convey any rights in the copyrighted work embodied in the object."); *see also Peker v. Masters*

---

non-infringing products. This Court need not decide the issue of whether the intermediate copying done by these Defendants is by itself a violation of the reproduction right, since the reproduction right is so clearly violated by the Defendants by the making of hundreds or thousands of unauthorized infringing copies of the copyrighted Motion Pictures and sending them to their customers.

[9] *See, e.g.,* Zavin Decl. Exh. D (Lines Depo.) at 56:17-25 (admitting that CleanFlicks is "copying a copy of the Hollywood films"); CleanFlicks Opp. at 3 (¶ 3) ("CleanFlicks makes these edits by purchasing a motion picture, digitizing it onto a computer and then utilizing editing software .... Once the editing has been completed, the digitized motion picture is burned onto a separate DVD."); CleanFilms Opp. at 15 ("For every master edited film CleanFilms acquires ..., CleanFilms makes copies of that master edited version and couples to each of those copies a purchased, Studio-version of the film."); Studios' Opening Br. (Statement of Undisputed Facts) at ¶¶ 17-21, 32-37; *see also Peker v. Masters Collection*, 96 F. Supp. 2d 216, 219 (E.D.N.Y. 2000) ("Even if not 'virtually indistinguishable,' defendant's replica is a convincing copy of [plaintiff's work] ....").

[10] Contrary to Defendants' assertion (*see* CleanFilms Opp. at 15 & n.6), there is no legal right to create a "back up" of an original copyrighted work for <u>commercial</u> purposes. Indeed, in the case of *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1135 (N.D. Cal. 2002), upon which Defendants rely, the court expressly held that absent statutory authority, "there is as yet no

*Collection*, 96 F. Supp. 2d 216, 219 (E.D.N.Y. 2000) (rejecting first sale defense notwithstanding defendant's assertion that it purchased one of plaintiff's original works for each of its "replicas," holding that "[i]t is no defense that [defendant] used a lawfully acquired object to achieve its unlawful goal of copying."); *Design Options, Inc. v. BellePonte, Inc.*, 940 F. Supp. 86, 91 (S.D.N.Y. 1996) (sweater wholesaler did not acquire rights in copyrighted sweater designs when it purchased sweaters bearing the designs; wholesaler had right to resell sweaters but did not have the right to reproduce the designs and to manufacture and sell new versions of the designs).

Not surprisingly, Defendants cannot cite a single case supporting their contention that their infringing duplication of the Motion Pictures somehow becomes legal if Defendants separately purchase copies of the Studios' authorized DVDs. For instance, Defendants cite *C.M. Paula Co. v. Logan*, 355 F. Supp. 189, 190 (N.D. Tex. 1973), in which the alleged infringer purchased the plaintiff's greeting cards at retail stores and then directly transferred the exact artwork image from each card onto a ceramic plaque. The district court found that no "reproduction" occurred, because the defendant's process did not attempt to duplicate the plaintiff's original protected artwork, but rather used the tangible, authorized copy and physically transferred it to a different medium, *i.e.*, the ceramic plaque. *Id.* at 191. Thus, as the court noted, "[e]ach ceramic plaque sold by defendant ... requires the purchase and use of an individual piece of artwork marketed by the plaintiff. For example, should defendant desire to make one hundred ceramic plaques ..., defendant would be required to purchase one hundred separate [greeting cards]." *Id.* (emphasis added). No such inherent physical "requirement" of using a lawful original copy is present in Defendants' production of their Edited Motion Pictures.[11]

---

generally recognized right to make a copy of a protected work, regardless of its format, for [even] personal noncommercial use."

[11] *See, e.g.*, Deposition of Richard Teraci ("Family Flix") (hereinafter "Teraci Depo."), at 155:8-14, attached as Exhibit A to the Reply Declaration of Jacques M. Rimokh ("Rimokh

Defendants' reliance upon the district court decision in *Lee v. Deck the Walls, Inc.*, 925 F. Supp. 576, 582 & n.5 (N.D. Ill. 1996), *aff'd*, 125 F.3d 580 (7th Cir. 1997) is similarly misplaced. There, the court distinguished the defendant's acts (which consisted of the mounting of notecards onto ceramic tiles), from the typical copyright case in which "the contested issue is usually whether the defendant 'copied,' *i.e.*, reproduced, the plaintiffs copyrighted work," and held that where defendant "used [plaintiff's] exact work in the mounting process," reproduction was not at issue. *Id.* (emphasis added). The Defendants in this case, however, admittedly use copies of the Studios Motion Pictures to create their edited versions[12] – not the Studios' "exact work."

