nature than more traditional types of commercial use," and, therefore, weighed less against fair use).

### (2)   Defendants' Sale of Edited Movies Is Not "Criticism"

The Supreme Court explained in *Campbell* that the analysis of the first factor "may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like . . . ."  510 U.S. at 578-79.  "Although these categories have an illustrative and not limitative function, . . . the illustrative nature of the categories should not be ignored." *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) (internal quotations and citations omitted).

In an obvious *post hoc* effort to attempt to shoehorn their commercial activities into one of the uses listed in the preamble, Defendants now argue – for the first time in this three-year-long case – that the creation and sale of Edited Motion Pictures constitutes "criticism" of the Studios' Motion Pictures.[18]  This is frivolous.

The obvious and incontrovertible overriding purpose of Defendants' use here is to profit by tailoring and marketing the Studios' Motion Pictures to exploit a perceived market. The purpose of the Edited Motion Pictures is to entertain the viewer.  It is <u>not</u> to publicly criticize, parody or otherwise comment on the content of each specific copyrighted Motion Picture.[19]  Indeed, with the allegedly objectionable material deleted from the Studio's Motion

---

[18]   Defendants never alleged criticism in their clarifying statements, deposition testimony or interrogatory responses.

[19]   In order to qualify as transformative under the first fair use factor, the criticism "must target the original, and not just its general style, the genre of art to which it belongs, or society as a whole . . . ." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400 (9th Cir. 1997) (citation and quotations omitted).

Picture, how exactly is the viewer of an Edited Motion Picture (who allegedly refuses to view the unedited original) supposed to know what specific content is being criticized through editing?[20]

In *Castle Rock Ent'm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 142-43 (2d Cir. 1998), a closely analogous case, the defendants, who had recast the plots and facts from various episodes of the popular television series *Seinfeld* into an unauthorized trivia book ("*The SAT*"), also claimed that their infringing work was a fair use because it was "criticism" of the TV show.[21]   In an analysis that is equally applicable here, the Second Circuit readily rejected this claim of "criticism" on summary judgment, holding:

> Finally, even viewing *The SAT* in the light most favorable to defendants, we find scant reason to conclude that this trivia quiz book seeks to educate, criticize, parody, comment, report upon, or research *Seinfeld,* or otherwise serve a transformative purpose.  The book does not contain commentary or analysis about *Seinfeld,* nor does it suggest how *The SAT* can be used to research *Seinfeld;* rather, the book simply poses trivia questions. *The SAT'* s plain purpose, therefore, is not to expose *Seinfeld'* s "nothingness," but to satiate *Seinfeld* fans' passion for the "nothingness" that *Seinfeld* has elevated into the realm of protectable creative expression.

*Id.  See also Pacific & Southern Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) (rejecting fair use argument where defendant's use was "neither productive nor creative in any way.  It does not analyze the broadcast or improve it at all. . . . TV News Clips only copies and sells.").

Moreover, Defendants' efforts to rely on their consumers' purported desire to criticize Hollywood is the kind of bootstrapping not permitted in a fair use defense.  As set forth

---

[20]   If Defendants' purpose were legitimately criticism of the content of the Motion Pictures, they could do so easily and far more effectively by means, such as published writings or other expressive works, that do not copy virtually the entire motion picture and infringe the Studios' copyrights.  Defendants also provide no explanation as to how "opting not to view [ ] particular scenes in movies that contain [certain] material" is a more effective criticism of the Studios' Motion Pictures than a traditional boycott, in which the objecting party refuses to purchase or watch the "offensive" motion picture.  (CleanFilms Opp. at 7).

[21]   In a statement which is no less apparent fabrication than Defendants' claim of criticism here, the defendants in *Castle Rock* claimed that their trivia book was "a quintessential example of critical text of the TV environment .... expos[ing] all of the show's nothingness to

in the Studios' Moving Brief (at 29-30), whether the Defendants' customers make noncommercial use of the Edited Motion Pictures does not affect whether the Defendants' commercial activities are fair. *See, e.g., Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998) ("the question of whether defendants' copying and transmission of the [video footage] constitutes fair use is distinct from whether their subscribers' broadcasts of the works are fair use"); *Princeton University Press v. Michigan Document Servs. Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996) ("the courts have . . . properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses") (internal quotations and citation omitted).

Accepting Defendants' *post hoc* efforts to mischaracterize their infringing, purely commercial activities as being encompassed within the higher purposes of legitimate fair use would stretch the defense beyond recognition. *See Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992) (rejecting defendant's argument that his work was a parody recognized by the fair use doctrine, explaining that "[i]f an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different artistic use . . . there would be no practicable boundary to the fair use defense.").[22]

    (3)    The Purported "Public Benefit" of Providing "Clean" Versions of the Studios' Motion Pictures Does Not Further the Purposes of Copyright Law

Defendants' assertion that their sale of Edited Motion Pictures "is undoubtedly of great public benefit," because it provides "discerning viewers with a 'clean' viewing no alternative, " does not insulate their infringing activities. (CleanFilms Opp. at 21.)

