Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 253334 (S.D.N.Y.), 1992 Copr.L.Dec. P 26,824
**(Cite as: 1991 WL 253334 (S.D.N.Y.))**

Page 1

H

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Gerard BASQUIAT, Plaintiff,
v.
Vrej Baghoomian, et al., Defendants.
**No. 90-Civ-3853 (LJF).**

Nov. 19, 1991.
Cinque & Cinque, P.C. by James P. Cinque, New York City, for plaintiff.

John B. Koegel, New York City, for defendants.

*Order and Opinion*

FREEH, District Judge.

**\*1** In this action, plaintiff Gerard Basquiat ("Basquiat"), administrator of the estate and father of the late Jean-Michel Basquiat ("Jean-Michel"), alleges that defendant Vrej Baghoomian ("Baghoomian"), individually and through his company, Vrej Baghoomian, Inc., infringed the estate's copyright in numerous works of art created by Jean-Michel. More specifically, Basquiat claims that Baghoomian published a book containing photographs of sixty-nine (69) of Jean-Michel's paintings, prints and drawings without obtaining permission from or paying any royalties to the estate. Baghoomian does not deny publishing the book, but claims it was produced as a "catalogue" in conjunction with an exhibition of the works depicted. Basquiat has moved for partial summary judgment on the issue of copyright infringement. Baghoomian opposes that motion on the grounds that the publication at issue constitutes "fair use" and thus, that no liability should be imposed. For the reasons stated below, Basquiat's motion for partial summary judgment is denied.

FACTS
The artist Jean-Michel Basquiat died intestate on August 12, 1988. His father, Gerard Basquiat, was named administrator of Jean-Michel's estate. (Cinque Aff.Ex. A). During his lifetime, Jean-Michel created numerous works of art, including the sixty-nine paintings, prints and drawings at issue in this case.

Pursuant to 17 U.S.C. § 410(a), in 1990 the estate registered those sixty-nine paintings and prints with the United States Copyright Office. [FN1] (Clinque Aff.Ex.B).

Following Jean-Michel's death, the Vrej Baghoomian Gallery, allegedly the "exclusive representative and dealer exhibiting and selling all of the works of Jean-Michel Basquiat," planned and conducted an exhibition as a "tribute" to Jean-Michel. (Opposition at 4). In conjunction with that exhibition, Baghoomian and his staff prepared a one hundred fifty-four page, hardcover book containing photographs of all the works displayed at the exhibition, as well as two essays commissioned specifically for that purpose (the "Basquiat book"). (Baghoomian Aff.Ex. B). In 1989, (Baghoomian purported to copyright the book in the name of his gallery and corporation, Vrej Baghoomian, Inc. (*Id.*).

According to Baghoomian, only 4000 copies of the Basquiat book were ever published. (Baghoomian Aff. ¶ 11). Baghoomian has also stated that while the Basquiat book cost $116,000 to produce, to date the gallery has received only $58,812 from its sales. (Baghoomian Aff. ¶ 14).

DISCUSSION
Under Fed.R.Civ.P. 56, summary judgment is only appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Because questions of fact remain in dispute here, Basquiat's motion for partial summary judgment must be denied.

In his complaint, Basquiat claims that Baghoomian is "currently exhibiting, selling, reproducing and publishing" Jean-Michel's art (Complaint ¶ 12) in violation of the estate's exclusive right under the Copyright Act to reproduce the copyrighted works, to prepare derivative works based on the copyrighted works, and to distribute copies of the copyrighted works. 17 U.S.C. § 106. In their papers before this Court, the parties have focused exclusively on the publication of the Basquiat book as the allegedly infringing activity. Accordingly, the Court cannot address Basquiat's other claim, that Baghoomian is also exhibiting and selling Jean-Michel's work without authorization.

**\*2** Baghoomian does not deny that he prepared and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 2
Not Reported in F.Supp., 1991 WL 253334 (S.D.N.Y.), 1992 Copr.L.Dec. P 26,824
**(Cite as: 1991 WL 253334 (S.D.N.Y.))**

sold a hardcover book containing photographs of sixty-nine of Jean-Michel's paintings, drawings and prints. Baghoomian defends against the claim of infringement, however, on the grounds that the "catalogue" he prepared constitutes "fair use." Section 107 of the Copyright Act specifically states that "the fair use of a copyrighted work, including such use by reproduction in copies ... or by any other means ... for purposes such as criticism, comment, news reporting, reaching ..., scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. In determining whether the use made of a particular copyrighted work constitutes fair use within the meaning of Section 107, courts must consider four factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

[17 U.S.C. § 107].

The question of fair use is a mixed question of fact and law. Harper & Row, 471 U.S. at 566, 105 S.Ct. at 2233--a number of factual questions remain. Neither party has presented evidence of the number of Basquiat books sold. Basquiat contends that such sales are currently continuing (Plaintiff's 3(g) Statement ¶ 4), while Baghoomian claims that he is not actively promoting or encouraging sales of the Basquiat book at this time. (Baghoomian Aff. ¶ 15). Although it appears that Baghoomian has not profited from sales of the Basquiat book, that net loss is irrelevant to the potential impact the existence of such a book may have on the estate's ability to prepare a similar book of its own. Moreover, while there is little evidence that the publication of the Basquiat book had a negative financial impact on the value of the copyrighted works, or the potential market for another book on Jean-Michel's work, Basquiat has testified that he terminated plans for his own book on Jean-Michel's work when he learned of the Basquiat book. (Basquiat Deposition at 58-64).

**\*3** Given the uncertain state of the evidence, the Court cannot find that the Basquiat book constitutes fair use as a matter of law. [FN2] Until the fair use

issue is developed and resolved, the Court also cannot determine the question of infringement. Accordingly, Basquiat's motion for partial summary judgment must be denied.

SO ORDERED.

> FN1. Baghoomian claims that this action should not proceed because the copyright registration obtained by the estate was insufficient. Such registration is a prerequisite to suit under the Copyright Act. 17 U.S.C. § 411. However, Baghoomian's vague argument regarding the adequacy of the registration obtained by the estate is unpersuasive. Absent a citation to a specific statutory provision or regulation indicating that registration of the sixty-nine works as a group rather than individually forecloses the estate from suit, the Court declines to make such a finding.

> FN2. Defendants apparently recognized that factual issues remain on the fair use question because they have not filed a cross-motion for summary judgment.

**Motions, Pleadings and Filings (Back to top)**

•       1:90cv03853       (Docket) (Jun. 07, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3132255 (W.D.Mich.), 2005 Copr.L.Dec. P 28,952
**(Cite as: 2004 WL 3132255 (W.D.Mich.))**

Page 1

C

**Motions, Pleadings and Filings**

United States District Court,
W.D. Michigan, Southern Division.
BRILLIANCE AUDIO, INC., Plaintiff,
v.
HAIGHTS CROSS COMMUNICATIONS, INC.,
Haights Cross Communications, LLC, Haights
Cross Operating Company, Recorded Books, LLC,
and Audio Adventures, LLC, d/b/a
Landmark Audio, Defendants.
**No. 1:04-CV-396.**

Dec. 30, 2004.

Terence J. Linn, Van Dyke, Gardner, Linn &
Burkhart, LLP, Grand Rapids, MI, for Plaintiff.

John C. Englander, Goodwin Procter, LLP, Boston,
MA, for Defendants.

*OPINION*

QUIST, J.

