**Westlaw.**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 760130 (S.D.N.Y.), 52 U.S.P.Q.2d 1615
**(Cite as: 1999 WL 760130 (S.D.N.Y.))**

Page 1

**H**

Motions, Pleadings and Filings

United States District Court, S.D. New York.
NATIONAL FOOTBALL LEAGUE, Plaintiff,
v.
PRIMETIME 24 JOINT VENTURE, Defendant.
**No. 98 Civ. 3778 LMM.**

Sept. 27, 1999.

*MEMORANDUM AND ORDER*

MCKENNA, J.

**1.**

*1 Plaintiff National Football League ("NFL") moves, and defendant PrimeTime 24 Joint Venture ("PrimeTime") cross-moves, for summary judgment pursuant to Fed.R.Civ.P. 56. NFL's motion is granted and PrimeTime's motion is denied. NFL has demonstrated that it owns the copyrights in the telecasts of 123 of its games broadcast during the period August 31, 1997 through December 27, 1998, and that PrimeTime has infringed at least some of those copyrights. PrimeTime has failed to show that there is a material issue of fact in this regard, and NFL "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Further, NFL has shown that it is entitled to a permanent injunction.

**2.**

The allegations of the complaint are summarized in the Court's Memorandum and Order denying PrimeTime's motion, pursuant to Fed.R.Civ.P. 12(b)(6), for dismissal. *National Football League v. PrimeTime 24 Joint Venture,* No. 98 Civ. 3778, 1999 WL 163181 (S.D.N.Y. Mar. 24, 1999). Familiarity with that decision (the "March 24, 1999 Order") is assumed.

**3.**

PrimeTime does not dispute that NFL is the owner of the copyrights in the telecasts of 123 NFL games broadcast during the period August 31, 1997 through December 27, 1998, at least some of which are claimed to have been infringed by PrimeTime. [FN1]

FN1. *See* Roman Decl. ¶¶ 2-3 and Exs. A (listing games) & B (copies of certificates of registration (or applications therefor) of copyright in the telecasts).

In response to requests for admissions pursuant to Fed.R.Civ.P. 36 (Roman Decl. Ex. N), PrimeTime has admitted that "in 1997[it] made secondary transmissions of U.S. network programming including NFL game telecasts for receipt by dish owners located outside the United States" (*id.* ¶ 8), that "in 1998[it] made secondary transmissions of U.S. network programming including NFL game telecasts for receipt by dish owners located outside the United States" (*id.* ¶ 9), and that "unless enjoined, [it] intend[s] in the future to make secondary transmissions of U.S. network programming including NFL game telecasts for receipt by dish owners located outside the United States." (*Id.* ¶ 10.)

PrimeTime also admits that "in the past [it has] received over-the-air broadcast signals in the United States of U.S. network programming including NFL game telecasts and retransmitted those NFL game telecasts to one or more satellites for further retransmission to locations outside the United States" (*id.* ¶ 39), but states that it is unable to make the same admission as to 1997 and 1998 because its "current practice is to receive all network programming signals *via* direct fiber-optic uplink" and that that practice began at a time it cannot determine precisely. (*Id.* ¶¶ 40-41.)

NFL has submitted specific evidence that during 1997, more than 20 of its games, of which it is the owner of the copyright, were broadcast into Canada on channels PT 24 East, PT 24 West and PT 24 FOXNET (Roman Decl. Exs. K, L & M) and that those channels were available in Canada as "the full package of PrimeTime 24 programming." (*Id.* Ex. K ¶ 4.) PrimeTime does not dispute that it caused these games to be retransmitted to Canada, nor that it causes, and intends to continue to cause, other NFL games of which NFL is the owner of the copyright, to be retransmitted to Canada.

*2 PrimeTime does not claim that it is a licensee of NFL.

On these undisputed facts and admissions, under the law as the Court found it to be in the March 24, 1999

Not Reported in F.Supp.2d                                                                                                                   Page 2
Not Reported in F.Supp.2d, 1999 WL 760130 (S.D.N.Y.), 52 U.S.P.Q.2d 1615
**(Cite as: 1999 WL 760130 (S.D.N.Y.))**

Order, NFL is entitled to summary judgment. Entirely apart from the law of the case doctrine, the Court adheres to the determinations expressed in that decision. Nor is the Court persuaded by the new arguments, or variations on old arguments, now advanced by PrimeTime.

4.

PrimeTime argues that the manner in which it provides network signals to Canada [FN2] differs from what the complaint suggests, and that that difference makes a legal difference. The Court disagrees.

> FN2. PrimeTime has denied that it made during 1997 and 1998, and intends to make if not enjoined, secondary transmissions of U.S. network programming including NFL game telecasts for receipt by dish owners in Latin America or the non-U.S. Caribbean. (Roman Decl. Ex. N. ¶ ¶ 19-26.) PrimeTime takes the position that "this case is only about [its] service to individual subscribers in Canada." (Def. Mem. at 3 n. 1.)

PrimeTime describes its manner of transmitting U.S. network programming to Canada as follows:

> In reality, the signals received by [PrimeTime's] Canadian subscribers are the same network signals, originating from the same sources, and delivered at the same time, using the same equipment, as the network signals received by [PrimeTime's] American subscribers. The specific mechanisms by which [PrimeTime] subscribers (American and Canadian) receive their network signals are easily described. In the case of the relevant non-Fox stations, the signals are fiber optically uplinked and retransmitted by a service provider named Williams Vyvx Services to two satellites on which [PrimeTime] leases transponders. Fox, on the other hand, transmits its national Fox Net signal to its own satellite for further retransmission to designated recipients (including cable providers and others). Pursuant to contract with [PrimeTime], Fox makes the signals from its satellite directly available to [PrimeTime] subscribers. In the past, including during the 1997 and 1998 NFL seasons, Fox itself retransmitted the Fox Net signal to the relevant [PrimeTime] satellite. The arrangement was altered to the one described just above as of May 3, 1999.
> Once the various signals reach the relevant satellite (Fox's own satellite in the case of Fox, and one of two satellites on which [PrimeTime] leases transponders in the case of the various affiliates), the signals are relayed to Earth. The territory covered by the signals relayed from the satellites (their "footprints") includes portions of Canada. [PrimeTime] has no control over the size or shape of the satellites' footprints. The dimensions of the footprints were determined by the satellites' owners prior to launch. In addition to [PrimeTime's] domestic subscribers, a small number of Canadians residing within the satellites' "footprints" have subscribed for PrimeTime services. PrimeTime's Canadian subscribers thus receive NFL game signals as a result of the very same steps PrimeTime takes to exercise its rights under [the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119].

(Def. Mem. at 3 (citing Weinstein Aff., June 14, 1999, ¶ ¶ 7-8) .)