In both cases cited by Defendants, the use of the copyright holder's authorized original tangible copy was inherently required in the "creation" of the alleged infringer's end product and, thus, there was no copying. Defendants admit making copies and, critically, their process of creating and distributing Edited Motion Pictures does not physically require the purchase and use of an authorized Studio DVD for each unauthorized copy they create and distribute.

Moreover, unlike the cases where the use of the tangible, authorized copy in the production of the tiles and plaques ensured that there was no additional copy to be exploited, Defendants' "one-to-one" argument relies entirely on their own wholly voluntary compliance. Such discretionary and utterly unenforceable compliance with this self-made policy cannot possibly support the broad exemption from copyright infringement that Defendants propose.

---

Reply Decl.") (" Q: ...In terms of the physical process in what you need to do to make an edited version, there's nothing that requires you, at least from a mechanical standpoint, to have an original in your hand before you can print out an edited copy, right? A: That's correct.").

[12] *See* CleanFlicks Opp. at 3 (¶ 3) (admitting that the Studios' Motion Pictures are copied, or "digitized," onto a computer for editing); CleanFilms Opp. at 15; Studios' Opening Brief (Statement of Undisputed Facts) at ¶¶ 18-19, 33-34 and sources cited therein.

The Copyright Office came to precisely the same conclusion for the exact same reasons when issuing its report and recommendation against amending § 109 (the first sale doctrine) to provide for a "digital first sale doctrine."[13] Pursuant to the proposed amendment, § 109 would allow the owner of a lawfully made digital copy of a work to sell or otherwise transmit the work to another person in digital form over the Internet, provided the sender's original copy is destroyed (either voluntarily by the sender or automatically by virtue of an embedded technological measure). *Id.* The proponents of the amendment argued that, even though an additional copy is made in the transfer process (*i.e.*, both the sender and the receiver of the work will each have a copy of the work, at least for some period of time, if not indefinitely), the impact on the reproduction right can be eliminated so long as the sender agrees to destroy the original copy after transmission. *Id.* This is precisely the "one-to-one" argument asserted by Defendants here (*i.e.*, one lawful copy is purchased and (theoretically disabled) for each subsequent copy which is made and sold).

As an initial matter, the Copyright Office confirmed its view that any distribution activity, such as the proposed digital transmission, that implicated the reproduction right was not protected under § 109:

> Unlike the traditional circumstances of a first sale transfer, the recipient [of a digital transfer] obtains a <u>new copy</u>, not the same one with which the sender began. Indeed, absent human or technological intervention, the sender retains the source copy. This copying implicates the copyright owner's reproduction right as well as the distribution right. Section 109 provides no defense to infringements of the reproduction right. Therefore, when the owner of a lawful copy of a

---

[13] Copyright Office, *DMCA Section 104 Report, A Report of the Register of Copyrights Pursuant to § 104 of the Digital Millennium Copyright Act*, August 2001 ("Copyright Office Report"), attached as Exhibit B to Rimokh Reply Decl., *also available at* http://www.copyright.gov. While such Copyright Office reports are not controlling, they are persuasive authority. *See, e.g., Cablevision Systems Development Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 607 (D.C. Cir. 1988); *see also Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 490 (3d Cir. 2003) (finding Copyright Office interpretation of Copyright Act to be persuasive authority).

> copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement.

Copyright Office Report, 79-80 (emphasis added).

Thereafter, in reasoning which is equally applicable and compelling here, the Copyright Office rejected the alleged ameliorating effect of the "forward and delete" (or "one-to-one") scheme on which the proposed amendment was premised:

> In order to get around the fact that a transmission results in two copies, the analogy [to physical copies] requires one of two things to happen: either a voluntary deletion of the sender's copy or its automatic deletion by technological means. Both are unworkable at this time.
>
> Relying on voluntary deletion is an open invitation to virtually undetectable cheating, and there is no reason to believe there would be general compliance with such a requirement. If the burden were placed on the copyright owner to demonstrate that there was no simultaneous deletion of the copy from which the transmission was made, it would erect what would probably be an impossible evidentiary burden. If the burden of establishing the defense were placed on the defendant, and had to be met by demonstrating simultaneous deletion, the defendant would have a similarly impossible evidentiary burden.

Copyright Office Report at 97-98 (emphasis added). Accordingly, not only is Defendants' reliance on *Logan* and *Lee* completely inapt to their "one-to-one" argument, but the Copyright Office has already rejected "one-to-one" arguments similar to that asserted by Defendants.

(2) CleanFlicks and Family Flix Are Clearly Making Infringing Derivative Works Based Upon the Studios' Motion Pictures

Though Defendants' creation and distribution of unlawful copies of the Studios' works is alone sufficient to support a grant of injunctive relief to bar their continuing infringing activities, such relief is separately and independently warranted because Defendants' Edited Motion Pictures are also unquestionably infringing derivative works that are not protected by the first sale doctrine.