---

articulate its true motive forces and its social and moral dimensions." *Castle Rock*, 150 F.3d at 142.

[22] In granting summary judgment for the plaintiff on fair use, the district court in the *Rogers* case also saw through the defendant's argument that his work was intended to criticize

In assessing fair use, the "ultimate test" "is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts' . . . would be better served by allowing the use than by preventing it." *Castle Rock*, 150 F.3d at 141 (quoting U.S. Const., art. I, § 8, cl. 8; additional citations omitted). Far from encouraging creativity, Defendants' argument of "public benefit" through access to unauthorized derivative works undermines the purposes of the Copyright Act itself. As explained by the Supreme Court:

> [A]lthough dissemination of creative works is a goal of the Copyright Act, the Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works. The copyright term is limited so that the public will not be permanently deprived of the fruits of an artist's labors. [Citation omitted]. But nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright.

*Stewart v. Abend*, 495 U.S. 207, 228-29 (1990). The policy that has prevailed under federal copyright law holds that prohibition of unauthorized copying protects investment in creating motion pictures, and serves the public interest by encouraging such investment. *See Castle Rock*, 150 F.3d at 146 ("It would . . . not serve the ends of the Copyright Act – *i.e.*, to advance the arts – if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original.") (internal quotations and citation omitted). In contrast, Defendants' "public benefit" argument "amounts to nothing more than a bald claim that defendant should be able to misappropriate plaintiff's property simply because there is a consumer demand for it. This hardly appeals to the conscience of equity." *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000).

---

the original. *Rogers v. Koons*, 751 F. Supp. 474, 479 (S.D.N.Y. 1990) ("Koons' sculpture does not criticize or comment upon Rogers' photograph. It simply appropriates it.").

Not only is Defendants' "public benefit" argument legally deficient, but it is devoid of factual basis. It is undisputed that the public already has access to motion pictures that have been edited for content, as fully-licensed versions of the Studios' Motion Pictures are presently available on television.[23] Additionally, now that the Family Movie Act has been passed permitting electronic editing technology, any public benefit from the Defendants' offering of their specific versions of edited movies can be accomplished by lawful methods and cannot justify the Defendants' activity. *See Infinity Broadcast*, 150 F.3d at 108-09 (finding no fair use even where defendant alleged a "substantial benefit to society" through his retransmissions of broadcasts).

    (4)   <u>Defendants' Edited Motion Pictures Are Not Transformative</u>

The first fair use factor also asks "whether and to what extent the new work is 'transformative,'" *Campbell*, 510 U.S. at 579 (internal citations omitted), and seeks a determination as to whether the alleged infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new . . . meaning [ ] or message . . . ." *Id.* "Rather than making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use." *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1995).

---

[23] Defendants ground their support for their "public benefit" argument on "judicial notice" and facts not in the record. *See* CleanFilms Opp. at 21. However, courts may not take judicial notice of unsupported, subjective concepts such as parental need for Edited Motion Pictures and the level of objectionable content in motion pictures.

The Edited Motion Pictures are not transformative in any sense cognizable under the fair use defense.[24] Defendants admit that they "edit out a very, very small percentage of the total footage of any given film" (*see* CleanFilms Opp. at 1), leaving the plot, mood, characters, setting, tone and overall message of the Motion Pictures virtually untouched. Defendants similarly admit that "[n]othing 'new' [is] added. . . ." (CleanFilms Opp. at 12). Thus, Defendants have not met their burden of showing how the removal of "only 30 seconds to 2 minutes of footage" of each feature-length film (see CleanFilms Opp. at 4) can "transform" a commercial motion picture.

Defendants' Edited Motion Pictures are designed to be used solely for the "same intrinsic purpose" as the original works: to entertain members of the public. *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) ("Although transformative use is not absolutely necessary for a finding of fair use, . . . where the use is for the same intrinsic purpose as the copyright holder's . . . such use seriously weakens a claimed fair use.") (citations and internal quotations omitted); *American Geophysical Union*, 60 F.3d at 923 ("Rather than making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use.").

Editing a film to the taste of certain members of the public does not transform the work. To hold otherwise would allow anyone to delete a small number of scenes from a film and then claim they could reproduce and sell it because it was "transformed." Such an interpretation

---

[24] The use of "transformed," in the context of derivative works, is not the same "transformative," as that term is used in the first element of the fair use test. *See Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 143 (2d Cir. 1998). "Although derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works – unlike works of fair use —take expression for purposes that are not 'transformative.'" *Id.*

of the copyright law would result in a near total evisceration of a copyright holder's rights, and simply cannot be condoned.  As illustrated above and in the Studios' Moving Brief (at 28-29), the Defendants' uses of the derivative works are not the type of uses that courts hold to be transformative.