**\*1** Plaintiff, Brilliance Audio, Inc. ("BAI"), has sued
Defendants, Haights Cross Communications, Inc.,
Haights Cross Communications, LLC, Haights Cross
Operating Company, Recorded Books, LLC, and
Audio Adventures, LLC (collectively "Defendants"),
alleging claims for copyright infringement and
trademark infringement, unfair competition, and
dilution under federal law, and trademark
infringement and unfair competition under state law.
BAI, a producer and seller of recorded books, or
"audiobooks," alleges that Defendants have engaged
in copyright and trademark infringement by
repackaging and relabeling BAI's works as "library
editions," which they rent, lease, or sell for
commercial advantage. Presently before the Court is
Defendants' motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6). Defendants contend that: (1)
BAI's copyright infringement claim fails because the
Copyright Act expressly allows the purchaser of an
authorized copy of a copyrighted work to rent that
copy without the permission of the copyright holder;
and (2) BAI's trademark-based claims fail because
the first sale doctrine allows a person to use another's
mark in connection with the repackaging and resale

of goods bearing the original manufacturer's mark.
For the reasons set forth below, the Court will grant
the motion and dismiss the case.

*Facts* [FN1]

FN1. The facts are based upon the
allegations of the complaint.

BAI is engaged in the business of developing,
authoring, manufacturing, and distributing sound
recordings of literary works, commonly referred to as
"books on tape" or "audio books." (Compl.¶ 9.) BAI
has conducted its business under the trademark and
trade name "Brilliance" since at least 1983, and has
registered the Brilliance mark on the principal
register of the United States Patent and Trademark
Office, Registration No. 1,919,390. (*Id.* ¶¶ 9, 15.) In
the course of its business, BAI has registered and has
applied to register its copyrights in the sound
recordings that it produces. (*Id.* ¶ 18.) BAI packages
and markets different versions or editions of its books
on tape both for retail sale and as "library editions" to
libraries and other lending institutions. (*Id.* ¶ 19.)

BAI alleges that Defendants are repackaging and
relabeling BAI's copyrighted sound recordings as
being "library editions" and that Defendants rent,
lease, or lend BAI's copyrighted products for
commercial advantage. [FN2] (*Id.* ¶ 20, 22-24.)
BAI also alleges that Defendants are using BAI's
Brilliance mark on the repackaged and relabeled
products. (*Id.* ¶¶ 26, 33.) BAI claims that
Defendants have engaged in copyright infringement
through their acts of renting or leasing their
repackaged products for commercial advantage. (*Id.* ¶
28.) In addition, BAI contends that Defendants' use
of the Brilliance mark on their repackaged and
relabeled goods constitutes trademark infringement,
unfair competition, and dilution under federal law,
and trademark infringement and unfair competition
under Michigan law. (*Id.* ¶¶ 26, 33, 39, 43-44, 48,
54.)

FN2. For purposes of this motion, the Court
will refer to Defendants as a single group
since it is unnecessary to differentiate
between the several defendant entities.

*Motion Standard*
**\*2** An action may be dismissed if the complaint fails

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3132255 (W.D.Mich.), 2005 Copr.L.Dec. P 28,952
**(Cite as: 2004 WL 3132255 (W.D.Mich.))**

Page 2

to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions or legal conclusions. *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2 *Moore's Federal Practice,* ¶ 12.34[1][b] (Matthew Bender 3d ed.2003). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

*Discussion*
I. Copyright Infringement Claim

Defendants contend that BAI fails to state a claim for copyright infringement because the "first sale" doctrine expressly permits the purchaser of an authorized copy of a copyrighted work to rent or lease that copy without the permission of the copyright holder. "The first-sale doctrine provides that once the holder of an intellectual property right 'consents to the sale of particular copies ... of his work, he may not thereafter exercise the distribution right with respect to such copies....' " *Allison v. Vintage Sports Plaques,* 136 F.3d 1443, 1447 (11th Cir.1998) (quoting M. Nimmer and D. Nimmer, *Nimmer on Copyright* § 8.12[B][1] (1997)). In the realm of copyright, the first sale doctrine is set forth in Section 109 of the Copyright Act, which provides that "the owner of a particular copy or phonorecord ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a); *see also Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 203 (4th Cir.1997) ("Generally, as permitted by what is known as the first-sale doctrine, the copyright owner's right to distribute a copyrighted work does not prevent the owner of a lawful copy of the work from selling, renting, lending, or otherwise disposing of the lawful copy."). The language "otherwise dispose of" includes the right to rent or lease an authorized copy of a work. *See Step-Saver Data Sys., Inc. v. Wyse*

*Tech.,* 939 F.2d 91, 96 n. 7 (3d Cir.1991).

Defendants further contend that the limited exception to the first sale doctrine set forth in Section 109(b) does not apply because that exception pertains only to sound recordings of musical works. The exception provides, in relevant part:

**\*3** Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording or the owner of copyright in a computer program ..., and in the case of a sound recording in the musical works embodied therein, neither the owner of a particular phonorecord nor any person in possession of a particular copy of a computer program ..., may, for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord or computer program ... by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution....

17 U.S.C. § 109(b)(1)(A).

BAI contends that Defendants' motion must be denied for two reasons. First, BAI contends that its copyright infringement claim complies with the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure and properly states all of the elements necessary for such a claim. BAI further argues that Defendants' motion is not a proper Rule 12(b)(6) motion because the motion requires the Court to look beyond the facts alleged in the complaint in order to establish the premise that Defendants purchased BAI's audiobooks at retail. Second, BAI contends that Defendants' motion must be denied because the exception to the first sale doctrine applies to all sound recordings, including sound recordings of literary works, and not solely to sound recordings containing musical works.

The Court rejects BAI's first argument regarding the procedural basis of Defendants' motion. While it is true that a Rule 12(b)(6) motion may be used to test the merits of a plaintiff's claim, such a motion is also proper where the complaint, on its face, indicates the existence of an affirmative defense or some other legal ground for dismissal of the complaint. *See Miskovsky v. Gray,* No. 03-6186, 2004 WL 1909462, at \*3 (10th Cir. Aug.27, 2004) (affirming the district court's dismissal because the face of the complaint indicated that the claim was time-barred); *Foote v. Public Hous. Comm'r of United States,* 107 F.Supp.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

270, 273 (W.D.Mich.1952) (stating that "when the allegations of the complaint show that a suit has not been brought within the statutory period, the defense of the statute of limitations may be raised under Rule 12(b)(6) by motion to dismiss, on the ground that the complaint fails to state a claim upon which relief can be granted"); McCoy v. Goord, 255 F.Supp.2d 233, 249 (S.D.N.Y.2003) (noting that while failure to exhaust a claim under the Prison Litigation Reform Act does not constitute a failure to state a claim, a 12(b)(6) motion is the proper vehicle for asserting failure to exhaust where the deficiency is apparent on the face of the complaint). Therefore, the Court need not determine whether Defendants' reliance on the first sale doctrine constitutes an affirmative defense or a doctrine of copyright law that limits the scope of a copyright owner's exclusive rights, and thus, claim for copyright infringement. Rather, the only question is whether the face of the complaint discloses some basis for dismissal, and in this case the Court concludes that it does. Furthermore, BAI alleges that Defendants "are repackaging and/or relabeling *retail* editions of Plaintiff's sound recordings as being Library Editions." (Compl. ¶ 20 (italics added).) BAI does not claim that the retail editions of its works were stolen or counterfeit. Thus, it may be reasonably inferred from the face of the complaint that Defendants' possession of BAI's products is legal, and Defendants need not prove that they purchased BAI's products.