Against that background, PrimeTime argues that there is no "domestic *infringing* act permitting further 'infringement' abroad that a court can take cognizance of" (Def. Mem. at 4), because PrimeTime's "uplink and retransmission of [NFL] game signals to satellite, the purportedly 'infringing' acts the Court identified, are actually encompassed within [PrimeTime's] statutory license." (*Id.* at 5 (footnote omitted).) [FN3] In other words, according to PrimeTime, since it has a statutory license under 17 U.S.C. § 119 to take the game signals for the purpose of retransmitting them to domestic viewers (subject, of course, to the statute's conditions), and that does not constitute infringement, it follows that it may do so also for transmitting them to foreign viewers. "Either the uplink and retransmission is infringing or it is not." (Def. Mem. at 5.) But that is not so. A license-- whether private or statutory--is limited by its terms. Here, Congress (in effect the licensor), has clearly limited the license: "The statutory license created by this section [17 U.S.C. § 119] shall apply only to secondary transmissions to households located in the United States." *Id.* § 119(a)(7). [FN4] Thus, while PrimeTime may be permitted by the terms (and subject to the conditions) of 17 U.S.C. § 119 to uplink and retransmit signals to domestic viewers, it may not, absent a license from the copyright owner, uplink and retransmit signals to foreign viewers.

> FN3. PrimeTime notes that, during the 1997 and 1998 NFL seasons, "the signals of the Fox network were uplinked and retransmitted by Fox for [PrimeTime]." (*Id.* at 5 n. 2.)

> FN4. PrimeTime invites the Court to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:02-cv-01662-RPM   Document 281-3   filed 09/22/05   USDC Colorado   pg 3 of 17

Not Reported in F.Supp.2d                                                                                                                  Page 3
Not Reported in F.Supp.2d, 1999 WL 760130 (S.D.N.Y.), 52 U.S.P.Q.2d 1615
**(Cite as: 1999 WL 760130 (S.D.N.Y.))**

reexamine Section 5 of the March 24, 1999 Order, *National Football League v. PrimeTime 24 Joint Venture,* 1999 WL 163181,*4- *5. (Def. Mem. at 6-7.) The Court has done so and remains convinced of its conclusion. (The Court adds that the statutory phrase "located in the United States," 17 U.S.C. § 119(a)(7), is not a mere "isolated phrase." (Def. Mem. at 6.) It is part of a single sentence, which constitutes a separate subsection of 17 U.S.C. § 119, and the Court finds no reason to think that it was the result of Congressional inadvertence .)

**\*3** Nor do the means by which PrimeTime obtains the NFL game signals make a legal difference: Whether by fiber optic uplink or otherwise, or whether through contractual arrangements with its service provider or with Fox (in those arrangements' past or the present version) (Weinstein Aff., June 14, 1999, ¶ ¶ 8, 13), PrimeTime is taking telecasts originating in the United States and transmitting them by satellite to foreign viewers.

As to PrimeTime's suggestion, if it be one, that because it cannot control satellite "footprints," it is absolved of infringement, that suggestion is met by NFL's observation that PrimeTime "has the power to shut off (or not to sell) its service to Canadian subscribers, who, without [PrimeTime's] authorization and assistance, would not be able to descramble the signal" (Pl. Reply Mem. at 4 n. 2), an observation which PrimeTime has not disputed. (Def. Reply Mem. *passim* ).

### 5.

PrimeTime argues that a permanent injunction should not be granted before it has had discovery as to its defenses. (Def. Mem. at 7-10.) PrimeTime has specifically identified as follows what it believes, if it had discovery, it would be able to show in opposition to a permanent injunction:

> [PrimeTime] has reason to believe the injury suffered by the NFL is not "irreparable." First, the NFL knew of [PrimeTime's] conduct for years before finally bringing this suit in 1998. Second, there are other entities that provide NFL game signals to far more Canadians than [PrimeTime] without the permission of the NFL. That the NFL has waited so long to take action against [PrimeTime], and is not even suing the other entities, shows that [PrimeTime's] limited conduct cannot inflict truly "irreparable" harm.

(White Rule 56(f) Aff. ¶ 9.) PrimeTime also suggests that NFL has an adequate remedy under Canadian Law. (Def. Mem. at 10; Def. Reply Mem. at 7 n. 1.)

The Copyright Act provides that "[a]ny court having jurisdiction of a civil action arising under this title may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). As the word "may" suggests, the grant of an injunction, even a final injunction, is within the discretion of the Court. Since injunctions are the creature of equity, "[t]he general principles of equity followed by the courts in granting or denying injunctions are applicable to copyright infringements." Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, at 108 (1961). While some courts have used language that suggests that, upon a finding of liability for infringement, a final injunction is mandatory, *see, e.g., Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1542 (S.D.N.Y.1991), that is not the case. Equitable considerations may, in some situations, dictate the denial of a final injunction. *See, e.g ., New Era Publications Int'l, ApS v. Henry Holt & Co.,* 873 F.2d 576, 584-85 (2d Cir.1989).

**\*4** In copyright cases, a court exercising its discretion with respect to the issuance or not of a final injunction must, however, bear in mind that "[i]rreparable harm may ordinarily be presumed from copyright infringement." *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985) (Friendly, J.); *see also American Metro, Enter, of N.Y. v. Warner Bros. Records, Inc.,* 389 F.2d 903, 905 (2d Cir.1968) ("A copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of the copyrighted material is invaded.").

A court should also bear in mind that, in a case in which it is shown that, absent an injunction, the infringer will continue to infringe, the failure to issue a final injunction will ordinarily be tantamount to the creation of a compulsory license, future damages then becoming a sort of royalty. *See* 2 William F. Patry, *Copyright Law & Practice* § 502, at 1158 n. 348 (1994); *see also Cadence Design Sys., Inc. v. Avant! Corp.,* 125 F.3d 824, 828 n. 8 (9th Cir.1997), *cert. denied* 118 S.Ct. 1795 (1998). That is not, absent compelling reason, a desirable practice or consistent with the objectives of the Copyright Act.

The Court perceives no reason in the present case to delay the entry of a final injunction. PrimeTime has made it clear that, unless enjoined, it will continue to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transmit telecasts of NFL games in which NFL holds the copyright via satellite to Canada, if not to other foreign countries. The presumption that the infringement of a copyright gives rise to irreparable harm has not been rebutted where, as here, an intent to infringe in the future is evident. In *Richard Feiner & Co. v. Turner Entertainment Co.,* 98 F.3d 33 (2d Cir.1996), relied on by PrimeTime, in which the Court of Appeals reversed that part of a preliminary injunction requiring a recall of infringing materials, *id.* at 33, on grounds of delay, *id.* at 34-35, the appellant did not seek permission to recommence production and sale of infringing material. *Id.* at 35.

In *Richard Feiner,* the Court of Appeals made it clear that:
> Although delay for purposes of preliminary-injunction analysis may be similar to the equitable consideration of laches in shaping appropriate final relief, our refusal to approve the issuance of a preliminary injunction should *not* prevent a lower court from considering the full panoply of available remedies when it fashions permanent relief.
> *Id.* at 34.