Contrary to Defendants' arguments (*see* CleanFilms Opp. at 12, 14), the discretion they admittedly exercise in selecting the scenes and dialog to be edited from the Motion Pictures and the manner in which they effect the edits easily reflect sufficient "originality" to support a finding that the Edited Motion Pictures constitute infringing derivative works. For instance, Defendants' deposition testimony indisputably establishes that Defendants' edits are not the "mundane" muting of dialogue or deletion of footage described in the opposition papers. Rather, Defendants exercise their discretion[15] in employing a host of editing techniques such as:

- Editing/Replacing Audio: Defendants exercise their discretion as to whether individual words or larger portions are redacted or "dissolved." If individual words are redacted, defendants may replace the redacted portion with ambient noise from another portion of the movie (to cover up distracting audio "dead spots"). Defendants employ audio and visual "blending", including "cross-fading" to ensure the smooth transition of edited scenes. *See* Rimokh Reply Decl., Exh. C (Lines (CleanFlicks) Depo.) at 62:20 – 68:24; *id.* Exh. A (Teraci Depo.) at 93:25 – 97:8.

- Editing/Obscuring/Substituted Video: Defendants similarly exercise their discretion as to whether small or large portions of video should be deleted, whether the video can be cropped, obscured through "fog" or use of a black bar, or whether the video can be substituted with other video from the movie. *See* Rimokh Reply Decl., Exh. C (Lines Depo.) at 62:20 – 68:24; *id.* Exh. A (Teraci Depo.) at 93:25 – 97:8.

The discretion employed by Defendants in their selection of material to edit, as well as their implementation of the foregoing editing techniques, has resulted in significant differences among and between the edited versions Defendants create. *See, e.g.,* Rimokh Reply

---

[15] For instance, Ray Lines of CleanFlicks testified (*see* Rimokh Reply Decl., Exh. C (Lines Depo.) at 68:1-10):

> Sometimes there's dialogue in a film that can't be taken out. And maybe somebody's standing there naked in the shower, talking, and this dialogue is critical to the theme of the movie or the plot, or whatever. And so ... you don't want to take that out, so you'll just -- you know, you can do either a fog-type thing where you fog up the shower so that you can't see the person's naked or something like that, you know, because you don't want to take that scene out.

Decl., Exh. A (Teraci (Family Flix) Depo.) at 27:20 – 28:6 ("Q: Is it fair to say that …, between Family Flix and Clean Flicks, it was your view that Clean Flicks was more permissive than you would be with its editing? A: Permissive? Q: Meaning that they left more things in that you would have taken out of the movie. A: Correct."); Zavin Decl. Exh. D (Lines (CleanFlicks) Depo.) at 71:5-10 ("Q: Have you reviewed any of the Family Flix edited films? A: Only one, and I was disappointed in it, the way they do it. Q: How so? A. I thought the editing was terrible.").

Clearly the exercise of discretionary editing techniques satisfies any originality requirement.

> Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. . . . To be sure, the requisite level of creativity is extremely low; <u>even a slight amount will suffice</u>. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be.

*Feist Pub, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (quoting 1 M. Nimmer & D. Nimmer, Copyright §§ 1.08 [C][1], 2.01[A], [B] (1990) (emphasis added)); *see also Maljack Productions, Inc. v. UAV Corp.*, 964 F. Supp. 1416, 1427-28 (C.D. Cal. 1997), *aff'd on different grounds sub. nom., Batjac Productions, Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998) (creation of "pan and scan" version of public domain motion picture – a process by which motion pictures are adapted from the widescreen theater format to a narrower format for television viewing – held sufficiently original to constitute a copyrightable derivative work); *Weissmann v. Freeman*, 868 F.2d 1313, 1321-22 (2d Cir. 1989) (finding researcher's revisions and additions to prior version of scholarly article to be sufficiently original to support copyrightable derivative work).

Accordingly, Defendants are unquestionably creating unauthorized derivative works of the Motion Pictures, and first sale does not apply to these derivative works.