Accordingly, this factor weighs decidedly against a finding of fair use.

### C.    The Nature of the Copyrighted Work Weighs Against Fair Use

Defendants do not address the Studios' argument on the second factor of the fair use defense and thus concede this factor. *See, e.g.,* CleanFlicks Opp. at 5.

### D.    The Amount and Substantiality of the Portion Used by Defendants – Virtually the Entirety – of the Studios' Motion Pictures – Weighs Against Fair Use

The third fair use factor also weighs strongly against a finding of fair use here. The plain language in Section 107(3) of the Copyright Act unambiguously and expressly directs the Court to consider "whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' are reasonable in relation to the purpose of the copying." *Campbell,* 510 U.S. at 586 quoting 17 U.S.C. § 107(3)).  Nonetheless, Defendants urge that this Court do the opposite, *i.e.,* to analyze the third fair use factor with respect to the amount <u>not used</u>.  No such departure from the law is warranted here, nor do Defendants cite any authority even suggesting that this Court should ignore both the statutory mandate and well-established legal precedent.

It is undisputed that Defendants take virtually all of the work, leaving out only "a very, very small percentage of the total footage of any given film." (*See* CleanFilms Opp. at 1.) Defendants admit that they take so much that the run-time of each motion picture stays virtually the same, with a reduction of approximately "only 30 seconds to 2 minutes of footage" of each

feature-length film. *Id.* at 4. Thus, as a matter of law, the amount of the taking is overwhelmingly substantial.

"While 'wholesale copying does not preclude fair use per se,' copying an entire work 'militates against a finding of fair use.'" *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (quoting *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986)). However, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper & Row*, 471 U.S. at 565.

The Supreme Court has explained that "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. As discussed above in the context of the first factor analysis, the Edited Motion Pictures are not transformative but instead are used "for the same intrinsic purpose for which the copyright owner intended it to be used," namely to entertain viewers. *Worldwide Church of God*, 227 F.3d at 1118 (citations and internal quotations omitted).

Not only does Defendants' copying take a substantial amount of physical footage, but it also takes the story, plot, themes, characters, mood and setting of each motion picture. Each Edited Motion Picture is, in virtually all respects, a near-complete substitute for the original.

This third factor, therefore, also weighs decidedly against a finding of fair use.

E.    **The Edited Motion Pictures Serve as Direct Market Substitutes for the
      Studios' Motion Pictures and Usurp the Studios' Exclusive Right to Develop
      The Market for Authorized Edited Versions of Their Motion Pictures**

    (1)    The Mechanical Editing Parties' Argument of Public Benefit Does Not
           Eliminate Their Burden of Showing Lack of Effect on the Market

As established above, contrary to their assertion, the burden is on Defendants to

show (1) that their use cannot serve as a market substitute for the copyrighted work, and (2) the

lack of effect of the use upon the potential market for or value of the copyrighted work.

Defendants have failed to meet their burden here.[25]

As the Supreme Court has explained, this factor "requires courts to consider not

only the extent of market harm caused by the particular actions of the alleged infringer, but also

whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would

result in a substantially adverse impact on the potential market for the original." *Campbell*, 510

U.S. at 590 (citation and internal quotations omitted). *Accord, Sony Corp. v. Universal City*

_____

[25]   Defendants' assertion that the fourth fair use factor is the "most important" is also
incorrect. "The Supreme Court has recently retreated from its earlier cases suggesting that the
fourth statutory factor is the most important element of fair use, recognizing instead that '[a]ll
[factors] are to be explored, and the results weighed together, in light of the purposes of
copyright.'" *Castle Rock.*, 150 F.3d at 145 (*quoting Campbell*, 510 U.S. at 578). "Market harm
is a matter of degree, and the importance of this factor will vary, not only with the amount of
harm, but also with the relative strength of the showing on the other factors." *Campbell*, 510
U.S. at 591 n.21. The *Basquiat* and *Storm Impact* cases are legally and factually distinguishable
from the case at hand. First, in *Basquiat v. Baghoomian*, No. 90-Civ-3853 (LJF), 1991 WL
253334, at *2 (S.D.N.Y. Nov. 19, 1991), the court did not "prioritize" any particular factors, but
instead briefly noted that where certain factual issues remained, such as whether the defendant
was even currently promoting or encouraging sales of an allegedly infringing work, partial
summary judgment on the issue of infringement was inappropriate at the time. The self-
contradiction contained in *Storm Impact, Inc. v. Software of the Month Club*, No. 95 C 2154,
1997 WL 566378, at *4, 7-8 (N.D. Ill. Sept. 8, 1997), renders the persuasiveness of the decision
questionable. Without explanation, the court relied on *Harper & Row* to determine that
questions as to the fourth factor made summary judgment inappropriate, even though earlier in
the opinion the court cited the more-recent *Campbell* case for the proposition that the factors
"are not to be treated in isolation, but are to be explored and the results weighed together, in light
of the purposes of copyright on a case-by-case basis." *Id.* The decision stands apart from the
majority of modern post-*Campbell* fair use cases, which apply a more balanced approach.