*4 The remaining issue is whether the exception set forth in § 109(b)(1)(A) is limited to sound recordings of musical works, or whether it applies to all sound recordings. If the former is true, BAI's claim must fail, because the first sale doctrine would preclude a claim for copyright infringement based upon Defendants' leasing or rental of BAI's works. In determining this issue, the Court must first turn to the language of the statute itself. United States v. Health Possibilities, P.S.C., 207 F.3d 335, 338-39 (6th Cir.2000) ("The starting point in a statutory interpretation case is the language of the statute itself."). A court must construe a statute "as a whole and not interpret one provision in a way that would render another meaningless or superfluous." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 377 F.3d 592, 597 (6th Cir.2004) (citing Beck v. Prupis, 529 U.S. 494, 506, 120 S.Ct. 1608, 1617, 146 L.Ed.2d 561 (2000)); see also Mitchell v. Chapman, 343 F.3d 811, 825 (6th Cir.2003), cert. denied, --- U.S. ----, 124 S.Ct. 2908, 159 L.Ed.2d 814 (2004). ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a

provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (quoting Lake Cumberland Trust, Inc. v. E.P.A., 954 F.2d 1218, 1222 (6th Cir.1992)). Where the language of the statute is clear, the court may not resort to legislative history. Daniel v. Cantrell, 375 F.3d 377, 383 (6th Cir.2004).

The pertinent language for the Court's analysis is "unless authorized by the owners of copyright in the sound recording ... and in the case of a sound recording in the musical works embodied therein...." 17 U.S.C. § 109(b)(1)(A). The first part of this language establishes that the exception applies to sound recordings, but the second part, "and in the case of a sound recording in the musical works embodied therein," limits sound recordings to a specific class of sound recordings, namely, those containing musical works. Thus, the application of the statute to sound recordings is expressly limited to those containing musical works and does not cover sound recordings of literary works, such as BAI's audiobooks.

BAI contends that the exception applies to all sound recordings, because the Copyright Act broadly defines "sound recording" to include "works that result from the fixation of a series of musical, spoken, or other sounds...." 17 U.S.C. § 101. BAI further points out that the term "phonorecord" is also broadly defined to include any "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed," 17 U.S.C. § 101, and is not restricted to the capturing of only musical sounds or musical works. BAI's argument fails, however, because it ignores Section 109(b)(1)(A)'s express limitation on sounding recordings to those with "musical works embodied therein." BAI attempts to explain this language by arguing that in addition to authorization from the owner of the copyright in the sound recording, authorization is required from the owner of the musical work copyright "if" the sound recording contains musical works. (Pl.'s Mem. Opp'n at 8.) But the statute does not say that authorization is also required "if musical works [are] embodied therein"; rather, it expressly acknowledges that the exception applies only where the sound recording contains musical works.

*5 Even if the Court were to find the statute ambiguous, the legislative history still supports the conclusion that Congress intended to limit the statute to sound recordings containing musical works. The

exception was enacted through the Record Rental Amendment Act, which Congress passed in 1984 in order to address the growing phenomenon of commercial record rental businesses which allowed customers to avoid purchasing the records by taping music at home. *See* S.Rep. No. 98-162 at 2 (1983). In discussing the proposed amendment, the Committee on the Judiciary reported that "record rentals pose a serious threat to America's record companies, music publishers, performers, songwriters, and record retailers." *Id.* at 3. The report stated that "a limited modification of the first sale doctrine is warranted to remove the threat that commercial record rentals pose to the health of America's music community." *Id.* at 4. In addition, the report stated that a purpose of a particular amendment was "to make clear that the bill is fully applicable to the copyright owners of the recorded musical works as well as of the sound recording itself." *Id.* at 7. Subsequent history pertaining to the sunset provision in the original act also confirms that the problem to be addressed by the amendment was peculiar to the music industry. In its report on the extension of the act, the House Judiciary Committee noted, "In 1984, the Congress adopted the Record Rental Amendment Act, which modifies the first sale doctrine ... to prohibit the lending of phonorecords unless permitted by the owners of the copyright in the sound recording *and* in the underlying musical work." H. Rep. No. 100-776 at 1-2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4339 (italics added). In fact, during hearings, the committee heard testimony from the Register of Copyrights, who questioned whether the Act was also intended to apply to nondramatic musical works. Although the committee realized that the term "sound recording" covers literary works and dramatic musical works, as well as nondramatic musical works, it noted that the problem to be addressed by the 1984 law was that "consumers listen repeatedly to musical works, thus giving rise to the legitimate concern about displacement of sales." *Id.* at 3, 1988 U.S.C.C.A.N. at 4341. The committee further noted that:

> It is less likely ... that literary works invite the same kind of long-term, repeated enjoyment by consumers. The problems addressed by the Act in 1984 do not relate to recorded literary works, nor did the testimony in support of the legislation. In addition, during the 1988 hearings, no specific problems regarding the rental of recorded literary works were raised.
> *Id.*

In light of the foregoing, BAI has failed to provide any persuasive reason for interpreting the exception

as covering sound recordings of literary works.

II. Trademark Claims

Defendants also contend that BAI's trademark-based claims alleged in Counts II--VI of the complaint must be dismissed because the activity of which BAI complains--Defendants' use of the Brilliance mark on Defendants' repackaged products--is permitted under the first sale doctrine, which also limits trademark rights. Defendants contend that their alleged conduct is sanctioned by the rule set forth in *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924), in which the Supreme Court held that a party may use the trademark of a product's manufacturer in connection with the repackaging and resale of such unaltered product, so long as the use of that trademark does not create confusion as to the source of the repackaged goods. *See id.* at 368-69, 44 S.Ct. at 351.

**\*6** BAI does not dispute that a purchaser may repackage and resell genuine trademarked goods under the manufacturer's trademark without incurring liability for trademark infringement. (Pl.'s Mem. Opp'n at 18-19 ("Repackaging and redistributing of unaltered trademark goods is permitted under the first sale doctrine only if the repackaged goods include a proper disclosure as to that effect.").) BAI argues, however, that Defendants' motion must be denied, because BAI has properly alleged all the required elements of its trademark-based claims and Defendants are merely attempting to raise a defense rather than disputing the sufficiency of BAI's claims. BAI further contends that Defendants' motion to dismiss is improper because to prevail on their fair use and first sale defenses they would have to prove that they lawfully obtained BAI's products and that they utilized a form of notice sufficient to advise the public about the repackaging.

As with the copyright infringement claim, the Court rejects BAI's argument that Defendants may not raise their fair use and first sale arguments by way of a Rule 12(b)(6) motion. Regardless of whether Defendants' argument is characterized as a defense or a doctrine limiting BAI's trademark rights, a 12(b)(6) motion is proper where the face of the complaint discloses a basis for dismissal as a matter of law.

Under the first sale doctrine, "[t]he resale of genuine trademarked goods generally does not constitute infringement." *Softman Prods. Co. v. Adobe Sys., Inc.,* 171 F.Supp.2d 1075, 1092 (C.D.Cal.2001). *See also PACCAR Inc. v. TeleScan Techs., L.L.C.,* 319

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3132255 (W.D.Mich.), 2005 Copr.L.Dec. P 28,952
(Cite as: 2004 WL 3132255 (W.D.Mich.))

Page 5

F.3d 243, 257 (6th Cir.2003) ("The first sale doctrine applies when a purchaser 'does no more than stock, display, and resell a producer's product under the producer's trademark.' ") (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1076 (9th Cir.1995)). "The reason behind the rule 'is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.' " *Enesco Corp. v. Price/Costco Inc.,* 146 F.3d 1083, 1085 (9th Cir.1998) (quoting *NEC Elecs. v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir.1987) (citing *Prestonettes, Inc.*)). "An action will not arise where the goods being sold are genuine goods bearing a true mark." *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 78 (2d Cir.1994).

In *Prestonettes, Inc.,* the defendant purchased genuine Coty toilet powder and perfume. The defendant subjected the powder to pressure, added a binder, and sold the compound in a metal case under the Coty mark. The defendant rebottled and sold the perfume in smaller bottles. Coty alleged that the defendant had no right to use its trademark in connection with the resale of the powder and perfume. The district court held that the defendant could use Coty's trademark but ordered it to include labels on the goods which clarified that the items were made by Coty and that the goods were independently repackaged and rebottled by the defendant. The court of appeals reversed in light of the perfume's delicate nature and potential for adulteration and issued a preliminary injunction. The Supreme Court, noting that there was no allegation that the defendant was adulterating Coty's products, reversed and upheld the district court's decision allowing the defendant to sell the product with the disclosure labels. *See Prestonettes, Inc.,* 264 U.S. at 367-68, 44 S.Ct. at 351.