Even assuming, *arguendo,* that the delay on which, in part, PrimeTime premises its lack of irreparable harm argument would have been a sufficient ground for the denial of a preliminary injunction, it is not sufficient to suggest that a final injunction should be denied on the ground of laches. On June 17, 1997, NFL objected in writing to PrimeTime's distribution of NFL telecasts in Canada or elsewhere outside of the United States and called upon PrimeTime to cease delivery of copyrighted network NFL telecasts to viewers outside the United States. (Hawkins Decl. Ex. A.) After some further correspondence, into August of 1997 (*id.* Exs. B, C & D), NFL filed this action in May of 1998. Such a delay does not suggest any abandonment of its rights on the part of NFL, and PrimeTime has not put forward facts showing that it was prejudiced by any delay, a prerequisite to a defense of laches. *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651, 655 (2d Cir.1978).

*5 PrimeTime offers no authority for the proposition that, if NFL has not commenced litigation against other infringers of its copyrights, it cannot obtain an injunction against PrimeTime for the latter's infringement of those copyrights.

Nor is there any basis for PrimeTime's argument that NFL has an adequate remedy under Canadian law. The copyrights which the Court has found have been infringed by PrimeTime are United States copyrights (and PrimeTime is a New York corporation with its principal place of business in New York (Cplt. ¶ 6, admitted in Ans. ¶ 6)), and the Court sees no reason why NFL should either be relegated to the expense and inconvenience of litigation in Canada, or limited to whatever royalties may be collectible from PrimeTime's Canadian distributors (*see* Def. Reply Mem. at 7 n. 1).

In short, PrimeTime has not shown that, if it established what it believes it could establish with the aid of discovery, there would be a reason in equity to withhold a final injunction, or that NFL has an adequate remedy under Canadian law. Since there is clearly a threat of continuing infringement, NFL is entitled to a final injunction. *Cass County Music Co. v. Khalifa,* 914 F.Supp. 30, 34 (N.D.N.Y.1996).

6.

PrimeTime makes several arguments regarding the scope of a final injunction (should one issue, which, of course, it does not concede).

It argues, for one thing, that its conduct with respect to NFL games broadcast on the Fox network should not be enjoined, because "signals of the Fox network are no longer uplinked or retransmitted in this country by or on behalf of [PrimeTime]," whose "subscribers in Canada are given direct access to the Fox Net signal transmitted from Fox's own satellite." (Def. Mem. at 11.) However, the Court can see no relevant distinction in PrimeTime's rearrangement of the manner in which Fox telecasts of NFL games are retransmitted from the United States to Canada: in the past, the Fox signal was transmitted, by contractual arrangement between PrimeTime and Fox, by Fox to PrimeTime's satellite and thence to the Canadian viewers; now the Fox signal is transmitted, by contractual arrangement between PrimeTime and Fox, by Fox to a Fox satellite and thence to the Canadian viewers. PrimeTime is still causing, by contract, the transmission of the copyrighted work from the United States to the Canadian viewers. That the signals are transmitted *via* a Fox satellite rather than a satellite on which PrimeTime leases a transponder is not relevant.

PrimeTime also argues that a final injunction should not cover NFL games broadcast on the ABC, ESPN or TNT networks because NFL has not offered evidence "that [PrimeTime] infringed NFL copyrights (if any) in games broadcast by ABC, ESPN or TNT." (Def. Reply Mem. at 9 .) It is true that the complaint alleges that PrimeTime makes

Case No. 1:02-cv-01662-RPM   Document 281-3   filed 09/22/05   USDC Colorado   pg 5 of 17

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 760130 (S.D.N.Y.), 52 U.S.P.Q.2d 1615
(Cite as: 1999 WL 760130 (S.D.N.Y.))

Page 5

secondary transmissions of programming of the CBS, NBC, ABC and Fox networks. (Cplt. ¶ 6 (not referring to ESPN or TNT)), and that the copyright registrations submitted by NFL (Roman Decl. Exs. A & B) do not relate to games broadcast over the ABC, ESPN or TNT networks. That may affect the damages that NFL may recover in the present action, but it does not affect the appropriate scope of a final injunction, which is properly based on the fact that PrimeTime has infringed NFL game copyrights and intends, unless enjoined, to continue to do so.

> *6 [W]hen, as here, there has been a history of copyright infringement which persuades the court that there is a threat of future violations, an injunction may properly be entered which applies 'not only to the works as to which infringement has already been adjudicated, but also to any other works presently owned by plaintiff.'

*Picker Int'l Corp. v. Imaging Equip. Servs., Inc.,* 931 F.Supp. 18, 45 (D.Mass.1995) (quoting 3 *Nimmer on Copyright* § 14.06[B] at 14-100 (1994)).

To the extent that PrimeTime suggests that a final injunction should only apply to retransmission to Canada, the same reasoning applies: the final injunction will include all foreign countries.

7.

For the foregoing reasons, and there being "no just reason for delay," Fed.R.Civ.P. 54(b), NFL is entitled to the entry of judgment: (1) declaring that PrimeTime has violated NFL's rights under the Copyright Act by retransmitting NFL game telecasts of which NFL is the owner of the copyright to locations outside of the United States; (2) permanently enjoining PrimeTime from making secondary transmissions of NFL game telecasts of which NFL is the owner of the copyright to locations outside of the United States; and (3) referring this case to a Magistrate Judge to calculate such statutory damages and attorneys' fees as NFL may be entitled to.

NFL is to submit a proposed judgment on ten business days' notice to PrimeTime, which may object in writing to the form of the judgment.

8.

PrimeTime argues that any final injunction should be stayed pending review by the Court of Appeals. That request is denied, but the judgment to be submitted should provide that the injunction is stayed for three business days in order to afford PrimeTime an opportunity to seek a stay from the Court of Appeals.

Not Reported in F.Supp.2d, 1999 WL 760130 (S.D.N.Y.), 52 U.S.P.Q.2d 1615

**Motions, Pleadings and Filings (Back to top)**

• 1:98cv03778 _____(Docket) (May. 27, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 566378 (N.D.Ill.), 1998 Copr.L.Dec. P 27,744, 44 U.S.P.Q.2d 1441
**(Cite as: 1997 WL 566378 (N.D.Ill.))**

Page 1

**H**

<u>Motions, Pleadings and Filings</u>

United States District Court, N.D. Illinois.
STORM IMPACT, INC. an Illinois Corporation, and David Alan Cook, Plaintiffs,
v.
SOFTWARE OF THE MONTH CLUB, Defendant.
**No. 95 C 2154.**

Sept. 8, 1997.

*Memorandum Opinion and Order*

<u>ZAGEL</u>, District Judge.