## II. DEFENDANTS' INFRINGING BUSINESSES ARE NOT PROTECTED BY THE FAIR USE DEFENSE

### A. Defendants, Not the Studios, Have the Burden of Proof of Establishing Each Element of Their Affirmative Defense of Fair Use

As a preliminary matter, it is well-established that a defendant asserting the fair use defense has the burden of proof of establishing the elements of the defense – including where a plaintiff seeks permanent injunctive relief. *See, e.g., Video Pipeline, Inc. v. Buena Vista Home Ent'm't, Inc.*, 342 F.3d 191, 197 (3d Cir. 2003) (fair use "is an affirmative defense for which the alleged infringer bears the burden of proof;" affirming grant of injunction); *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1390 n.5 (6th Cir. 1996) (same). *See also College Entrance Examination Bd. v. Pataki*, 889 F. Supp. 554, 564-65, *modified*, 893 F. Supp. 152 (N.D.N.Y. 1995) (quoting House Report, H.R. Rep. No. 102-836 at 3 & n.3 (August 11, 1992) (available at 1992 WL 199748 (Leg. Hist.), attached as Exh. E. to Rimokh Decl.) ("the burden of proving fair use is always on the party asserting the defense, regardless of the type of relief sought by the copyright owner."); *accord, Depew v. United States*, 50 F. Supp. 2d 1009, 1016 (D. Colo. 1999) (granting summary judgment and permanent injunction and holding that the party opposing the injunction "had the burden of going forward with evidence to establish his affirmative defense").

Defendants misread the law in arguing that the Studios have the burden of proof on fair use. The sole case relied upon by Defendants, *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001), in support of their burden shifting argument holds merely that the burden may shift on a motion for a <u>preliminary</u> injunction. *SunTrust* does <u>not</u> support a general burden shifting for all injunctive relief. *See id.* at 1275 n.31. On the contrary, there is no

basis or authority for shifting the burden of proof on an affirmative defense to a plaintiff where, as here, after years of discovery a party moves for summary judgment requesting the final relief of a permanent injunction.

Similarly, Defendants are wrong in asserting that it is not appropriate for the Court to address and dispose of their fair use defense on a motion for summary judgment. (CleanFilms Opp. at 19). Courts repeatedly resolve the fair use defense on summary judgment. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985) (holding, on appeal of summary judgment motion, that fair use was not a defense to plaintiff's claim of copyright infringement); *Chicago Bd. of Education v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003) (affirming grant of summary judgment and rejecting fair use defense, holding that "[defendant] has presented no evidence sufficient to withstand summary judgment"); *Castle Rock Ent'm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) ("[T]his court has on a number of occasions 'resolved fair use determinations at the summary judgment stage' where, as here, there are no genuine issues of material fact.") (citation omitted).

**B. Defendants' Distribution of Non-Transformative Edited Motion Pictures for Admittedly Commercial Purposes Weighs Heavily Against Fair Use**

Defendants' arguments on the first fair use factor are flawed as a matter of fundamental copyright law and undisputed fact.

(1) <u>Defendants' Use is Directly Commercial</u>

Defendants rely on outdated, pre-*Campbell*[16] authorities to argue that their overwhelmingly commercial, for-profit use of the Studios' Motion Pictures is not significant in the analysis of the first fair use factor. (CleanFilms Opp. at 20). Although the Supreme Court in

[16] Both *New Era Publications Int'l v. Henry Holt & Co.*, 695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989) and *Rosemont Enters., Inc. v. Random House, Inc.*, 366

*Campbell* rejected the notion that a commercial use is presumptively unfair, the Court stated that the issue of whether a use is commercial is still a significant element to be weighed in the determination of the first fair use factor. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584-85 (1994). In particular, where, as here, the defendant's use is non-transformative (as established directly below), courts have repeatedly held post-*Campbell* that the commercial nature of the use weighs heavily against a finding of fair use. *See, e.g., On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001) (Leval, J.) ("The question whether the new use is commercial . . . acquires an importance it does not have when the new work is transformative."); *Micro Star v. FormGen, Inc.*, 154 F.3d 1107, 1113 (9th Cir.1998) (purely commercial purposes of CD sold to extend gameplay of video game weighed heavily against fair use); *Triad Systems Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1337 (9th Cir. 1995) (commercial nature of computer servicing business weighed against fair use); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985); *Video Pipeline*, 342 F.3d at 198.

Defendants' exploitation and use of the Studios' Motion Pictures is "directly commercial" and for Defendants' own commercial gain. Their use is not within the scope of the illustrative uses identified in the preamble[17] of § 107 which, though generally conducted for profit in this country, are also created to serve some other purpose that furthers the goals of copyright. *See, e.g., Kelly v. Arriba Soft Corp.*, 280 F.3d 934, 940-41 (9th Cir. 2002) (finding web site's use of copyrighted images as part of search engine was "commercial"; yet, since the defendant "was neither using [plaintiff's] images to directly promote its web site nor trying to profit by selling [plaintiff's] images," the use "was more incidental and less exploitative in

---

F.2d 303 (2d Cir. 1966), cited in ClearFilms Opp. at 20, were decided prior to the Supreme Court's 1993 landmark fair use decision in *Campbell v. Acuff-Rose*.

[17] For example, news reporting, comment, criticism, teaching, scholarship, or research.