*Studios, Inc.*, 464 U.S. 417, 451 (1984) (stating that for the copyright holder to prevail on the fourth factor, "[a]ctual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage."); *Harper & Row*, 471 U.S. at 568 (the inquiry "must take account not only of harm to the original but also of harm to the market for derivative works."). Defendants have offered no evidence to meet their burden of establishing an issue of fact as to this factor.

(2)     A Showing of an Alleged Benefit to the Studios is Irrelevant to Fair Use

Defendants' argument that the Studios are likely to benefit from Defendants' business cannot serve as a substitute for the required showing on the fourth factor of the fair use test. Courts have flatly rejected arguments of benefit to the plaintiff as irrelevant to the fair use inquiry. *See, e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1018 (9th Cir. 2001) ("increased sales of copyrighted material attributable to unauthorized use should not deprive the copyright holder of the right to license the material. . . . Nor does positive impact in one market . . . deprive the copyright holder of the right to develop identified alternative markets . . . .") (citations omitted); *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 n. 16 (2d Cir. 1997) (noting that even if the unauthorized use of the plaintiff's work in the defendant's program might increase sales of the defendant's work, that does not preclude plaintiff her entitlement to a licensing fee); *DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir. 1982) ("Since one of the benefits of ownership of copyrighted material is the right to license its use for a fee, even a

speculated increase in [plaintiff's] comic book sales as a consequence of [defendant's] infringement would not call the fair use defense into play as a matter of law.  The owner of the copyright is in the best position to balance the prospect of increased sales against revenue from a license."); *Los Angeles Times v. Free Republic*, 54 U.S.P.Q.2d 1453, 1471 (C.D. Cal. 2000) (citing cases to explain that "[c]ourts have routinely rejected the argument that a use is fair because it increases demand for the plaintiff's copyrighted work"); *Storm Impact, Inc. v. Software of the Month Club*, 13 F. Supp. 2d 782, 790 (N.D. Ill. 1998) ("This argument that increased distribution of the author's work is a benefit to the author has been rejected by the Supreme Court.").  *See also Campbell*, 510 U.S. at 591 n. 21 ("Even favorable evidence, without more, is no guarantee of fairness.  Judge Leval gives the example of the film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success; the boon to the song does not make the film's simple copying fair.").

      (3)    Defendants' "One-to-One" Theory of Lack of Market Harm Fails as a Matter of Law and Fact

Defendants summarily claim that the Studios somehow "break even" as a result of their purported "one-to-one" scheme and, therefore, the policy behind the Copyright Act to encourage investment is not implicated.  However, the extent of Defendants' infringing actions here fully underscore that any purported "one-to-one" defense should be rejected as wholly illusory and unenforceable.  For instance, CleanFlicks, a supplier of numerous edited video distributors including CleanFilms and Play It Clean, has repeatedly admitted that it does not in fact "disable" an original Studio DVD for every edited version it sells.  Rather, CleanFlicks provides its customers with <u>both</u> an original DVD and an edited version. *See* Zavin Decl. Exh. A (CleanFlicks Answer) at ¶ 37 ("CleanFlicks admits that they currently provide the customer with both the original, unaltered DVD and the recordable DVD containing the edited copy of the

Studio's film."); *id.* Exh. C (CleanFlicks Interrogatory Responses) at Response 9.   Such duplication and creation of infringing copies causes direct market substitution as CleanFlicks' customers receive are free to alienate one or both of the motion picture DVDs distributed into the market by CleanFlicks.   Clearly, the widespread dissemination and substitution of <u>two</u> copies (*i.e.* an edited version in addition to the original version) would cause the Studios extreme market harm and, accordingly, simply cannot be condoned.   Indeed, as discussed above at 12-13, the Copyright Office has expressed concern with such a situation, noting that "[r]elying on voluntary deletion is an open invitation to virtually undetectable cheating, and there is no reason to believe there would be general compliance with such a requirement."   Copyright Office Report at 97.   If this type of "cheating" became widespread, market harm would be an incontrovertible result.