*7 Several courts have interpreted *Prestonettes, Inc.* as establishing a rule that a repackager of trademarked goods has an obligation to include a notice or disclaimer on the product.

Under the authority of the COTY case, the courts have required a repacker ... to use a label closely following the label approved in the COTY case. That is, the label, if it is to use the trademark of the original manufacturer, must clearly state: (1) that the trademarked product has been ... repacked; (2) that the ... repacker is wholly separate and distinct from the original manufacturer; (3) the name of the ... repacker. A fourth requirement is that the label not emphasize the original manufacturer's

trademark by putting it in larger type, different color or size, etc.

*Enesco Corp.,* 146 F.3d at 1086 n. 4 (citing 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25:35 (4th ed.1996)). Other courts have questioned whether *Prestonettes, Inc.* establishes an absolute obligation on the part of a repackager to include a label or disclaimer on its product. *See Dream Team Collectibles, Inc. v. NBA Props., Inc.,* 958 F.Supp. 1401, 1420 (E.D.Mo.1997). The Sixth Circuit has not addressed the issue, but for purposes of Defendants' motion, the Court will assume that it would require a notice or disclaimer similar to that described in *Enesco Corp.*

In this case, BAI merely alleges that Defendants have used the Brilliance mark on their repackaged goods and that such use is likely to cause confusion or dilution. (Compl.¶¶ 33, 39, 43.) As mentioned above, such an act does not generally give rise to a trademark, unfair competition, or dilution claim, and therefore fails to state a claim upon which relief can be granted. *See Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 78 (2d Cir.1994). BAI's argument that Defendants are required to prove that they "lawfully obtained" BAI's products must be rejected, because BAI admits that Defendants are repackaging retail editions of BAI's products and BAI has not alleged that Defendants have obtained those retail editions in an unlawful manner. Moreover, BAI does not allege that Defendants failed to include a notice or disclaimer on its product or that such notice or disclaimer is insufficient. Accordingly, BAI's trademark-based claims must be dismissed for failure to state a claim.

### Conclusion

For the foregoing reasons, the Court will grant Defendants' motion to dismiss in its entirety and will dismiss the case.

An Order consistent with this Opinion will be entered.

Not Reported in F.Supp.2d, 2004 WL 3132255 (W.D.Mich.), 2005 Copr.L.Dec. P 28,952

### Motions, Pleadings and Filings (Back to top)

• 2004 WL 2234810 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) (Sep. 13, 2004)

•          1:04cv00396                (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 6
Not Reported in F.Supp.2d, 2004 WL 3132255 (W.D.Mich.), 2005 Copr.L.Dec. P 28,952
**(Cite as: 2004 WL 3132255 (W.D.Mich.))**


(Jun. 14, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                     Page 1
Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058
**(Cite as: 1990 WL 198610 (D.Kan.))**

C

**Motions, Pleadings and Filings**

United States District Court, D. Kansas.
DATA PRODUCTS, INC., Plaintiff,
v.
William C. REPPART, Jr., Joe Ellzey, Patrick Lee
Morse, S T Paging, Inc., S T
Broadcasting, Inc., and Breadbasket Enterprises, Inc.,
Defendants,
and
SUNFLOWER TELEPHONE COMPANY, INC., S
T Computer Resources, Inc., and S T
Enterprises, Ltd., Defendants and Third Party
Plaintiffs,
v.
Claude Martin PICKETT, Third Party Defendant.
**No. 89-1291-K.**

Nov. 29, 1990.

Tim Headley, Baker & Botts, Houston, Tex., Gary L.
Ayers, Foulston & Siefkin, Wichita, Kan., for
plaintiff.

H.W. Fanning, Kahrs, Nelson, Fanning, Hite &
Kellogg, Wichita, Kan., for defendants & 3D party
plaintiffs.

Claude Martin Pickett, pro se.

*MEMORANDUM AND ORDER*

PATRICK F. KELLY, District Judge.

*1 In the present action, plaintiff Data Products, Inc.
(DPI) asserts various claims against Sunflower
Telephone Company, S T Enterprises, Inc., and
several of the latter's wholly-owned subsidiaries. In
addition, DPI advances similar claims against the
officers of the corporate defendants, including
William C. Reppart, Jr., Joseph Ellzey, and Patrick
Morse. In general, DPI claims that the defendants
wrongfully copied and used computer software
belonging to DPI, and that in so doing the defendants
breached contractual agreements between the parties
and infringed DPI's copyright to the software.

The defendants, alleging various defenses, have
moved for summary judgment. In addition, the

plaintiff has filed a motion to compel discovery.
These motions came before the court in a hearing
held November 5, 1990. For the reasons stated
herein, the motions for summary judgment of the
various defendants are hereby denied.

Summary judgment is proper where the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with affidavits, if any,
show there is no genuine issue as to any material fact,
and that the moving party is entitled to judgment as a
matter of law. Fed.R.Civ.P. 56(c). In considering a
motion for summary judgment, the court must
examine all evidence in a light most favorable to the
opposing party. McKenzie v. Mercy Hospital, 854
F.2d 365, 367 (10th Cir.1988). The party moving
for summary judgment must demonstrate its
entitlement to summary judgment beyond a
reasonable doubt. Ellis v. El Paso Natural Gas Co.,
754 F.2d 884, 885 (10th Cir.1985). The moving
party need not disprove plaintiff's claim; it need only
establish that the factual allegations have no legal
significance. Dayton Hudson Corp. v. Macerich Real
Estate Co., 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the
opposing party may not rely upon mere allegations or
denials contained in its pleadings or briefs. Rather,
the nonmoving party must come forward with
specific facts showing the presence of a genuine issue
of material fact for trial and significant probative
evidence supporting the allegation. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Once
the moving party has carried its burden under Rule
56(c), the party opposing summary judgment must do
more than simply show there is some metaphysical
doubt as to the material facts. "In the language of the
Rule, the nonmoving party must come forward with
'specific facts showing that there is a *genuine issue
for trial.* ' " Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986)
(quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*
). One of the principal purposes of the summary
judgment rule is to isolate and dispose of factually
unsupported claims or defenses, and the rule should
be interpreted in a way that allows it to accomplish
this purpose. Celotex Corp. v. Catrett, 477 U.S. 317
(1986).

The computer software which is the subject of the
present action involves two computer program

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058
(Cite as: 1990 WL 198610 (D.Kan.))

packages: the LCBA Telephone Accounting System ("TAS"), and the TAS-Payroll System. Copyrights for these packages were registered by the plaintiff on March 7 and 28, 1989.

**\*2** These program packages were acquired by Sunflower Telephone prior to its acquisition by S T Enterprises. By a November 14, 1980 agreement between Sunflower and DPI's predecessor, L.C. Buchanan & Associates, Inc., Sunflower obtained the right to use the TAS package for itself and one of its subsidiaries, Jetmore Telephone.

Buchanan employees subsequently installed the TAS package on Sunflower's computer, placing the program package in the KEN/TCOOP library.

Another program package (alternately known as TAS for Cable or the DPI CATV Accounting System) was subsequently acquired by Sunflower from DPI. This package was designed for the exclusive use of Cablevision, Ltd., at that time another subsidiary of Sunflower. [FN1] The license agreement between Sunflower and DPI was made on May 10, 1982, and pursuant to the agreement, DPI employees installed the cable program package on Sunflower's computer. The cable package was placed in the computer's CTSSRC/CTSLIB library.