*\*1 Storm Impact and David Cook have sued Software of the Month Club (SOMC) for copyright infringement. SOMC defends against a finding of infringement with the affirmative defense of fair use.

Storm Impact is an Illinois corporation with an office in Glenview. Its owner is David Alan Cook. Dan Schwimmer worked with plaintiffs designing levels and courses for the games TaskMaker and MacSki which were developed (beginning in 1989) by Cook, Schwimmer and Thomas Zehner (artwork). They produced software and shareware. Cook copyrighted TaskMaker and MacSki and listed himself as sole author. <u>[FN1]</u>

> <u>FN1.</u> There is an immaterial dispute as to whether Cook was author or co-author and whether he should have listed Schwimmer and Zehner who, in any event, assigned their rights to Cook.

In October, 1993, Storm Impact began selling an upgraded version of TaskMaker "v.2.0." One of the marketing tactics Storm Impact used was to distribute the software as "shareware." Shareware is not a kind of software, it is a way of marketing software as an alternative to retail selling; it is much cheaper than conventional retail methods.

The federal government has defined shareware as "copyrighted software which is distributed for the purposes of testing and review, subject to the condition that payment to the copyright owner is required after a person who has secured a copy decides to use the software." <u>37 C.F.R. § 201.26</u>. Shareware gives the user an opportunity to use the product and try it out before buying it.

There are two common forms of shareware. With the first, the owner of the software makes the complete software available to users without charge for the purpose of evaluation. If users wish to keep the software after a trial basis, they must forward a registration fee to the owner. Shareware programs distributed in this manner rely to a large extent on the honesty of the users. The second form of shareware contains the computer equivalent of a lock on part of the program. The "lock" is a feature built into the software program which disables portions of the program. The user can sample the unlocked portion at no charge, and, if the user likes what he sees, he can buy the "key" in the form of a floppy disk and registration number which enables the user to use the whole program. Storm Impact used this second form of shareware to market TaskMaker.

In September 1994, Storm Impact started selling an upgraded version of MacSki "v.1.5." The MacSki game contained a number of ski runs. The shareware version stopped the user halfway down the ski run. If the user wanted to play the full game, he could register with Storm Impact to purchase the "key." Storm Impact made both TaskMaker and MacSki available on America Online.

Shareware programs typically display a legend that expressly permits the user to try the software before buying it and encourages the user to give unaltered and complete copies of the software to friends, family and associates. The legend customarily contains an express restriction that one cannot charge for copies or try to make a profit from the software or its distribution. The restrictions typically forbid commercial distribution, of the software, mass distribution, or its sale for a profit.

*\*2 Both TaskMaker and MacSki contain express restrictions which appear on their respective screen displays. The TaskMaker restriction states:
> Copy this game! Give copies to your friends, family, and associates.... If you like this game, and want to see more, make an effort to give a copy to everyone you know. Remember--copies must be unaltered and complete.... Don't charge for copies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 566378 (N.D.Ill.), 1998 Copr.L.Dec. P 27,744, 44 U.S.P.Q.2d 1441
**(Cite as: 1997 WL 566378 (N.D.Ill.))**

Page 2

or try to make a profit from TaskMaker® or its distribution. See the Legal section of this text for details.

The MacSki restriction states:

Copy this game! Give copies to your friends, family, and associates.... But remember--copies must be unaltered and complete. Make sure to include the sound, color, and course files with the application. Don't charge for copies or distribution. Read the Legal section of this text for restrictions.

The Legal section for both games state:

Commercial distribution prohibited, as is distribution in exchange for compensation or any other consideration, except that acquisition of download time in exchange for uploading this program onto electronic bulletin boards is allowed. De minimus actual costs incurred in distribution, such as disks and postage, may be recouped. Mass duplication and distribution prohibited, except for uploading to electronic bulletin boards, and then only when no consideration passes except for free download time.

In addition, the MacSki game has an express prohibition against copying the program on CD-ROM, under any circumstances, and further defines mass duplication as "50 or more copies in any 12 month period."

Software of the Month Club is a California corporation with an office in Carlsbad, California. SOMC provides collections of newly introduced shareware to its customers on a monthly basis. SOMC charges an initial fee of $39.95 to become a member. Thereafter, members pay a monthly fee of $24.95 to retain the service and receive a disk or CD-ROM each month.

SOMC has employees scour the online universe for what it thinks is the "latest and greatest" shareware and receives shareware directly at its own website from those who wish to have their products considered for selection by SOMC. SOMC employees then screen through the number of different shareware programs each month and assemble the "best" shareware programs into categories by subject matter, i.e., educational, business, games, etc. About 25% of what is examined makes it to the final volume which is then distributed to customers on a monthly basis, but sometimes more frequently. SOMC has 60,000 members and in 1993/94 had about 30,000 members. SOMC sends literature to its customers that recommends that users register with the authors whose work they enjoy.

All of this costs money. SOMC is in business to make profits (and it does) from its labors of searching for and testing shareware and its use of its critical judgment of the popular merits of the shareware. It gets fees from its members and, perhaps, fees from software makers who sell their products through SOMC distribution.

*3 SOMC says it performs a service to authors. Storm Impact wrongly disputes this assertion. SOMC clearly does provide a service, it endorses and distributes the works of authors. [FN2] What Storm Impact means to say is that it does not want the service because it might alienate potential customers, injure its reputation and result in customers being given erroneous technical advice. [FN3] Storm Impact believes that *free* shareware is a good distribution technique and does not want to participate in an enterprise where a fee is charged in connection with shareware distribution.

> FN2. In contrast to a "shovelware" CD-ROM which collects hundreds of programs, new or old, without evaluation of their merits.

> FN3. SOMC says it offers technical advice only on how to use the disk it provides. Storm Impact says it has evidence that SOMC gives erroneous advice on the operation of the MacSki® color files.

It has been SOMC's policy not to use shareware if it has the restrictions seen on plaintiffs' shareware. Yet, a SOMC employee believed (at a prior time) that if something was shareware, then permission to reproduce was implied. And, before this lawsuit there was a mixed-bag practice of seeking permission to use an author's work at some times and not at others. Apparently, no one at SOMC either read or paid attention to the express restrictions that were on TaskMaker or MacSki. Express permission to put them on SOMC disks was never received. Since the filing of this lawsuit, SOMC now asks all authors for written permission to reproduce their shareware unless the work itself contains permission to reproduce. [FN4]

> FN4. I omit some details in order to shorten the "treeware" version of this opinion.

Both sides seek summary judgment which should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:02-cv-01662-RPM   Document 281-3   filed 09/22/05   USDC Colorado   pg 9 of 17

Not Reported in F.Supp.                                                                                         Page 3
Not Reported in F.Supp., 1997 WL 566378 (N.D.Ill.), 1998 Copr.L.Dec. P 27,744, 44 U.S.P.Q.2d 1441
**(Cite as: 1997 WL 566378 (N.D.Ill.))**

matter of law. Fed.R.Civ.P. 56(c); _Celotex Corp. v. Catrett,_ 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Both sides agree there is no prior decision on the question presented here and both sides argue from first principles.