Further, Defendants' edited versions are not copy protected as Defendants necessarily strip away the copy protection systems incorporated in the Studios' original DVDs as part of their editing process.   *See* Studios' Opening Brief (Statement of Undisputed Facts) at ¶¶ 25, 41 and sources cited therein.   The undisputed testimony of Ray Lines of CleanFlicks establishes numerous instances where edited video retailers, including Defendants Family Flix and Play It Clean, have made unauthorized copies of CleanFlicks' Edited Motion Pictures, causing further market harm to the Studios.   *See* Zavin Decl. Exh. D (Lines Depo.) at 70:14-22 ("[Richard Teraci of Family Flix] was doing the same thing that everybody else was doing, which was … he ordered, I think, a hundred movies initially, and he was copying them."), at 71:12-18 (testifying that Family Flix had copied CleanFlicks movies: "[Family Flix] had multiple copies of the same titles, and we'd only sold him one"), at 98:14-23 (Play It Clean "w[as] one of the dealers that were copying movies, so we had [to] cut them off.").

Defendants' bald assertion that the Studios "likely benefit" from Defendants' infringing activities (*see* CleanFilms Opp. at 28) is, thus, a wholly speculative theory that Defendants fail to factually support. While Defendants claim that the Studios "received revenues from the sale of the [original] movies to the Mechanical Editing Parties," (*see* CleanFlicks Opp. at 12 & n.1; CleanFilms Opp. at 9 & n.4), in fact it is undisputed that Defendants acquire used copies of the Studios' authorized DVDs, conduct which solely serves to increase Defendants' profit margins. *See* Zavin Decl. Exh. D (Lines (CleanFlicks) Depo.) at 90:3-15 ("Q: Does it matter to you whether the originals you buy are new or used? A: No ... as long as they're in good shape."); *id.* Exh. H (Teraci (Family Flix) Depo.) at 85:16 – 86:5 ("Q: Do you buy them new or used? A: ... We do both. Q: Do you have a reference? A: Well, I would say being able to buy the movie at the best price is a really important factor.").

As the courts have held, the market for derivative works belongs exclusively to the copyright owner, and the copyright owner has the sole right to decide to exploit the market or not. *See A&M Records, Inc. v. Napster,* 239 F.3d 1004, 1017 (9th Cir. 2001) ("lack of harm to an established market cannot deprive the copyright holder of the right to develop alternative markets for the works"); *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998) ("Only Formgen has the right to enter [the market for new versions of the work]; whether it chooses to do so is entirely its business."); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 145-46 (2d Cir. 1998) ("Although Castle Rock has evidenced little if any interest in exploiting this market for derivative works based on *Seinfeld,* such as by creating and publishing *Seinfeld* trivia books ..., the copyright law must respect that creative and economic choice."); *see also Salinger v. Random House, Inc.,* 811 F.2d 90, 100 (2d Cir. 1987) ("Public

awareness of the expressive content of the letters will have to await either Salinger's decision to publish or the expiration of his copyright...").

It is an undisputed fact that the Edited Motion Pictures compete with, and indeed are direct market substitutes for, the Studios' own edited versions of their Motion Pictures, which are distributed and exploited in the airline and television markets. Moreover, the dollar premium that Defendants place on the Edited Motion Pictures illustrates a usurpation of a viable market that the Studios, as owners of the copyrighted Motion Pictures, have every right to exploit at their choosing. *See, e.g., Micro Star*, 154 F.3d at 1113; *Castle Rock*, 150 F.3d at 145-46.

(4)    The *Williams & Wilkins* Case Does Not Affect Defendants' Burden on the Fourth Factor

Defendants' fourth factor analysis erroneously relies on *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1362 (Ct. Cl. 1973), *aff'd*, 420 U.S. 376 (1975). The *Williams* court, however, explicitly limited its holding to the type of copying of articles done by researchers at government medical research libraries, explaining that "we do not pass on dissimilar systems or uses of copyrighted materials by other institutions or enterprises, or in other fields, or as applied to items other than journal articles, or with significant variables." The concerns about harm to the advancement of medical science are not present in this case.

Moreover, both the Ninth Circuit Court of Appeals[27] and Professor Nimmer,[28] the leading commentator on copyright law, have acknowledged the validity of *Williams* dissenting

---

[27]    *See Universal City Studios, Inc. v. Sony Corp. of America*, 659 F.2d 963, 971 (9th Cir. 1981) ("We believe that Williams & Wilkins Co. is clearly distinguishable. It appears that the Court of Claims was primarily concerned about the serious damage to medical science that would result if it held for the plaintiff. In this case, there is no corresponding countervailing societal benefit to 'weigh' against the copyright interests of the author. We do not mean to suggest that increased access to such Disney products as 'Chip and Dale/Mixed Nuts' is not a benefit to society. We only mean to say that the consequences attendant upon reduced consumer control of access do not in any way correspond to the deleterious consequences of reduced access identified by the Court of Claims in Williams & Wilkins Co."), *reversed on other grounds, Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

Judge Nichols in calling it the "Dred Scott decision of copyright law."  487 F.2d at 1387

(Nichols, J., dissenting).