Several years later, S T Enterprises was formed, and the corporate structure of many of the Kansas companies involved in the present action underwent reorganization. Under the reorganization, S T Communications (formerly Cablevision, Ltd.), S T Paging, S T Computer Resources, and S T Broadcasting became wholly-owned subsidiaries of S T Enterprises. [FN2] Later, the common stockholders of Sunflower exchanged their stock for S T Enterprises common stock in an IRC § 351 reorganization.

Under a March 20, 1985 management agreement, S T Enterprises undertook to provide payroll, billing, and accounting services for Sunflower and the subsidiary corporations. In fulfilling the obligations, S T Enterprises began to use Sunflower's DPI software. In 1986, the president of S T Enterprises, William Reppart, directed Claude Pickett (an employee of S T Computer Resources) to arrange for the computer to perform payroll services. Pickett created the STENT library on the computer, which was used by S T Enterprises to perform its obligations under the management agreement.

In addition to this "internal" use of the DPI software,

S T Computer Resources employees used the software on behalf of one of S T Enterprises customers, Grant County Implement Company. Using the STENT library, the employees created the PAYROLL library which they installed on the Grant County Implement computer in 1988. The defendants concede that, assuming DPI owns a valid copyright, on the program package, this sale represents an infringement of this right.

In their motion for partial summary judgment, the defendants present several arguments. Their main argument is that any action by S T Enterprises in creating the STENT libraries represents at most a breach of contract between DPI and the defendants and cannot constitute an infringement of copyright. The defendants also seek a determination that DPI is not entitled to an award of attorney fees or punitive damages. Finally, the defendants seek summary judgment on behalf of various corporate defendants (Sunflower, S T Paging, S T Broadcasting, and Breadbasket Enterprises), and the individual named defendants.

**\*3** *1. Infringement*

As noted above, the main emphasis of the defendants' motion for summary judgment is limited. It seeks to narrow the scope of the action to one for a breach of contract by eliminating the plaintiff's claim for copyright infringement. On the basis of the evidence submitted to the court, this portion of the defendants' motion for summary judgment must be denied.

The defendants' argument here is made up of three parts. They argue that the STENT program was created solely from the KEN/TCOOP library, which was created as a result of the 1980 agreement between Sunflower and Buchanan. Second, the defendants contend that the 1980 agreement was a sale of the software to Sunflower, unlike the 1982 agreement which represented a mere license to use the software. Finally, the defendants contend that, having acquired ownership of the software, they were entitled to transfer it as they wished under the "first use doctrine" recognized under 17 U.S.C. § 109(a). The defendants thus contend that the creation of the STENT library was a legitimate, non-infringing use of software which Sunflower had purchased from DPI.

The court finds that the arguments of the defendants must be rejected. Each of the three arguments is either premised on an incorrect understanding of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 3
Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058
(Cite as: 1990 WL 198610 (D.Kan.))

law, or represents matters for which there remains a factual dispute and thus is not ripe for summary resolution by the court.

It is not possible in the light of the evidence before the court to resolve the genealogy of the STENT library. In support of its argument that the STENT program library was created solely from the 1980 KEN/TCOOP library, and not the 1982 CTSSRC/CTSLIB library, the defendants present three pieces of evidence: (1) a printout of the payroll section of the STENT library which they contend is virtually identically with the KEN/TCOOP library; (2) the affidavit of Kristen Ball, a former S T Computer Resources programmer, stating that the STENT library was not made from the CTSSRC/CTSLIB library; and (3) the deposition testimony of Claude Pickett stating that he made the STENT library from the TCOOP library.

There is some other evidence, however, which indicates that the defendants' use of the DPI programs may have violated the 1982 agreement as well as the initial 1980 agreement. The defendants have admitted that DPI software obtained under the 1982 license agreement was used to perform billing services for S T Paging. DPI also cites the affidavit of Ken Rodgers. Rodgers is the employee of DPI who installed the programs on Sunflower's computers. According to the affidavit, the STENT library includes an accounts payable program which was copied with minor modifications from the cable TV library created in 1982.

In light of the above evidence, the source of the STENT library is not ripe for summary judgment. There is insufficient evidence to conclude beyond a reasonable doubt that the STENT library was created solely from the 1980 programming.

The second, penultimate link in the defendants' argument is even weaker. The defendants, as a predicate for their final argument that their use of the software was valid under the "first sale" doctrine, argue that the 1980 agreement was a sales agreement rather than a license, and that the agreement served to transfer title to the programming to Sunflower. The status of the 1980 agreement is ambiguous, however, and its status as a contract of sale or a license agreement should be resolved by a jury.

*4 On the one hand, the 1980 agreement is much less emphatic about the nature of the property to be transferred than the 1982 agreement. The 1982 agreement, dealing with the cable TV program package, expressly states that it is a "SOFTWARE LICENSE AGREEMENT," and repeatedly emphasizes that DPI is extending to Sunflower a license for the use of the package. The 1980 agreement, in contrast, does not explicitly state whether it is a contract for sale or a license agreement. However, the more circumspect nature of the 1980 agreement may be explained simply by the form of the agreement. Unlike the 1982 agreement, which was executed in a formal comprehensive agreement, the 1980 agreement takes the form of a less formal letter agreement.

More importantly, the language of the 1980 agreement remains ambiguous. The agreement designates the amount Sunflower is to pay as the "Purchase" price. The agreement does not state whether by paying that amount Sunflower thereby purchases the software, or whether it merely purchases the license to use the software. The defendants' statement that there is nothing in the 1980 agreement to suggest it is a license agreement is incorrect. The third paragraph of the letter refers to the subject of the agreements as "the LCBA licensed programs." The letter further indicates that it is a license rather than a transfer of legal title by its statement that Buchanan (DPI's predecessor) retains "proprietary rights herein." In view of these facts, summary judgment would be inappropriate.

But it is on the third and final point that the defendants' argument is the weakest. Even assuming that the STENT program was derived solely from the software supplied under the 1980 agreement, and that this agreement constituted a sale of the software, the "first sale" doctrine provides no defense to the present claims advanced by the plaintiff. The first sale doctrine finds its origins in 17 U.S.C. § 109(a), which provides:

Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

Under the first sale doctrine, the distribution rights accorded to the holder of the copyright in any given copy of the copyrighted material are extinguished upon the transfer of title to the copy. The purchaser may then alienate that particular copy of the copyrighted material to another party without violation of the copyright laws. *United States v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Wise,* 550 F.2d 1180 (9th Cir.), *cert. denied,* 434 U.S. 929 (1977). However, this right on the part of the purchaser only extends to the transfer of the original copy; it does not extend to the making of unauthorized copies of the material. *Red Baron-Franklin Park, Inc. v. Taito Corp.,* 883 F.2d 275, 280-81 (4th Cir.1989), *cert. denied,* 110 S.Ct. 869 (1990); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,* 856 F.2d 1341, 1344 (9th Cir.1988), *cert. denied,* 489 U.S. 1018 (1989); *United States v. Powell,* 701 F.2d 70, 72 (8th Cir.1983); *Secure Services Tech. Inc. v. Time and Space Processing,* 722 F.Supp. 1354, 1364 (E.D.Va.1989). Even after the sale of an item under copyright protection, the owner of the copyright retains the right to prevent the unauthorized copying or manufacture of derivative works. *Mirage Editions,* 856 F.2d at 1343-44.

*5 In the present case, the defendants did not simply use the programming contained in the original KEN/TCOOP library, but they copied the programs into a separate library, modified it, and then used the program for payroll and other services. Even assuming that the 1980 agreement was a sales contract and that title to the program package passed to Sunflower, DPI relinquished only the right to vend that particular copy of the package. The rights guaranteed DPI by 17 U.S.C. § 106, prohibiting the unauthorized reproduction or preparation of derivative works from the initial programming, were not affected by its sale to Sunflower. *United States v. Powell,* 701 F.2d at 72. As a result, the first sale doctrine creates no defense to the present claim by DPI, whether or not the 1980 transaction was a license agreement or a sales contract.