The purpose of copyright protection, in the words of the Constitution, is to "promote the Progress of Science and useful Arts." _Sony Corp. of America v. Universal City Studios, Inc.,_ 464 U.S. 417, 477, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Copyright is based on the belief that by granting authors the exclusive rights to reproduce their works, they are given an incentive to create, and that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors." _Id._ However, for progress to occur, others must be permitted to build upon and refer to the creations of prior thinkers. Thus, there is an inherent tension in the need to protect copyrighted material and to allow others to build upon it. _Campbell v. Acuff-Rose Music, Inc.,_ 510 U.S. 569, 114 S.Ct. 1164, 1169, 127 L.Ed.2d 500 (1994).

One device for resolving this tension is the fair use doctrine which creates an exception to the copyright monopoly. The defense of fair use carves out of the exclusive rights conferred by the Copyright Act, and legally empowers a person to use the copyrighted works in a reasonable manner without the consent of the copyright owner. The fair use doctrine requires courts to avoid the rigid application of the copyright statute when it would stifle the very creativity the law is designed to foster. _Campbell,_ 114 S.Ct. at 1170.

*4 Fair use allows a second author to make certain uses of the first author's work for the public good. _Sony,_ 464 U.S. at 478. The uses which are deemed fair have a common theme, each is a productive use, resulting in some added benefit to the public beyond that produced by the first author's work. _Id._ As courts have said, the fair use doctrine strikes a balance between the dual risks created by the copyright system: on the one hand, that depriving authors of their monopoly will reduce their incentive to create, and, on the other, that granting authors a complete monopoly will reduce the creative ability of others. _Id._ at 479.

This rule was made by judges without benefit of statute until the doctrine was codified at Section 107 of the Copyright Act. This statute does not supersede the common law tradition of fair use. Rather, Section 107 was intended only to restate (and approve) the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way. _Campbell,_ 114 S.Ct. at 1170. Section 107 states as follows:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
> 17 U.S.C. § 106.

The four fair use factors are illustrative and not exhaustive. They are not to be treated in isolation, but are to be explored and the results weighed together, in light of the purposes of copyright on a case-by-case basis. _Campbell,_ 114 S.Ct. at 1170-71.

SOMC does not contest that its use of plaintiffs' shareware constitutes an infringement of Storm Impact and Cook's rights in MacSki and TaskMaker under Section 106 of the Copyright Act, but for a finding of fair use.

The first factor in a fair use enquiry is "the purpose and character of the use, including whether such a use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor directs the courts to examine whether the particular use made of copyrighted material was necessary to the asserted purpose, or whether the defendant's purpose could have been accomplished by taking nonprotectible material or less expression. William F. Patry, _The Fair Use Privilege in Copyright Law,_ 2d ed. p. 418-19. In balancing the inquiry, courts should examine whether the defendant reproduced the copyright owner's expression for the purpose of marketing the precise form of that expression or for the purpose of making his own additional statement. _Id._ at 425.

*5 There are two aspects to this test, (1) the degree to which the challenged use has transformed the

Case No. 1:02-cv-01662-RPM   Document 281-3   filed 09/22/05   USDC Colorado   pg 10 of 17

Not Reported in F.Supp.                                                                                                   Page 4
Not Reported in F.Supp., 1997 WL 566378 (N.D.Ill.), 1998 Copr.L.Dec. P 27,744, 44 U.S.P.Q.2d 1441
**(Cite as: 1997 WL 566378 (N.D.Ill.))**

original, and (2) the profit or nonprofit character of the use. Analysis here centers on whether the new work merely "supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." Campbell, 114 S.Ct. at 1171 (internal quotations and citations omitted). Works that are transformative are more likely to promote science and the arts, whereas works that merely copy the original are likely to be found to be infringements of the copyrighted work. Such transformative use is not absolutely necessary for a finding of fair use; however, the more transformative the new work, the less will be the significance of other factors which may weigh against a finding of fair use. Id .

SOMC argues that its use of plaintiffs' works is transformative because the compilation of the qualitatively and subjectively best shareware for a given month supersedes the original work and adds something new to it. SOMC claims its use has a different purpose than the original, that of critique and comment of the best shareware that exists.

There is no doubt that, in one sense, SOMC has provided something new by selecting MacSki and TaskMaker and compiling these programs into a volume of other shareware programs that are considered to be the "latest and greatest." However, what is new is the compilation, not the individual works. The MacSki and TaskMaker programs have not been transformed. The shareware programs that are available through SOMC are exact duplicates of the original, they are just distributed to a larger audience. SOMC also makes the shareware available for exactly the same purpose as Cook and Storm Impact, to allow potential customers to sample the new programs before buying them. The fact that SOMC has included MacSki and TaskMaker in a compilation does not cause the shareware programs to be transformative. Cf. Princeton University Press v. Michigan Document Service, 99 F.3d 1381, 1389 (6th Cir.1996), cert. denied, 520 U.S. 1156, 117 S.Ct. 1336, 137 L.Ed.2d 495 (1997) ("If you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very mucheven if you juxtapose them to excerpts from other works and package everything conveniently. This kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis accomplished by the parodists in the Campbell case .")

The other element of the first fair use factor is whether SOMC's use of the copyrighted material is of a commercial nature or is for nonprofit educational purposes. This factor does not establish an either/or choice with commercial uses banished and nonprofit educational uses allowed. The central inquiry "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). It is difficult to classify any particular use as either commercial or noncommercial as few uses will qualify as purely one or the other. Most involve some degree of monetary gain, whether direct or indirect.

*6 SOMC argues that its use is not commercial, rather it claims it is providing a service to both the customer and the author by providing a larger market for the ultimate sale of the author's software and a service to the customer to weed through all the shareware that exists. SOMC claims the fact that it makes money from the sale of its monthly service does not transform its service into a commercial use since every business makes money.

SOMC is in the business of selling the ability to try out the "latest and greatest" computer programs without having to pay the full price for the program until the customer knows he actually wants to purchase it. SOMC could not be successful in this endeavor if it did not market what it finds to be the best shareware each month. TaskMaker was a featured game selection one month. It is clear that SOMC's commercial success is dependant upon featuring Cook's and other authors' shareware as SOMC captures revenues as a direct consequence of copying the original work. However, the shareware versions of MacSki and TaskMaker are available online for free. There is no customary price for the shareware versions which SOMC distributes to its customers. Thus, it cannot be said that SOMC is profiting from the exploitation of the copyrighted material without paying the customary price. Harper & Row, 471 U.S. at 562. Therefore, I find the commercial nature of SOMC's use does not favor either side.