      **F.**      **Aggregate Assessment of Fair Use Factors**

      None of the foregoing fair use factors support a finding of fair use in this case.

Accordingly, the Studios are entitled to summary judgment on their copyright infringement

claims as a matter of law.

**III.**      **THE DEFENDANTS HAVE NOT MET THEIR BURDEN OF PROOF ON THEIR**
             **AFFIRMATIVE DEFENSES OF ESTOPPEL, LACHES AND WAIVER**

      Estoppel, laches and waiver are affirmative defenses for which Defendants have

the burden of proof.  *See, e.g., Paul v. Monts*, 906 F.2d 1468, 1474 (10th Cir. 1990); *Bowe v.*

*SMC Electrical Prods., Inc.*, 935 F. Supp. 1126, 1135 (D. Colo. 1996).  In opposing the Studios'

motion, Defendants offered no evidence to support any of these defenses.  Thus, as a matter of

law, the Studios are entitled to summary judgment dismissing Defendants' estoppel, laches and

waiver defenses.

**IV.**      **THE DEFENDANTS' CREATION AND DISTRIBUTION OF**
             **EDITED MOTION PICTURES HAS NOT BEEN LEGALIZED BY**
             **THE FAMILY MOVIE ACT**

      Defendants' assertion that the Family Movie Act[29] should be held to apply to

them (*see* CleanFilms Opp. at 30-31): (1) purposefully disregards the unambiguous statutory

---

[28]   *See* 4 M. Nimmer & D. Nimmer, Copyright, § 13.05[E][4][c], at 13-251-252 (1996)
("This landmark decision by the Court of Claims appears to this writer to be seriously in error,
with implications that might well justify its description by one of the dissenting judges as 'the
Dred Scott decision of copyright law.'  Relying upon this factor, the court made the point in its
first 'proposition' . . . that the plaintiff failed to show 'that it is being or will be harmed
substantially' by the defendant's photocopying practices, and from this concluded that such
practices by the defendant constitute fair use.  In this the court fell into error by confusing the
issues of damages and liability. . . . Far from justifying a defense of fair use, failure to prove
damages will in the usual case give rise to a minimum statutory damages liability.").

[29]   The Family Movie Act of 2005 is Title II of the Family Entertainment and Copyright
Act of 2005 (S. 167, 109th Cong. (2005)), Zavin Decl. Exh. X.  *See* Copyright Act, 17 U.S.C.
§ 110 (as amended).

language, conclusive here, which provides an exception from infringement only "if no fixed copy of the altered version of the motion picture is created;" (2) overlooks the Act's relevant legislative history, which states that the Act's "exemption only applies to viewer directed changes the viewing experience, and not the making or distribution of actual altered copies of the motion picture;" and (3) ignores this Court's previous ruling that the Family Movie Act does not apply to Defendants.

Where, as here, Congress' intent is unambiguous, the statutory language is conclusive. *See Ben Ezra, Weinstein, and Co. v. America Online Inc.*, 206 F.3d 980, 984 (10th Cir. 2000) ("In construing a federal statute, we 'give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.'") (citation omitted).

The Family Movie Act provides only a narrow exemption to copyright infringement which Congress explicitly and unambiguously declined to extend to fixed copies of edited motion pictures such as the Edited Motion Pictures created and distributed by Defendants. *See* Copyright Act, 17 U.S.C. § 110(11) (as amended by the Family Entertainment and Copyright Act of 2005) ("the following are not infringements of copyright: ... (11) the making imperceptible, <u>by or at the direction of a member of a private household,</u> ... of limited portions of audio or video content of a motion picture ... from an authorized copy of the motion picture ... <u>if no fixed copy of the altered version of the motion picture is created</u>") (emphasis added).[30]

_____

[30]   Even if the statutory language were ambiguous – which it is not – the Court could resolve the ambiguity by reviewing the relevant legislative history. *See In re Geneva Steel Co.*, 281 F.3d 1173, 1178 (10th Cir. 2002) ("If a statute is ambiguous, a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history."); *New Mexico Cattle Growers Ass'n v. United States Fish and Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001) (same); *City and County of Denver v. Continental Air Lines, Inc.*, 712 F. Supp. 834, 836 (D. Colo. 1989) (J. Matsch) ("The legislative history of the . . . Act reinforces this court's conclusion [concerning Congress' intent.]").