The defendants present two further arguments in support of their motion for partial summary judgment. In the first, the defendants argue (at pp. 16-17 of their brief) that Sunflower's swap of common stock with S T Enterprises pursuant to 26 U.S.C. § 351 legitimizes the alleged infringement. The defendants argue that since Sunflower was entitled to use the TAS programming for itself and its subsidiary, Jetmore, then S T Enterprises had equal rights to use the programming for itself and its subsidiaries after the stock swap with Sunflower.

The defendants present not a single authority in support of their argument that the copyright laws may be circumvented in this manner. 26 U.S.C. § 351 deals only with the tax consequences of transfers in corporate ownership. It provides no shield for the avoidance of copyrights held by third persons. In the present case, S T Enterprises used the TAS program

package for subsidiaries which were not even in existence at the time Sunflower acquired the package in 1980.

Finally, the defendants argue that any modifications made to the TAS or cable TV program packages were valid under 17 U.S.C. § 117. The argument is limited in scope: it would serve to protect the defendants only from infringement claims which are based on the modification of the programs for the use of Sunflower or its subsidiaries (Jetmore or Cablevision, Ltd.). It would not provide protection from the claims of infringement arising from the use of the programs by S T Enterprises or its subsidiaries. 17 U.S.C. § 117 (1990 Supp.) provides in part:

Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

*6 DPI argues that § 117 is inapplicable, since the modifications were not performed in the process of inputting the programs into the Sunflower computer, but were performed later. *See, e.g., Micro-Sparc, Inc. v. Amtype Corp.,* 592 F.Supp. 33 (D.Mass.1984). However, as Judge O'Connor recognized in *Foresight Resources Corp. v. Pfortmiller,* 719 F.Supp 1006, 1009-10 (D.Kan.1989), cases such as *Micro-Sparc* which apply § 117 in a narrow manner are against the weight of recent authority and contrary to the intent of Congress. The better view is that § 117 is designed to protect software purchasers who make modifications or enhancements to the software for their own use only. *Id.,* at 1010.

But again, § 117 has only a limited application in the present case. Under the statute, any modifications or enhancements to the DPI software would not constitute an infringement to the extent that they were used solely by Sunflower and its subsidiaries, Jetmore and Cablevision, Ltd. Any use of the software by S T Enterprises or its subsidiaries would not receive any protection from § 117.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058
**(Cite as: 1990 WL 198610 (D.Kan.))**

*2. Damages*

  The defendants also seek a determination that DPI's claims for attorney fees and punitive damages may not be awarded in the present action. Citing 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2737 (2d ed. 1983), DPI responds that partial summary judgment on the issue is not proper, as it relates only to one part of the claims asserted against the defendants. But while a final and appealable judgment may not be entered, the court retains the authority and the responsibility to narrow by interlocutory disposition the issues to be presented at trial. 6 (Pt. 2) MOORE'S FEDERAL PRACTICE ¶ 56.20 [3.-2] (2d ed. 1988).

  The defendants argue that under the circumstances of the present case, attorney fees and punitive damages are not awardable under either copyright law or state contract law. DPI does not dispute either point. Instead, it argues that its claims for attorney fees and punitive damages may be awarded on other claims it has advanced in the action.

  For example, punitive damages may be awarded in Kansas where a defendant has acted wantonly or in willful or reckless disregard of the rights of the plaintiff. *Sampson v. Hunt,* 233 Kan. 572, 665 P.2d 743 (1983). In the present action, there is evidence which could support a finding that the defendants acted in reckless disregard of the rights of DPI, either in their own use of the program package or in the sale of the PAYROLL program to Green County Implement. Both the 1980 and 1982 agreements between DPI and Sunflower contain express restrictions on the ability of Sunflower to use or copy the programming. Larry Buchanan has testified that he warned Reppart, Pickett, and Pat Morse at an executive meeting against "allow[ing] the programs to be put out." Before copying the programs, Pickett also inquired whether they should not first inquire into the legality of the actions. These concerns were apparently overruled or ignored, and S T Enterprises began its use of the DPI programs.

  *7 Similarly, the motion of the defendants does not address itself to the claims cited as the basis for DPI's claim for attorney fees. Along with its claims for breach of contract and copyright infringement, DPI has included a claim against the defendants for a misappropriation of trade secrets in violation of K.S.A. 60-3321. If the misappropriation is shown to be willful and malicious, reasonable attorney fees

may be awarded pursuant to K.S.A. 60-3323(iii).

  The existence of federal copyright law does not in itself preempt the protections accorded under state trade secrets statutes. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974); *Brignoli v. Balch Hardy and Scheinman, Inc.,* 645 F.Supp. 1201 (S.D.N.Y.1986); *Warrington Assoc.'s v. Real-Time Eng'g Sys.,* 522 F.Supp. 367 (N.D.Ill.1981); *Balboa Ins. Co. v. Trans Global Equities,* 218 Cal.App.3d 1327, 267 Cal.Rptr. 787 (1990); *M. Bryce & Assoc.'s v. Gladstone,* 107 Wis.2d 241, 319 N.W.2d 907 (Wis.Ct.App.), *cert. denied,* 459 U.S. 944 (1982). *See also Foresight Resource Corp. v. Pfortmiller,* 719 F.Supp. 1006, 1011 (D.Kan.1989) (preemption exists only where injunction under state trade secret law would deprive defendant of specific right accorded under 17 U.S.C. § 117 to modify computer programs for own use). Although there are no cases applying the Kansas law, several courts in other jurisdictions have found that in appropriate cases the misappropriation of computer software can constitute a violation of state trade secrets law. *University Computing v. Lykes-Youngstown Corp.,* 504 F.2d 518 (5th Cir.1974); *Continental Data Sys. v. Exxon Corp.,* 638 F.Supp. 432 (E.D.Pa.1986); *Q-Co Industr. v. Hoffman* 625 F.Supp. 608 (S.D.N.Y.1985); *Dickerman Assoc.'s v. Tiverton Bottled Gas Co.* 594 F.Supp. 30 (D.Mass.1984); *Warrington Assoc.'s v. Real-Time Engineering Systems,* 522 F.Supp. 367 (N.D.Ill.1981); *Aries Information Sys. v. Pacific Management Sys.,* 366 N.W.2d 366 (Minn.Ct.App.1985); *Management Science America v. Cyborg Sys.,* 6 Computer L.Serv.Rep. 921 (N.D.Ill.1978); ; *Ward v. Superior Court,* 3 Computer L.Serv.Rep. 206 (Cal.Super.1972).

  Whether the present action presents a substantial claim for a misappropriation of trade secrets is not before the court. The defendants have made no attempt to test the sufficiency of the claim. It is sufficient for present purposes to note that the claim has been advanced, and that under Kansas law, attorney fees may be awarded.

  In addition, attorney fees may be awarded pursuant to the contract itself if the jury determines that the creation of the STENT library represented a breach of the 1982 agreement. The defendants stress in their motion that the 1980 agreement contains no provision authorizing the award of attorney fees. However, as noted earlier (*supra,* at 7), there is some evidence that the defendants' actions may have violated the 1982 agreement as well by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 6
Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058
**(Cite as: 1990 WL 198610 (D.Kan.))**

unauthorized copying and use of the DPI cable TV program package. The 1982 license agreement, unlike the earlier TAS program package agreement, does expressly provide for the award of attorney fees.

**\*8** The defendants' motion, to the extent it seeks to eliminate punitive damages and an award of attorney fees, must be denied. While these may not be awardable under a simple breach of contract action or, under the circumstances of the present case, in the plaintiff's claim for copyright infringement, there are other claims for relief which may justify either or both forms of relief.