The second factor in the analysis requires the court to examine "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor recognizes that fair use is more difficult to establish when the work being used is at the more of intended copyright protection.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Campbell,* 114 S.Ct. at 1175. Creative and original works are accorded greater protection than factual works. Thus, fair use is more difficult to establish when creative works are copied. *Id.*

Storm Impact and Cook's works are computer games, original and creative works. They are not facts or news. This weighs in favor of plaintiffs.

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). When "a substantial portion of the infringing work [i]s copied verbatim, [it evidences] the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper & Row,* 471 U.S. at 565. However, the extent of permissible copying varies with the purpose and character of the use. *Campbell,* 114 S.Ct. at 1175. Thus, the court must look to whether the quantity and value of the materials used are reasonable in relation to the purpose of copying. *Id.*

> [W]hether a substantial portion of the infringing work [i]s copied verbatim from the copyrighted work is a relevant question for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, ... with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original.
> \*7 *Id.* at 1175-76 (internal citation omitted).

SOMC has copied and distributed the shareware programs in their entirety, electron for electron. In its defense, SOMC argues that software authors insist on their shareware being distributed without modification and that the circumstances require duplicating the whole work because of the nature of shareware as a marketing tool. SOMC cites to *Sony* for the proposition that when circumstances such as these call for duplication of the whole work without modification, fair use exists. However, the fact that SOMC has copied the works electron for electron emphasizes the dearth of transformative character to its use. *Id.* At 1176. Because SOMC uses MacSki and TaskMaker for the same purpose as plaintiffs, to allow potential customers to sample the new programs before buying them, SOMC's use merely supersedes that of the original. Thus, I find such duplication of the original is not reasonable in light of the purpose of the copying.

The fourth fair use factor looks to "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Under this concept, courts must consider the extent of market harm caused by the particular actions of the alleged infringer and whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original. *Campbell,* 114 S.Ct. at 1177. This inquiry must take account of the harm to the market for derivative works as well as the harm to the original. *Id.* The Court in *Harper & Row* described this last factor as the single most important element of fair use. *Harper & Row,* 471 U.S. at 566. "Fair use ... is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566-67, citing, 1 Nimmer § 1.10[D], at 1-87.

SOMC asserts that there is no negative effect upon the potential market for the copyrighted work, but a benefit to both plaintiffs and the public. SOMC claims plaintiffs are benefitted because their sales of the complete software have been greatly enhanced based on the wide distribution of the shareware versions. SOMC also claims the public has benefitted as the software market has enhanced access to the best shareware that is available. This argument that increased distribution of an author's work is a benefit to the author has been rejected by the Supreme Court. In *Harper & Row* the Court stated, "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work.... But Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory license' ..." to copyrighted works. *Harper & Row,* 471 U.S. at 569 (internal citation omitted).

Storm Impact and Cook claim that the inclusion of MacSki and TaskMaker among SOMC's mailings has created ill will among potential customers and has interfered with their carefully planned method of distributing MacSki and TaskMaker. Plaintiffs claim they have received numerous complaints from persons who are upset that they have to register and pay them to obtain the "key" after they have already made numerous payments to SOMC. SOMC disputes that any complaints have been made. SOMC claims that customers who use shareware know what it is, that you try before you buy, and cannot possibly believe that they have already paid for the complete software program when they only receive the shareware version. Further, SOMC argues customers are informed when they sign up with SOMC that they are not receiving the complete

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 566378 (N.D.Ill.), 1998 Copr.L.Dec. P 27,744, 44 U.S.P.Q.2d 1441  
**(Cite as: 1997 WL 566378 (N.D.Ill.))**

Page 6

software program, but are informed that if they like the shareware they may then purchase the "key" from the author.

**\*8** In order to understand the effect SOMC has had on plaintiffs' work, it is necessary to understand the custom and practice of the shareware market. On the one hand, shareware creators generally give their product away for free and encourage users to give free copies to everyone they know. At the same time however, shareware creators put restrictions on their products telling users not to sell, mass distribute or charge for copies.

It is also necessary to understand how SOMC fits in within the "of the month club" industry. There seems to be an infinite number of "month clubs," to name only a few: "Book of the Month Club," "Beer of the Month Club," "CD of the Month Club," "Knucklehead of the Month Club," "Fruit of the Month Club," etc. Plaintiffs apparently analogize SOMC to the Book of the Month Club or CD of the Month Club where the customer pays each month to receive a new and complete version of a book or CD. But SOMC is different because it is the free sample of the month club. SOMC's service might be analogized to a newspaper containing movie reviews where a customer buys the paper to read the reviews and see what is playing, but knows she will have to pay again to see the movie. SOMC claims customers know what they are getting and they do not believe they are paying twice to obtain plaintiffs' software. Whether customers are aware of the nature of shareware and SOMC's business is one fact that must be determined.

Plaintiffs also make the assertion that ill will is created toward its products because SOMC gives poor technical advice. Many of us know from personal experience that there are times when the simple loading of a new program from a CD-ROM or disk may alter existing files on one's hard drive. SOMC claims it only gives technical advice regarding the loading of the disks and CD-ROMs it sends out each month. But it is unclear whether the disks or CD-ROMs ever cause problems with customer's computers or whether SOMC gives poor technical advice regarding loading problems or relating to plaintiffs' programs.

Based on the facts before me, it is unclear what impact SOMC has had on plaintiffs' future distribution plans, or whether SOMC has created ill will among potential customers based on the fact that customers must still pay Cook to receive the "key" or because SOMC gives bad technical advice. A more thorough understanding of the shareware industry is necessary to decide this factor. I regard this dispute as material to the resolution of the case.

When considering the factors, they appear overall to weigh in favor of plaintiffs and against a finding of fair use. However, a material issue of fact remains regarding the fourth factor which was described by the Supreme Court as "the single most important element of fair use." *Harper & Row,* 471 U.S. at 566. Because resolution of this factor could tip the balance in favor of SOMC, summary judgment is inappropriate. There is the further prudential consideration that cases of first impression are best decided on more fully developed records.

**\*9** For these reasons, summary judgment is denied.

Date: 3 September, 1997

Not Reported in F.Supp., 1997 WL 566378 (N.D.Ill.), 1998 Copr.L.Dec. P 27,744, 44 U.S.P.Q.2d 1441

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv02154 (Docket) (Apr. 07, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31409852 (S.D.Ohio), 2002 Copr.L.Dec. P 28,521
(Cite as: 2002 WL 31409852 (S.D.Ohio))

United States District Court,
S.D. Ohio, Eastern Division.
TOO, INC., Plaintiff,
v.
KOHL'S DEPARTMENT STORES, INC., et al.,
Defendants.
No. 2:01-CV-1256.

Sept. 4, 2002.

Clothing retailer brought action against competitor and clothing manufacturer alleging copyright infringement. On defendants' motion to dismiss, the District Court, Sargus, J., held that defendants failed to show that first sale doctrine applied to manufacturer's allegedly infringing sale to competitor of retailer's copyrighted clothing.