In the case of these Defendants, they do the editing, not "a member of a private household," and they make "fixed copies." Indeed, in its opposition, CleanFilms implicitly admits that the Act does not currently exempt Defendants from infringement, suggesting instead that "sometime soon" Congress may pass additional legislation. *See* CleanFilms Opp. at 35.

While CleanFilms also suggests that the exemption may be extended by Court "interpretation," it provides absolutely no legal basis to support such a court statutory construction, and disregards that this Court has already declined to adopt such an interpretation. *See* Rimokh Reply Decl., Exh. D (Status Conference Transcript of Proceedings, dated July 21, 2005), at 13:16-23 ("The Court:  There has been the contention made by … CleanFilms and Family Flix, that we ought to treat everybody the same here, and, therefore, should expand the scope of the Family Entertainment and Copyright Act of 2005 to include the technology whereby the films are actually edited – I mean, the equivalent of being edited before they go to the public. I'm not going to do that.  I don't think that the statute has affected the dispute with respect to that.").

Because the Family Movie Act's exception to infringement does not extend to the conduct of Defendants – whose unauthorized Edited Motion Pictures are indisputably "fixed" on

---

Here, the relevant legislative history confirms that the protection afforded by the Family Movie Act does not extend to fixed copies of edited motion pictures. *See* Studios' Opening Brief at 36-37; Section-by-Section Analysis of the Family Movie Act of 2004, Amended and Passed by the Senate, 151 Cong. Rec. at 502 (January 25, 2005) (*available at* 2005 WL 182071 (Cong. Rec.)) ("There are a variety of services currently in litigation that distribute actual copies of altered movies.  This type of activity is not covered by the section 110(11) exemption created by the Family Movie Act. . . .  The … exemption only applies to viewer directed changes to the viewing experience, and not the making or distribution of actual altered copies of the motion picture."); House Report, H.R. Rep. No. 109-33(I) at 6-7 (April 12, 2005) (*available at* 2005 WL 858196 (Leg. Hist.)) ("The Act does not create an exemption for actions that result in fixed copies of altered works.  The Committee is aware of services and companies that create fixed derivative copies of motion pictures and believes that such practices are illegal under the Copyright Act.").

DVD, VHS tapes and computer storage devices – CleanFilms' request that the exception be extended to Defendants' infringing activities in this case should be summarily rejected.

## V.   THE IMMEDIATE ISSUANCE OF A PERMANENT INJUNCTION IS WARRANTED

While it is true that an injunction under § 502(a) is discretionary, courts routinely grant permanent injunctions in copyright infringement cases. *See, e.g., Taylor Corp. v. Four Seasons Greetings, LLC,* 403 F.3d 958, 967-68 (8th Cir. 2005); *Veeck v. Southern Bldg. Code Congress Intern. Inc.,* 241 F.3d 398, 402 (5th Cir. 2001); *JMV Music, Inc. v. Cichran,* No. 00-4094-SAC, 2000 WL 1863478, at *2 (D. Kan. Nov. 16, 2000). Injunctive relief is the only and appropriate relief here.

The Ninth Circuit's statement in *Abend v. MCA, Inc.* (a case relied on by Defendants), that "where great public injury would be worked by an injunction, the courts *might* . . . award damages or a continuing royalty instead of an injunction *in such special circumstances,*" was reserved for very limited, "special" situations. 863 F.2d 1465, 1479 (9th Cir. 1988) (emphasis added, internal citations omitted). In the *Abend* situation, the copyright owner had authorized the derivative work (a film based on a short story) and many people had contributed a great deal of time, money and creative effort to create a classic film based on that short story. Because the grantor died before the expiration of the first term of copyright, the Court held that the grant of the right to distribute the derivative work expired. This termination of the right to distribute was caused by the not necessarily foreseen death of the author in the first term of copyright in the underlying short story, not because the grantees had ever created an unauthorized work. One of the unique factors considered by the court in *Abend* was the significant creative and financial effort made to create the film ("Rear Window," directed by Alfred Hitchcock, and starring Jimmy Stewart and Grace Kelly), and the possibility that the

public would be deprived of a classic original work.  None of these factors are even close to being present in the instant case.  *Cf. Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997); *Woods v. Universal City Studios, Inc.*, 920 F. Supp. 62, 65 (S.D.N.Y. 1996) (awarding injunctive relief where defendant did not demonstrate that "special circumstances" or "great public injury" existed).

Nor does *New York Times Co. v. Tasini*, 533 U.S. 483, 505 (2001) (suggesting that injunction against electronic versions of articles, which had been previously licensed for print publication by defendant, where licensors and licensees could enter into a new license agreement expanding publishing rights), which Defendants also cite, support the denial of injunctive relief here.  In this case, as in *Abend*, there was an initial grant authorizing the publication of the articles.  The issue was publication in new media in which it was unclear who held the rights.  The defendants in *Tasini* were not bad actors.  The reasons that Defendants list in support of their argument – namely that the Studios allegedly will not suffer irreparable harm and that consumers will be deprived of edited movies – are anything but "special," and are completely unlike the unique situations presented in *Abend* or *Tasini*.