### 3. Subsidiaries and Individuals

Finally, the defendants seek to obtain summary judgment on behalf of the individual defendants and most of the corporate defendants. The motion seeks summary judgment on behalf of subsidiaries Sunflower, S T Paging, S T Broadcasting, and Breadbasket Enterprises, asserting that the copying and use of the DPI programming was performed only by S T Enterprises and by S T Computer Resources. With regard to the individual defendants, the motion is accompanied by affidavits from William Reppart, [FN3] Patrick Morse, [FN4] and Joseph Ellzey [FN5] stating that they did not use the DPI programs for their "personal use."

The defendants' argument must be rejected. Each of the individual defendants was an officer and shareholder in the various corporate defendants. Each had the right to supervise the infringing activity and each had a financial interest in that activity. As a result, each may be held jointly and severally liable for any infringement of DPI's copyrights. _Southern Bell v. Associated Tel. Directory, 756 F.2d 801, 811 (11th Cir.1985); Gershwin Publishing Corp. v. Columbia Artist Mgt., 443 F.2d 1159 (2d Cir.1971)._ This is true even if the individual defendants did not have "active supervision" of the employee committing the infringement, _Warner Bros. v. Lobster Pot, Inc., 582 F.Supp. 478, 483 (N.D.Ohio 1984),_ and were in fact ignorant of the infringing activity, _Southern Bell, 756 F.2d at 811._

Moreover, as indicated earlier, there is some evidence that the individual defendants were or should have been aware of the infringing activity. Reppart and Morse were present at an executive meeting in which Buchanan warned against using the DPI software. Before copying the programming, Pickett asked both Reppart and Ellzey whether the legality of the action should not first be investigated.

The arguments by the defendants relating to the corporate defendants are also uncompelling. In accomplishing the payroll and billing services required by the management agreement, the infringing activities were performed for the benefit of the subsidiary corporations. These infringing activities were performed with the knowledge of officers of S T Enterprises, persons who were also officers of the subsidiary corporations. "[A]n infringer is not merely one who uses a work without authorization by the copyright owner, but also one who authorizes the use of a copyrighted work without actual authority from the copyright owner." _Sony Corp. v. Universal City Studios, 464 U.S. 417, 435 n. 17 (1984)._ That the infringing activities themselves were performed by persons who were technically employees of S T Enterprises or S T Computer Resources does not provide the subsidiary corporations a shield from liability for the infringements.

### \*9 4. Other Motions

The motion for summary judgment by third party defendant Clyde Pickett must also be denied. Pickett contends that he copied the software and sold it to Green County Implement only upon the orders of his superiors. The defendants contend that Pickett's actions were wholly unauthorized. The resolution of this dispute must await the attention of the trier of fact; the matter cannot be resolved by summary judgment.

With regard to DPI's motion to compel discovery of financial information records filed by the corporate defendants, the court concludes that it should be granted. Under copyright law, an infringement gives the owner of the copyright the right to recover the profits of the infringer, as well as his own actual damages or lost profits. The dispute here is over the discoverability of potential expenses of the defendants, which at trial could be used to minimize their profits and hence the size of any award to DPI.

The defendants contend that S T Enterprises made no profit from its use of the DPI software. The plaintiffs argue, correctly, that whether the defendants' method of accounting shows a technical "profit" is irrelevant. The use of the software had an economic value to S T Enterprises and its subsidiaries. The determination of that value, and any expenses which may serve to minimize it, requires the discovery of the financial information sought by the plaintiff DPI. But in addition to their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058
**(Cite as: 1990 WL 198610 (D.Kan.))**

relevance to DPI's statutory damages under the copyright laws, such financial figures are discoverable as relevant to DPI's claim for punitive damages.

In their response, the defendants also argue that punitive damages may not be awarded in the present action. The defendants make only two points. First, they assert (without troubling to cite any authority) that DPI's claims for tortious interference and trade secret misappropriation are preempted by copyright. As discussed earlier, this is a conclusion contrary to the case law. Both the better rule and the weight of recent authority hold that copyright law and state trade secret law speak to separate interests, and the former does not preempt the protections accorded under the latter.

The other argument the defendants make is directed at the facts of the case. In support of its claim of willfulness, DPI has cited the testimony of Pickett and Buchanan. The defendants contend that the testimony of these witnesses is not "credible evidence which would support a jury issue." (Defs.' Resp. at 9.) They then attack the testimony of Pickett and Buchanan as either vague or inconsistent with the testimony of their own witnesses.

The defendants' response misunderstands the nature of summary judgment and the resolution of factual disputes. To the extent there is a question of the credibility of the witnesses, that is a matter to be resolved by the jury. DPI has presented evidence which, viewed in the light most favorable to the plaintiff, presents a factual issue on the question of willfulness. It is not for the court to determine which evidence or witnesses are the more credible.

**\*10** IT IS ACCORDINGLY ORDERED this 28 day of November, 1990, that the motions for summary judgment of the defendants (Dkt. Nos. 66 and 68) are hereby denied. The plaintiff's motion to compel discovery (Dkt. No. 67) is granted to the extent that the matters in dispute have not previously been resolved by agreement among the parties.

FN1. Cablevision, Ltd. subsequently became a separate, wholly-owned subsidiary of S T Enterprises. Likewise, Cablevision's subsidiary, S T Paging, was spun out from under Cablevision and made a wholly-owned subsidiary of S T Enterprises.

FN2. Breadbasket Enterprises, Inc., is a subsidiary of S T Broadcasting and a named

defendant in the present action. S T Communications has not been named as a defendant.

FN3. President of S T Enterprises, S T Computer Resources, S T Paging, S T Broadcasting, and Breadbasket Enterprises at the time of the copying and sale of the DPI programming.

FN4. Vice President of S T Enterprises, Sunflower, S T Computer Resources, S T Paging, S T Broadcasting, and Breadbasket Enterprises.

FN5. Vice President of S T Enterprises.

Not Reported in F.Supp., 1990 WL 198610 (D.Kan.), 1991 Copr.L.Dec. P 26,723, 18 U.S.P.Q.2d 1058

**Motions, Pleadings and Filings (Back to top)**

•      6:89cv01291         (Docket) (Jun. 06, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1863478 (D.Kan.)
**(Cite as: 2000 WL 1863478 (D.Kan.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.
JMV MUSIC, INC.; Nelson/Poplar Music Group;
Word, Incorporated; Jerry Leiber
Music; and Mike Stoller Music, Plaintiffs,
v.
Danny T. COCHRAN, Defendant.
**No. 00-4094-SAC.**

Nov. 16, 2000.

MEMORANDUM AND ORDER

CROW.

*1 The case comes before the court on the plaintiffs' motion for default judgment. (Dk.6). The plaintiffs filed this copyright infringement action in June based on unauthorized performances of three of the plaintiffs' songs on November 12, 1999. On August 31, 2000, the magistrate judge entered an order for the plaintiffs to show cause why this action should not be dismissed as the defendant had not filed an answer or Rule 12 motions within the allotted time and the plaintiffs had not taken any further action. (Dk.3). The plaintiffs promptly filed an affidavit in support of entry of default, and on September 11, 2000, the clerk entered default against defendant pursuant to Fed.R.Civ.P. 55(a). (Dks. 4 and 5). The plaintiffs followed up with their motion for default judgment filed September 22, 2000. (Dk.6). More than ten days have passed as of October 10, 2000, without any response filed to this motion.

"Where, as here, 'the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.' " Chen v. Jenna Lane, Inc., 30 F.Supp.2d 622, 623 (S.D.N.Y.1998) (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2688 at 58-59 (3d ed.1998)). The plaintiffs own the copyrights in three musical compositions that are the causes of action here. The plaintiffs are members of ASCAP [FN1] which has the right to license non-dramatic public performances of their copyrighted musical compositions. The

defendant Danny T. Cochran owns, operates, manages and maintains a place of business for public entertainment in Wichita, Kansas, known as Pure Country.