Motion denied.

West Headnotes

**Copyrights and Intellectual Property** ⚖38.5
99k38.5 Most Cited Cases
First sale doctrine did not apply to manufacturer's allegedly infringing sale to competitor of retailer's copyrighted clothing, even though retailer authorized manufacture of clothing, and manufacturer delivered desired quantities of clothing to retailer; manufacturer failed to show that it was ever given right to use copyright for any purpose other than manufacture for retailer or that retailer wrongfully rejected goods manufactured. 17 U.S.C.A. § 109(d); R.C. § 1302.80.

*OPINION AND ORDER*

SARGUS, J.

*1 This matter is before the Court for consideration of Defendants' Motion to Dismiss (Doc. # 9). For the reasons that follow, the motion is denied.

I.

Plaintiff Too, Inc. brings this action against Defendants Kohl's Department Stores, Inc. and the Wormser Company, Inc., for alleged copyright infringement under 17 U.S.C. § 501, *et seq.* Plaintiff is a Delaware corporation with its principal place of business in Columbus, Ohio. Plaintiff operates LIMITED TOO retail stores throughout the United States. The stores sell clothing and various accessories to girls aged seven to fourteen. Defendant Kohl's, a Delaware corporation with its principal place of business in Menomonee Falls, Wisconsin, is a retail department store that offers various items for sale, including girls' clothing. Defendant Wormser is a manufacturer of infants' and children's sleepwear. Wormser is an Illinois corporation with its principal place of business in Northbrook, Illinois. The Plaintiff invokes this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1338.

Plaintiff alleges that the Defendants have infringed Plaintiff's copyrights as to four design patterns on LIMITED TOO girls' sleepwear. The first is referred to as the "Rubber Ducky" design. Plaintiff alleges that it created the unique design, which depicts a duck, a bathtub and bubbles, sometime in the year 2000. (*Amended Complaint* at ¶¶ 9, 11). The style was manufactured by Defendant Wormser, one of Plaintiff's third-party sources and manufacturers of apparel items. (*Id.* at ¶ 11). The Rubber Ducky sleepwear was first sold in Limited Too stores on or about October 26, 2000. (*Id.* at ¶ 12). On December 12, 2001, Plaintiff obtained a copyright on the design. (*Id.* at ¶ 13). Plaintiff alleges that, at some unspecified time, Defendant Wormser sold certain quantities of the Rubber Ducky design sleepwear to Defendant Kohl's. (*Id.* at ¶ 18).

The second design pattern which Defendants allegedly infringed is referred to as the "Overcast" design. The design, which depicts a cloud pattern, was created by Plaintiff sometime in the year 2000 and was manufactured by Defendant Wormser. (*Am. Complaint* at ¶ 21). Plaintiff began selling the Overcast design sleepwear in its LIMITED TOO stores on or about September 7, 2000. (*Id.* at ¶ 22). Plaintiff obtained a copyright on the design on December 12, 2001. (*Id.* at ¶ 23). Plaintiff alleges that, at some unspecified time, Defendant Wormser sold the Overcast design sleepwear to Kohl's. (*Id.* at ¶ 28).

The third design pattern at issue is known as the "Leopard" design. The sleepwear bearing this design depicts a leopard animal print. (*Id.* at ¶ 29). The design was created by Plaintiff sometime in the year 2000 and was manufactured by Defendant Wormser. (*Id.* at ¶ 31). Plaintiff began selling the sleepwear in its LIMITED TOO stores on or about November 16,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 31409852 (S.D.Ohio), 2002 Copr.L.Dec. P 28,521
**(Cite as: 2002 WL 31409852 (S.D.Ohio))**

2000. (*Id.* at ¶ 32). Plaintiff obtained a copyright for the Leopard design sleepwear on December 12, 2001. (*Id.* at ¶ 33). Plaintiff claims that, at some unspecified time, Defendant Wormser sold the Leopard design sleepwear to Kohl's. (*Id.* at ¶ 38).

*2 The final design pattern at issue is LIMITED TOO's "Frosty" design, which depicts snowmen and stars. (*Am. Complaint* at ¶ 39). The Frosty design was also manufactured by Defendant Wormser, and was first sold by Plaintiff on or about November 5, 2000. (*Id.* at ¶ 42). Plaintiff obtained a copyright for the design on December 28, 2001. (*Id.*). Plaintiff claims that Defendant Wormser sold the Frosty sleepwear to Kohl's without Plaintiff's authorization. (*Id.* at ¶ 48).

Plaintiff filed the instant action on December 19, 2001 with a request for preliminary injunctive relief. The parties entered into an Agreed Order Granting Preliminary Injunction on February 22, 2002.

Defendants now move to dismiss Plaintiff's complaint on the basis that Plaintiff cannot state a claim for copyright infringement as to any of the foregoing sleepwear designs. Defendants further argue that because Plaintiff cannot state a claim, this Court lacks subject matter jurisdiction under 28 U.S.C. § 1331 and 1338. Plaintiff opposes the Defendants' motion.

## II.

A motion to dismiss for failure to state a claim pursuant to Fed R. Civ. P. 12(b)(6) "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the non-movant. *Schuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mayer v. Mylod*, 988 F.2d 635, 637 (6th Cir.1993). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir.1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there is no law to support the claim made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the face of the complaint.

## III.

The Copyright Act vests holders of copyrights with the exclusive right to distribute their works. In particular, the Act states:

> Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending....

17 U.S.C. § 106.

The copyright holder's right is limited by, *inter alia,* § 109(a), which states:

> (a) Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord....

*3 17 U.S.C. § 109(a).

The provision codified at § 109(a) is known as the "first sale doctrine." Under the doctrine, once a copyright holder has transferred its "material ownership" to another, the holder is divested of the right to control future transfers of particular copies of the copyrighted work. *Columbia Pictures Industries, Inc. v. Aveco, Inc.*, 800 F.2d 59, 63-64 (3rd Cir.1986). The voluntary disposition of interest in the copyrighted work negates the copyright owner's control over further or "downstream" transfers. *See Quality King Distrib. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 142-44, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998). In the absence of such a transfer of interest, "an unwitting purchaser who buys a copy in the secondary market can be held liable for infringement if the copy was not the subject of a first sale by the copyright holder. Thus, unless title to the copy passes through a first sale by the copyright holder, subsequent sales do not confer good title." *American Int'l Pictures v. Foreman*, 576 F.2d 661, 664 (5th Cir.1978). The alleged infringer bears the burden of tracing the chain of title to prove that the first sale doctrine applies. *Microsoft v. Harmony Computers & Elecs., Inc.*, 846 F.Supp. 208-212-14 (E.D.N.Y.1994).