Defendants forget that the establishment of copyright infringement yields a presumption of irreparable harm.  *See, e.g., Taylor Corp.*, 403 F.3d at 967-68 (awarding a permanent injunction and explaining that "[the plaintiff] certainly has the right to control the use of its copyrighted materials, and irreparable harm inescapably flows from the denial of that right."); *Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329, 338 (S.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2d Cir. 1999) (explaining that irreparable harm is presumed where infringement is shown; declining to grant an injunction where not doing so "would, in effect,

make any copyright holder an involuntary licensor of the copyright to any entity that could be relied on to pay damages.").

Similarly, the allegation that the public will be deprived of access to the infringing work is not an acceptable justification for awarding damages instead of an injunction. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985) ("Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work. . . . But Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory license' permitting unfettered access to the unpublished copyrighted expression of public figures.").

Moreover, injunctive relief is particularly required in cases like the one at hand, in which it is shown that, absent an injunction, the infringer will continue to edit more motion pictures and continue to infringe. *See National Football League v. Primetime 24 Joint Venture*, No. 98 Civ. 3778(LMM), 1999 WL 760130, at *4 (S.D.N.Y. Sept. 27, 1999). In such a situation, "the failure to issue a final injunction will ordinarily be tantamount to the creation of a compulsory license, future damages then becoming a sort of royalty." *Id. See also Cadence Design Systems*, 125 F.3d at 828 n.8 ("if the defendant is using copyrighted material owned by the plaintiff and a court awards damages instead of enjoining such use, the court has, in essence, made the plaintiff an involuntary licensor of its copyrighted material. The defendant can then use the copyrighted material to compete with the plaintiff."). As discussed above, the denial of injunctive relief in favor of a compulsory license "is not, absent compelling reason, a desirable practice or consistent with the objectives of the Copyright Act." *National Football League*, 1999 WL 760130, at *4.

## CONCLUSION

For all of the foregoing reasons, the Studios respectfully request that their motion for partial summary judgment and entry of a permanent injunction against the Defendants should be granted.

Respectfully submitted this 22nd day of September 2005.

By:  /s/
    Jonathan Zavin
    Jacques M. Rimokh
LOEB & LOEB LLP
345 Park Avenue
New York, New York
(212) 407-4000
(212) 407-4990 – Fax


By:  /s/
    Natalie Hanlon-Leh
    Christopher P. Beall
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
(303) 607-3500
(303) 607-3600 – Fax

*Attorneys for the Studio
Defendants/Counterclaimants*

NY438560.6

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

TIMOTHY B. CUMMINS, certifies as follows under penalties of perjury:

1.      I am not a party to this action and am over 18 years of age.

2.      On September 22, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following e-mail addresses:

**Jeffrey Nahinu Aldous**
ALDOUSJEFF@aol.com

**Christopher P. Beall**
cbeall@faegre.com

**Eric Michael Bono**
EricB@bairdkiovsky.com

**Andrew P. Bridges**
abridges@winston.com

**Cameron T. Chandler**
ctc@benningtonjohnson.com

**Bennett L. Cohen**
bcohen@stklaw.com

**Kathleen E. Craigmile**
kec@benningtonjohnson.com

**Erika Zimmer Enger**
enger.ericka@dorsey.com

**Carolyn J. Fairless**
fairless@wyklaw.com

**Natalie Hanlon-Leh**
Nhanlon-leh@faegre.com

**Thomas P. Howard**
thoward@thowardlaw.com

**James W. Hubbell**
jhubbell@khgk.com

**Thomas B. Kelley**
tkelley@faegre.com

**Nathan Michale Longenecker**
longenecker@twhlaw.com

**Scott Joseph Mikullecky**
Smikulee@sah.com

**Darwin (D.J.) K. Poyfair**
djpoyfair@stklaw.com

**David N. Schachter**
dschachter@sah.com

**Mark A. Wielga**
wielga@twhlaw.com

**Jonathan Zavin**
jzavin@loeb.com

3.      I further certify that I have deposited the document in the U.S.

Mail, sufficient postage prepaid, to the following non CM/ECF participants:

Ernest J. Getto
Latham & Watkins
505 Montgomery Street
San Francisco, CA  94111

Jennifer Anne Schaffner
Shughart, Thomson & Kilroy, P.C.
1050 17th Street
Denver, CO  80265


Dated:  New York, New York
September 22, 2005


/s/_____

Timothy B. Cummins