FN1. American Society of Composers, Authors and Publishers

Representatives of ASCAP wrote and visited with the defendant numerous times about securing a license agreement and about his liability for performing copyrighted music without a license. Despite these contacts, the defendant refused to execute a license agreement and to pay the license fees. The plaintiffs' three copyrighted musical compositions were performed at Pure Country when neither the defendant nor his agents nor the performers were licensed or had received permission from the plaintiff or any agent to perform these songs. These songs were performed while the defendant actively supervised Pure Country's operations and financially benefitted from them. The defendant has continued to perform copyrighted music without a license or the plaintiff's permission. The record establishes that the defendant has not appeared, filed an answer, responded to this motion, or otherwise defended himself in this action. Accepting these factual allegations as true, the defendant is liable for infringing the plaintiffs' copyrighted works.

By their motion, the plaintiffs seek injunctive relief, statutory damages of $3,000.00 per action, and costs including reasonable attorneys' fees. The plaintiffs submit detailed affidavits with exhibits that furnish a record sufficient for this court to determine damages and costs with reasonable certainty. For this reason, the court will make these findings without a hearing.

*2 The plaintiffs are entitled to an injunction that bars the defendant from performing publicly their copyrighted compositions or causing or permitting these compositions from being publicly performed on his premises or in any place owned, controlled or conducted by the defendant. The Copyright Act of 1976 provides that "[a]ny court ... may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "While a matter of discretion, permanent injunctions are typically granted when both a past infringement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1863478 (D.Kan.)
**(Cite as: 2000 WL 1863478 (D.Kan.))**

Page 2

and a continuing threat of infringement are shown." *Walden Music, Inc. v. C.H.W., Inc.,* No. 95-4023-SAC, 1996 WL 254654, at *6 (D.Kan. Apr. 16, 1996) (quoting *Big Tree Enterprises, Ltd. v. Mabrey,* No. 93-4024- SAC, 1994 WL 191996, at *8 (D.Kan. Apr. 15, 1994), *aff'd,* 45 F.3d 439 (10th Cir.1994) (Table)). "Further, recognizing that plaintiffs in this type of action represent all of ASCAP's members, recent cases have enjoined defendants from performing any or all music in the ASCAP repertory." *Jobette Music Co., Inc. v. Hampton,* 864 F.Supp. 7, 9 (S.D.Miss.1994) (citations omitted); *see Canopy Music Inc. v. Harbor Cities Broadcasting, Inc.,* 950 F.Supp. 913, 916 (E.D.Wis.1997). As the record shows that the defendant willfully and repeatedly infringed the plaintiffs' copyrights and remains a continuing threat to do so, the court permanently enjoins the defendant from performing publicly any musical composition licensed through ASCAP or causing or permitting these compositions from being publicly performed on his premises or in any place owned, controlled or conducted by the defendant.

Copyright plaintiffs proving infringement generally may elect between actual damages and profits or statutory damages. 17 U.S.C. § 504(c)(1). This statute permits statutory damages "in a sum of not less than $750 or more than $30,000" for any one work. The plaintiffs elect an award of statutory damages. This court in *Walden* summarized the relevant law governing this determination:

"The Court's discretion and sense of justice are controlling as to the sum of statutory damages to award within the given parameters ." *Schmidt [ v. Holy Cross Cemetery, Inc.],* 840 F.Supp. [829] at 835 [ (D.Kan.1993) ].

In determining an award of statutory damages within the applicable limits set by the Act, a court may consider " 'the expenses saved and profits reaped by the defendants in connection with the infringements, the revenues lost by the plaintiffs as a result of the defendant's conduct, and the infringers' state of mind-whether wilful, knowing, or merely innocent.' " 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B], at 14-41 (1991) (hereinafter "Nimmer") (quoting *Boz Scaggs Music v. KND Corp.,* 491 F.Supp. 908, 914 (D.Conn.1980)). The Supreme Court has stated that the "statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct." *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952).

**\*3** *N.A.S. Import, Corp. v. Chenson Enterprises, Inc.,* 968 F.2d 250, 252 (2nd Cir.1992). "Courts tend to focus on the infringer's intent and set an award that correlates to the 'blameworthiness of the infringing conduct.' " *Songmaker v. Forward of Kansas, Inc.,* No. 90-4156-SAC, 1993 WL 484210, at *4 (D.Kan. Sept. 13, 1993) (quoting *Almo Music Corp v. T & W Communications Corp.,* 798 F.Supp. 392, 394 (N.D.Mass.1992) (quoting *Milene Music, Inc. v.. Gotauco,* 551 F.Supp. 1288, 1296 (D.R.I.1982))). "Often times, the court [will] calculate the owed or anticipated license fees and then award statutory damages that exceed the fees by an amount commensurate with the wrongful conduct and sufficient to deter future violations." *Songmaker,* 1993 WL 484210, at *4. "The final calculation of statutory damages should still be based on the number of works infringed." *Id.*

1996 WL 254654, at *5-*6. The detailed affidavit establishes that the plaintiffs through ASCAP have repeatedly attempted to license the defendant's premises, that the defendant has continuously refused to execute a license agreement and pay the license fees, and that the defendant has not refrained from publicly performing the plaintiffs' copyrighted works. Had the defendant been licensed during this period, the defendant would have paid ASCAP nearly $4,000 in license fees to date. ASCAP incurred over $500 in investigative expenses. Based upon careful consideration of the above factors, the court finds that a statutory award in the amount of $3,000 per infringement, for a total of $9,000, takes into account the defendant's saved expenses, is commensurate with the blameworthiness of the defendant's infringement, and is sufficient to deter future violations.

A prevailing party in a copyright infringement action may recover costs and attorneys' fees in the court's discretion. 17 U.S.C. § 505. A fees award "serve[s] as an economic incentive for a copyright holder to use the courts in challenging an infringement." *Design v. K-Mart Apparel Corp.,* 13 F.3d 559, 568 (2nd Cir.1994). "Though said to be a matter within the court's discretion, attorney's fees are awarded more often as the rule than the exception." *Big Tree Enterprises, Ltd. v. Mabrey,* No. 93-4024-SAC, 1994 WL 191996, at *8 (D.Kan. Apr. 15, 1994). The court finds that an award of attorneys' fees and costs in this case would serve to make the plaintiffs' whole, to deter infringement, to dissuade the defendant from his continuing disdain for copyright laws, and to encourage the assertion of colorable copyright

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1863478 (D.Kan.)
**(Cite as: 2000 WL 1863478 (D.Kan.))**

Page 3

claims. *See Chi-Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1230 (7th Cir.1991). The court finds that the time expended and recorded and the hourly fee rates requested are fair, reasonable and appropriate for copyright litigation in this community and for this case in particular.

IT IS THEREFORE ORDERED that the plaintiffs' motion for default judgment (Dk.6) is granted and that the clerk of the court shall enter judgment for the plaintiffs as follows:

*4 That the defendant has infringed the plaintiffs' copyrights;

That the defendant, his agents, his servants and employees, and all others acting in concert with him are permanently enjoined from performing publicly any musical composition licensed through ASCAP or causing or permitting these compositions from being publicly performed on his premises or in any place owned, controlled or conducted by the defendant unless and until the defendant receives permission from the copyright owners or becomes properly licensed to perform music from the ASCAP repertory;

That the plaintiffs are awarded statutory damages against the defendant of $3,000 for each infringed work for a total award of $9,000; and

That the plaintiffs are awarded their full costs and attorney's fees totaling $1,967.35.

Dated this ___ day of November, 2000, Topeka, Kansas.

Not Reported in F.Supp.2d, 2000 WL 1863478 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**

• _5:00cv04094_____(Docket) (Jun. 12, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.