Defendants contend that the first sale doctrine

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31409852 (S.D.Ohio), 2002 Copr.L.Dec. P 28,521
**(Cite as: 2002 WL 31409852 (S.D.Ohio))**

Page 3

applies to this case and that, therefore, Plaintiff cannot state a claim for copyright infringement. Plaintiff argues that the doctrine does not apply because Defendant Wormser was never vested with an ownership interest in the sleepwear at issue. Defendants acknowledge that Wormser manufactured the sleepwear pursuant to a contract with Plaintiff. Defendants argue that Wormser "delivered the desired quantities of the sleepwear to Too. Wormser then sold the unused but lawfully manufactured inventory to Kohl's." (*Memorandum in Support of Motion to Dismiss* at 5). This is the only articulated basis on which Defendant Wormser claims it had an ownership interest in the sleepwear for purposes of the first sale doctrine. [FN1]

> FN1. The Court notes that attached to Defendants' motion are various purchase orders for the sleepwear at issue. Defendants proffer the exhibits in support of their assertion that they were under contract with Plaintiff to manufacture the sleepwear. Plaintiff makes this allegation in the Amended Complaint. Thus, the Court finds consideration of the exhibits unnecessary.

In regard to relevant legal authority, Defendants cite the case of *Bourne v. Walt Disney Co.*, 68 F.3d 621 (2nd Cir.1995). In that case, Plaintiff Bourne, the successor-in-interest to various copyrighted musical compositions held by composer Irving Berlin, sued Walt Disney Co. regarding Disney's use of the compositions in connection with the sales of Disney videocassettes and in television commercials. During the 1930s, employees of Defendant Disney composed music for use in the motion pictures "Snow White" and "Pinocchio" as well as for use in various other short cartoons. Disney assigned the copyrights for the compositions to Berlin. Berlin and Disney agreed to Disney's later use of certain compositions. For example, beginning in 1933 until 1939, Berlin gave Disney the right to use compositions to certain cartoons in exchange for Disney giving Berlin a share of the revenues received from such use. In contrast, when Disney assigned Berlin copyrights to the Snow White compositions in 1937, Disney was not given a right to use the same. When the copyrights to the music for Pinocchio were assigned to Berlin in 1939, Berlin and Disney agreed that Disney had certain rights to use the Pinocchio compositions.

*4 In considering Disney's use of various compositions in connection with sales of videocassettes and in commercials, the Second Circuit looked to the parties' agreements with respect to Disney's right to later use of the copyrighted compositions. The Court concluded that Disney indeed had a license to use certain compositions. As to Disney's right to distribute videocassettes using the compositions, Disney argued that because it had the right to use certain compositions, the later distribution of videocassettes fell within the first sale doctrine, codified at Section 27 of the Copyright Act of 1909. The Court concluded that the doctrine applied to Disney's actions.

The case at bar, however, is unlike the situation in *Bourne*. In this case, there is no allegation that Wormser was ever given the right to use the LIMITED TOO sleepwear for any other purpose than manufacture for Plaintiff. Further, Defendant makes no allegation as to the basis on which an interest in the sleepwear was allegedly conferred. Thus, this case is unlike the situation in *Bourne* where it was clear that an interest in the copyrighted work was conveyed. Defendants' reliance on the *Bourne* case is misplaced.

As Plaintiff points out, the fact that Plaintiff conveyed its copyrighted designs to Defendant Wormser for the purpose of manufacture, does not equate with the conveyance of an ownership interest in the finished product. Section 109 specifically states:

> (d) The privileges prescribed by subsections (a) and (c) do not, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it.

17 U.S.C. § 109(d). Indeed, Plaintiff's Amended Complaint clearly alleges that the Defendants' acts "were performed without the permission, license or authority of plaintiff, and/or were performed in deliberate, intentional, or reckless disregard of plaintiff's rights in its copyrighted Rubber Ducky, Overcast, Leopard and Frosty Designs." (*Am. Complaint* at ¶ 49). Assuming the allegations to be true, as this Court must do in the context of the present motion, the Court cannot conclude that Defendant's acts were authorized so as to trigger application of the first sale doctrine, at least as a matter of law. [FN2] As stated above, it is the alleged infringer that must establish the chain of title. When the record in this case develops, Defendants may present evidence, if it exists, as to Wormer's alleged authority to distribute the Plaintiff's copyrighted designs. For purposes of the present motion, however, the allegations must be construed in Plaintiff's favor and, upon so doing, this Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2002 WL 31409852 (S.D.Ohio), 2002 Copr.L.Dec. P 28,521  
**(Cite as: 2002 WL 31409852 (S.D.Ohio))**

Page 4

cannot conclude that Plaintiff could prove no set of facts that would entitle it to relief.

> FN2. The Court notes that Plaintiff offers the Declaration of Kent A. Kleeburger, Executive Vice President and Chief Financial Officer of Too, Inc., in support of its allegation that Plaintiff never authorized Wormser to distribute the sleepwear at issue. The Court will not consider the declaration in connection with resolution of the instant motion. The Court simply determines, at this juncture, whether Plaintiff states a claim on which relief can be granted. Evidence as to the merits of the claims must await presentation at the summary judgment or trial stage.

The Court notes that, in their Reply Memorandum, Defendants argue that Plaintiffs failed to take possession of all of the manufactured sleepwear and, as a result, Defendant Wormser was vested with authority, under Ohio law, to dispose of the garments by selling them to Kohl's. Defendants cite R.C. § 1302.80 in support of this argument. [FN3]

> FN3. The statute provides that a seller may resell goods under the conditions stated in § 1302.77, which provides that:
> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract under section 1302.70 of the Revised Code, then also with respect to the whole undelivered balance, the aggrieved seller may:
> (A) withhold delivery of such goods;
> (B) stop delivery by any bailee as provided in section 1302.79 of the Revised Code;
> (C) proceed under section 1302.78 of the Revised Code respecting goods still unidentified to the contract;
> (D) resell and recover damages as provided in section 1302.80 of the Revised Code;
> (E) recover damages for non-acceptance as provided in section 1302.82 of the Revised Code or in a proper case the price as provided in section 1302.83 of the Revised Code;
> (F) cancel.
> R.C. § 1302.77.

*5 The Court cannot resolve the applicability of Ohio law to Defendants' actions at this juncture. The Ohio statute presupposes a "wrongful" rejection of goods manufactured by a seller; this issue cannot be resolved under Rule 12(b)(6) given the state of the pleadings. At this point, Plaintiff clearly alleges that the Defendants acted without authority to sell the copyrighted sleepwear and does not admit that it wrongfully rejected goods manufactured by the Defendant. On this basis, the Court finds that Plaintiff states a claim for relief under the Copyright Act against Defendants Wormser and Kohl's.

IV.

In light of the foregoing, Defendants' Motion to Dismiss (Doc. # 9) is DENIED.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 31409852 (S.D.Ohio), 2002 Copr.L.Dec. P 28,521

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.