# EXHIBIT B

## INTRODUCTION

The Digital Millennium Copyright Act of 1998 (DMCA) was the most substantial revision of the nation's copyright law since the general revision enacted in 1976. What began as a more modest (though critically important) effort to implement two new treaties that addressed issues of copyright in the digital age became a far more comprehensive legislative project to address a range of issues, digital and non-digital. The debates, both inside and outside the Congress, that were generated by this legislation led to myriad proposals – some of which were enacted and some of which were not. As Representative Howard Coble, Chairman of the House Judiciary Subcommittee on Courts and Intellectual Property and one of the bill's chief sponsors in the House, stated when he brought the measure to the floor, the DMCA "is only the beginning of Congress' evaluation of the impact of the digital age on copyrighted works."[1]

The DMCA directed the Register of Copyrights to prepare this Report as part of Congress' continuing evaluation of the impact of the digital age on copyrighted works. It is the fourth such undertaking mandated by Congress in the DMCA. In 1999, the Copyright Office released a report on digital distance education, which included recommendations that are embodied in S. 487 in this Congress.[2] In 2000, the Copyright Office and the National Telecommunications and Information Administration of the Department of Commerce (NTIA) released a joint report on the effect of the prohibition on circumventing access control

---

[1] 144 Cong. Rec. H7092 (daily ed. Aug. 4, 1998) (statement of Rep. Coble).

[2] Copyright Office, Copyright Office Report on Copyright and Digital Distance Education (1999). The results of this study were presented to Congress on May 25, 1999 and are available at: www.loc.gov/copyright/docs/de_rprt.pdf. The text of S.487 is available at: thomas.loc.gov/cgi-bin/query/z?c107:S.487:.

1

technologies in section 1201(a)(1)(A) of title 17, and an exception to that prohibition in section

1201(g), on encryption research.[3]  Also in 2000, the Office completed a rulemaking required

under section 1201(a)(1)(C) concerning an exemption from the section 1201(a)(1)(A) prohibition

for noninfringing uses with respect to certain classes of works.

The focus of this Report is an evaluation of "the effects of the amendments made by [title

I of the DMCA] and the development of electronic commerce and associated technology on the

operation of sections 109 and 117 of title 17, United States Code; and the relationship between

existing and emergent technology and the operation of sections 109 and 117 . . . ."[4]  It is an

outgrowth of proposals that were made contemporaneously with the consideration of the DMCA,

but were not adopted in the law.  Specifically, this Report focuses on two proposals that were

characterized as vital to the continued growth of electronic commerce by their proponents:

creation of a digital first sale doctrine to permit certain retransmissions of downloaded copies of

works in digital form; and an exemption for certain digital reproductions that are incidental to the

use of a copyrighted work in conjunction with a machine.  One additional issue that was raised

during the preparation of the Report, and appears to fall within the scope set forth by Congress in

section 104 of the DMCA, is the appropriate breadth and formulation of the exception for

making archival copies of computer programs in section 117.

---

[3]  The results of that joint Copyright Office and NTIA study were presented to Congress in May 2000 and are available at: www.loc.gov/copyright/reports/studies/dmca_report.html.

[4]  DMCA, Pub. L. No. 105-304, § 104(a), 112 Stat. 2860, 2876 (1998).

The DMCA contemplated that, like the report on encryption research, the present effort would be a joint report of the Copyright Office and NTIA.  In March  2001, however, NTIA released its own report.  This Report, consequently, is exclusively the work of the Copyright Office.  All of the views expressed and the recommendations made are, necessarily, solely those of the Register of Copyrights.

3

4

As ultimately enacted, section 104 of the DMCA requires the Copyright Office and NTIA jointly to evaluate:

> (1) the effects of the amendments made by this title and the development of electronic commerce and associated technology on the operation of sections 109 and 117 of title 17, United States Code; and
>
> (2) the relationship between existing and emergent technology and the operation of sections 109 and 117 of title 17, United States Code.

## B. SECTION 109 AND THE FIRST SALE DOCTRINE

Section 109 of the Copyright Act restates the principle commonly referred to as the "first sale doctrine." Under the first sale doctrine a copyright owner does not retain the legal right to control the resale or other distribution of copies or phonorecords of a work that have already been lawfully sold. The first sentence of section 109(a) of the Copyright Act provides:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

It is this provision of the copyright law that permits sales of used books and CDs, lending of books and other copyrighted materials by libraries, and rentals of videocassettes, among other activities, without the need to obtain the permission of copyright owners or make royalty payments.

19

### 1. History of the First Sale Doctrine

The first sale doctrine was initially a judicial doctrine. In *Bobbs-Merrill Co. v. Straus*,[32] the U.S. Supreme Court held that a copyright owner's exclusive right to "vend" did not permit it to impose a price limitation on the retail sale of books in the absence of any agreement as to the future sale price. In its interpretation of the reach of the vending right, the Court expressed doubt that Congress intended to abrogate the common-law principle that restraints on the alienation of tangible property are to be avoided. It posed and answered a series of rhetorical questions:

> What does the statute mean in granting 'the sole right of vending the same'? Was it intended to create a right which would permit the holder of the copyright to fasten, by notice in a book or upon one of the articles mentioned within the statute, a restriction upon the subsequent alienation of the subject-matter of copyright after the owner had parted with the title to one who had acquired full dominion over it and had given a satisfactory price for it? It is not denied that one who has sold a copyrighted article, without restriction, has parted with all right to control the sale of it. The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it.[33]

The Court drew a sharp distinction between the reproduction right and the right to vend. It noted, as a matter of statutory construction, that the reproduction right was the "main purpose" of the copyright law, and the right to vend existed to give effect to the reproduction right.[34] Since a grant of control to the copyright owner over resales would not further this main purpose of

---

[32] 210 U.S. 339 (1908).

[33] *Id.* at 349-50.

[34] *Id.* at 350-51.

protecting the reproduction right, the Court was unwilling to read the statute as providing such a grant:[35]

> In our view the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose . . . a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract. This conclusion is reached in view of the language of the statute, read in the light of its main purpose to secure the right of multiplying copies of the work . . . . True, the statute also secures, to make this right of multiplication effectual, the sole right to vend copies of the book . . . . To add to the right of exclusive sale the authority to control all future retail sales . . . would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment.[36]

The parties in *Bobbs-Merrill* also raised, and the Court of Appeals addressed, antitrust concerns. Although the Supreme Court did not address these concerns, it was undoubtedly aware of them,[37] and competition policy is viewed as one of the underlying bases for the first sale doctrine.[38]

---

[35] *Id.*

[36] *Id.*

[37] "This conclusion renders it unnecessary to discuss other questions noticed in the opinion in the Circuit Court of Appeals, or to examine into the validity of the publisher's agreements, alleged to be in violation of the acts to restrain combinations creating a monopoly or directly tending to the restraint of trade." *Id.*

[38] *See* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §8.12[A] [hereinafter NIMMER].

## 2. Legislative History of Section 109

The year following the *Bobbs-Merrill* decision, Congress codified the first sale doctrine in the Copyright Act of 1909.[39] Section 109(a) of the Copyright Act of 1976 carried forward the existing federal policy of terminating a copyright owner's distribution right as to a particular lawfully-made copy or phonorecord of a work after the first sale of that copy. The House Report explains:

> Section 109(a) restates and confirms the principle that, where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means. Under this principle, which has been established by the court decisions and section 27 of the present law, the copyright owner's exclusive right of public distribution would have no effect upon anyone who owns "a particular copy or phonorecord lawfully made under this title" and who wishes to transfer it to someone else or to destroy it.[40]

Section 109 creates a two-prong test for eligibility for the privileges[41] under section 109. First, the person must be the owner of the copy[42] at issue. This applies to ownership of the

---

[39] Section 27 of the 1909 Copyright Act provided:

The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of itself constitute a transfer of the copyright, nor shall the assignment of the copyright constitute a transfer of the title to the material object; *but nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.*
17 U.S.C. § 27 (1977) (emphasis added).

[40] H.R. Rep. No. 94-1476, at 79 (1976) ["1976 House Report"].

[41] Many of the commenters referred to the first sale doctrine as a "right." This is an inartful term to describe the doctrine. Rights are guaranteed to individuals and are generally enforceable in court. The first sale doctrine is not an enforceable right from the standpoint of the owner of a copy – that is, there is no independent remedy if a person is effectively denied the benefits of section 109 through technological or contractual means. The first sale doctrine is a limitation to the scope of copyright; specifically it is a limitation to the distribution right of copyright owners.

[42] For convenience, the term "copy" will be used with the understanding that it incorporates phonorecords as well.

tangible item (e.g., a book, photograph, videocassette, CD, floppy disc, etc.) in which a copyrighted work is fixed.[43]  While ownership may be obtained by virtue of a sale, this prong is also satisfied if ownership is obtained by virtue of gift, bequest, or other transfer of title.[44]  It does not apply to mere possession, regardless of whether that possession is legitimate, such as by rental, or illegitimate, such as by theft.[45]  Nor does it refer to ownership of the copyright or of any of the exclusive rights.[46]

Second, that copy must have been lawfully made.  Ownership of a copy that is not authorized by either the copyright owner or the law, even if the owner is unaware of the piratical nature of the copy, does not permit the owner to avail himself of section 109.[47]  Nothing in the statute limits the manner in which the making of the copy may be accomplished, so long as the resulting copy is lawful.

The statute does not distinguish between analog and digital copies.  Consequently, it does not matter whether the work is embodied in an analog videocassette or a digital DVD – the copyright owner's distribution right with respect to that particular copy is extinguished once

_____

[43] Nimmer, *supra* note 38, at § 8.12[B][1].

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] Nimmer, *supra* note 38, at § 8.12[B][4].

ownership of the copy has been transferred, and the new owner is entitled to dispose of that copy as he desires.

### 3.  Subsequent Amendments to Section 109

Congress has seen fit on three occasions to limit the effect of the first sale doctrine.  In the Record Rental Amendment of 1984,[48] Congress amended section 109 to allow copyright owners of sound recordings and the musical works embodied therein to retain the exclusive right to dispose of a particular phonorecord by rental, lease or lending for purposes of direct or indirect commercial advantage, even after a lawful first sale of that phonorecord.  The purpose of the amendment was to prevent the displacement of record sales by "rentals" that were, in fact, thinly-disguised opportunities for consumers to make personal copies of records without buying them.[49] In essence the so-called "rental right" serves to guard against infringement of the reproduction right.  Congress extended the same concept to computer programs in the Computer Software Rental Amendments Act of 1990.[50]  Both provisions have been incorporated into multilateral agreements and are now widely-accepted international standards.[51]

---

[48]  Pub. L. No. 98-450, 98 Stat. 1727 (1984).

[49]  H.R. Rep. No. 98-987, at 2. (1983).

[50]  Title VII of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089, 5134 (1990). Both the Record Rental Amendment and the Computer Software Rental Amendments Act are codified at 17 U.S.C. § 109(b).

[51]  Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), Articles 11 and 14.4 (1994); WIPO Copyright Treaty, Article 7 (1996); WIPO Performances and Phonograms Treaty, Articles 9 and 13 (1996).

24

Congress also limited the effect of the first sale doctrine when, in the course of implementing U.S. obligations under the TRIPS agreement in 1994, it extended copyright protection to certain preexisting works of foreign origin that had previously fallen into the public domain in the United States.  Under section 109(a), as amended by the Uruguay Round Agreements Act,[52] copies embodying certain restored copyrights may not be sold or otherwise disposed of without the authorization of the copyright owner more than twelve months after the person in possession of the copies receives actual or constructive notice that the copyright owner intends to enforce his rights in the restored work.

By the same token, Congress has, on one occasion, expanded the first sale doctrine to cover not only the distribution right, but the public performance and public display rights as well.[53]  Although legislatively sunsetted on October 1, 1995, section 109(e) permitted the public performance or display of an electronic videogame intended for use in coin-operated equipment.[54]

---

[52] Pub. L. No. 103-465, 108 Stat. 4809, 4981 (1994).

[53] Section 109(c) also permits public display in limited circumstances: "Notwithstanding the provisions of section 106(5), the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located."  This provision permits, among other things, the display of a painting in a museum or public art gallery by the purchaser of the painting.

[54] Pub. L. No. 101-650, § 804(c), 104 Stat. 5089, 5136 (1990) was enacted as part of the Computer Software Rental Amendments of 1990 in order to overturn the result in *Red Baron-Franklin Park, Inc. v. Taito Corp.*, 883 F.2d 275 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990), a case which held that a copyright owner could prevent the purchaser of gray market circuit boards containing a copyrighted videogame from performing the videogame in a video arcade.

25

## III.  EVALUATION AND RECOMMENDATIONS

### A.  THE EFFECT OF TITLE I OF THE DMCA ON THE OPERATION OF SECTIONS 109 AND 117

We are not persuaded that title I of the DMCA has had a significant effect on the operation of sections 109 and 117 of title 17, apart from some isolated factual contexts that are discussed below.  Many of the public comments received by us alleged that 17 U.S.C. § 1201, as enacted in title I of the DMCA,[258] is affecting the operation of sections 109 and 117[259] (while a significant number of others argued that it is not[260]).  However, either the concerns raised cannot be accurately described as being "effects on the operation of" one of those sections, or if there is an effect on the operation of one of those sections, that effect can just as easily be ascribed to other factors (such as the existence of license terms) as to section 1201.  Consequently, none of the legislative recommendations made in this Report are based on effects of section 1201 on the operation of sections 109 and 117.

### 1.  The Effect of Section 1201 on the Operation of the First Sale Doctrine

#### a.  *DVD Encryption*

Several commenters argued that section 1201's protection of CSS for DVDs against circumvention affects consumers' exercise of the first sale doctrine by enforcing technological limitations on the way DVDs can be used.[261]  These commenters asserted that because CSS is

---

[258]  No commenters indicated that any other provision of title I of the DMCA affected the operation of sections 109 and 117, and we are not aware of any issues relating to whether other provisions have an effect on those sections of the Copyright Act.

[259]  See C-Fischer, C-DFC, C-NARM/VSDA.

[260]  See C-Copyright Industry Orgs., C-Time Warner Inc.

[261]  *See* C-Arromdee, C-Thau and Taylor.

73

proprietary technology that is licensed to device manufacturers under restrictive terms, the use of CSS limits the potential playback devices for DVDs, which, in turn, limits the potential market for resale of DVDs. Second, they argued that because licensed playback devices enforce region codes,[262] DVDs purchased in one region of the world cannot be as easily resold in other regions, again limiting the potential resale market.

This argument is without merit. The first sale doctrine codified in section 109 limits an author's distribution right so that subsequent disposition of a particular copy by its owner is not an infringement of copyright. The first sale doctrine does not guarantee the existence of a secondary market or a certain price for copies of copyrighted works. If fewer people may wish to purchase a used DVD, or if they would pay less for it due to CSS, that would not equate to interference with the operation of section 109. Many circumstances in the marketplace may affect the resale market for copies of works – improvements in technology, introduction of new formats, and the quality and cultural durability of the content of the work. None of these factors can properly be said to interfere with the operation of section 109, even though they could reduce the resale market for a work or even render it nonexistent.[263]

---

[262] Each DVD bears an embedded region code corresponding to the region of the world where the particular DVD is authorized to be sold. Licensed DVD players will only play DVDs that are coded for the region where the player is sold. Region coding is used to prevent gray market importation of DVDs from one region to another.

[263] To the extent that there is a concern that region coding may limit the number of purchasers outside North America who are willing to buy region 1 DVDs (i.e., DVDs coded for sale within North America), that concern has nothing to do with section 1201. Section 1201 of title 17, United States Code, has no effect outside the United States. Consequently, a purchaser in Hong Kong could modify a region 6 player so that it could play a region 1 DVD without fear of any repercussions under section 1201 (although there may or may not be consequences under Hong Kong law). Moreover, resale outside the U.S. has nothing to do with section 109, which only governs resale within the United States.

Equally without merit is the argument – essentially a corollary to the guaranteed resale market argument – that the first sale doctrine gives consumers a right to use a DVD on any electronic device. In fact, virtually all devices capable of playing a DVD that are sold in the U.S. are compliant with CSS, so there is no real effect on the resale market as a result of the application of CSS technology. Further, this argument has nothing whatever to do with the privilege under section 109 to dispose of a copy of a work. Moreover, taken one step further, that argument would lead to the absurd result of requiring that consumers be able to play Beta videocassettes on VHS players, or VHS videocassettes on personal computers.

### b.  *Tethering Works to a Device*

A plausible argument can be made that section 1201 may have a negative effect on the operation of the first sale doctrine in the context of tethered copies – copies that are encrypted with a key that uses a unique feature of a particular device, such as a CPU identification number, to ensure that they cannot be used on any other device.[264]  Even if a tethered copy is downloaded directly on to a removable medium such as a Zip™ disk or CD-RW, the content cannot be accessed on any device other than the device on which it was made. Disposition of the copy becomes a useless exercise, since the recipient will always receive nothing more than a useless piece of plastic. The only way of accessing the content on another device would be to circumvent the tethering technology, which would violate section 1201.

---

[264]  *See* C-CPSR, at 4-5.

The practice of using technological measures to tether a copy of a work to a particular hardware device does not appear to be widespread at the present time, at least outside the context of electronic books. We understand through informal discussions with industry that this technique is – or at least can be – employed in some cases with electronic books using digital rights management (DRM) technology. Given that DRM is in its relative infancy, and the use of DRM to tether works is not widespread, it is premature to consider any legislative change to mitigate the effect of tethered works on the first sale doctrine. Nevertheless, we recognize that if the practice of tethering were to become widespread, it could have serious consequences for the operation of the first sale doctrine, although the ultimate effect on consumers of such a development remains unclear.

## 2. The Effect of Section 1201 on the Operation of Section 117

The use of technological measures that prevent copying of a work could have a negative effect on users' ability to make archival copies that are permitted under section 117. If, and to the extent that, such anti-copying measures can also be considered to be access control measures that are protected against circumvention by section 1201,[265] section 1201 could be said to have an adverse impact on the operation of section 117 in this context. For several reasons, however, the actual impact on consumers appears to be minimal.

---

[265] Section 1201 does not prohibit the circumvention of technological protection measures that only prevent copying. Thus, a user could lawfully circumvent the measures to create an archival copy. However, to the extent that copy controls also function as access controls, the circumvention of which is prohibited by section 1201, the circumvention of those measures is prohibited. Moreover, because section 1201 also prohibits the creation and distribution of circumvention tools, those consumers who lack the ability to circumvent technological protection measures would be unable to circumvent those measures even when such circumvention would not be unlawful.

First, since the overwhelming majority of computer programs sold in the United States are sold pursuant to a license, and section 117 applies only to "owners," the terms of the license agreement generally determine whether a user has the right to make an archival copy.[266] In cases where the license does not permit the creation of an archival copy, even absent technological protection measures, the copying is prohibited. Thus, in such cases it is the license that is impairing the operation of section 117.

Second, at the present time most software is sold without copy protection. Where the license permits or does not preclude the creation of an archival copy (or in the relatively few cases where the transaction was an outright sale) the user may make an archival copy as contemplated in section 117.

Third, as of last year approximately ninety-eight percent of computer software sold in the United States was sold on CD-ROM.[267] This means that even where consumers are prevented from making an archival copy, they are still able to reinstall the work in the event of computer malfunction. In essence, the CD-ROM itself acts as the archival copy. In that case, even if consumers are prevented from making archival copies as contemplated in section 117, their software investment is protected from system malfunctions, thus fulfilling the purpose of the

---

[266] Our (admittedly unscientific) review of sixteen license agreements for software used by the Copyright Office found that fourteen of them permitted the user to make a backup copy and one was silent. Only one of the sixteen licenses prohibited the user from making a backup copy, requiring the user either to use the original media as the backup copy or to replace the original media for a twenty-five dollar fee.

[267] R-SIIA, at 9.

archival exemption as articulated by CONTU.[268]   Accordingly, we conclude that the evidence at this time of an effect of title I of the DMCA on the operation of section 117 is not substantial, and no legislative change is warranted.

## B.  THE EFFECT OF ELECTRONIC COMMERCE AND TECHNOLOGICAL CHANGE ON SECTIONS 109 AND 117

We have made no attempt in preparing this study to separate out the impact of electronic commerce on sections 109 and 117 from the impact of technological change.  Such an effort would probably have been futile since, as the language of section 104 suggests, by grouping the two issues together, the issues are inextricably intertwined.  In its essence, electronic commerce is commerce carried out through new technologies.  This study is an outgrowth of the intersection between new technology and the new business models that it makes possible.  Our evaluation is of the impact of that intersection on the specified provisions of the Copyright Act.

### 1.  The First Sale Doctrine in the Digital World

#### a.  *Application of Existing Law to Digital Content*

The application of section 109 to digital content is not a question of whether the provision applies to works in digital form — it does.  Physical copies of works in a digital format, such as CDs or DVDs, are subject to section 109 in the same way as physical copies of works in analog form.  Likewise, a lawfully made tangible copy of a digitally downloaded work, such as an image file downloaded directly to a floppy disk, is subject to section 109.  The question we address here

---

[268] *See supra*, at 29.

is whether the conduct of transmitting the work digitally,[269] so that another person receives a copy of the work, falls within the scope of the defense.[270]

Section 109 limits a copyright owner's exclusive right of distribution. It does not, by its terms, serve as a defense to a claim of infringement of any of the other exclusive rights.[271] The transmissions that are the focus of proposals for a "digital first sale doctrine"[272] result in reproductions of the works involved. The ultimate product of one of these digital transmissions is a new copy in the possession of a new person. Unlike the traditional circumstances of a first sale transfer, the recipient obtains a new copy, not the same one with which the sender began. Indeed, absent human or technological intervention, the sender retains the source copy. This copying implicates the copyright owner's reproduction right as well as the distribution right.

---

[269] The transmissions discussed in this section are not broadcasts, but transmissions that, like point-to-point transmissions, involve the selection of specific recipients by the sender.

[270] Some commenters were confused between the proposal to apply the first sale doctrine to otherwise unauthorized digital transmissions of copyrighted works by lawful owners of copies of such works and the notion that a lawful copy created as a result of an authorized digital transmission is a lawful copy for purposes of section 109. The former would expand the scope of section 109 and will be discussed below. The latter is well within the current language of the statute. Regardless of whether a copy is created as a result of the nearly instantaneous transmission of digital information through broadband computer connections or as a result of months of painstaking labor of a cloistered monk working with a quill by candlelight, so long as that copy is lawfully made, it satisfies the second prong of eligibility for the section 109 defenses.

[271] 17 U.S.C. § 109(a). In limited circumstances the public display right is covered as well. 17 U.S.C. § 109(c). *See supra*, note 53.

[272] The term "digital first sale doctrine" is used here to denote a proposed copyright exception that would permit the transmission of a work from one person to another, generally via the Internet, provided the sender's copy is destroyed or disabled (whether voluntarily or automatically by virtue of a technological measure). We use the term because it has been used frequently in discourse about the subject. It is, however, a misnomer since the proposal relates not to works in digital form generally (which are, of course, already subject to section 109), but to *transmissions* of such works.

79

Section 109 provides no defense to infringements of the reproduction right. Therefore, when the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement.

Some commenters suggested that this reading of section 109 is unduly formalistic. The language of the statute, however, must be given effect. Section 109 is quite specific about the rights that are covered, and does not support a reading that would find additional rights to be covered by implication. Where Congress intended to immunize an activity, such as fair use, from infringement of any of the exclusive rights, it did so expressly.[273] It simply cannot be presumed that where Congress did enumerate specific rights, it somehow intended other rights to be included as well. In addition, our reading of section 109 is entirely consistent with the judicial origin of the first sale doctrine in the *Bobbs-Merrill* decision. The Supreme Court drew a sharp distinction between the two rights, creating an exception to the vending (i.e., distribution) right only to the extent that it didn't interfere with the reproduction right.[274] We therefore conclude that section 109 does not apply to digital transmission of works.

### b. *Evaluation of Arguments Concerning Expansion of Section 109*

A number of commenters proposed that section 109 be expanded to apply expressly to the reproduction, public performance and public display rights to the extent necessary to permit the

---

[273] *E.g.,* 17 U.S.C. § 107 ("Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright.").

[274] *Bobbs-Merrill,* 210 U.S. at 350-51. *See* discussion *supra,* at 20-21.

80

digital transmission of a work by the owner of a lawful copy of that work, so long as that copy is destroyed. This section will review the arguments for and against such a digital first sale doctrine.

### i. Analogy to the physical world

Arguments in support of a digital first sale doctrine generally proceed from an analogy to the circulation of physical goods. Whether couched as a means of achieving technological neutrality,[275] meeting consumer expectations that were formed in the off-line world,[276] or eliminating barriers to competition between e-commerce and traditional commerce,[277] an underlying basis for the argument in favor of a digital first sale doctrine is that the transmission and deletion of a digital file is essentially the same as the transfer of a physical copy.

To be sure, there is an important similarity between physical transfer, on one hand, and transmission and deletion, on the other. At the completion of each process the transferor no longer has the copy (at least in usable form) and the transferee does. Some of the proposals would enhance this similarity by requiring the use of technological measures (in some cases

---

[275] *E.g.*, C-Anthony, at 3.

[276] *E.g.*, R-DiMA, at 6 (arguing that, without a digital first sale doctrine, consumers are being short-changed when they purchase copyrighted works online because they don't get what they expect, and, consequently, will become disenchanted with the medium, decreasing legitimate demand and increasing online infringement).

The opponents of a digital first sale doctrine counter that the proposal would sharply reduce the supply of works available online because copyright owners would lack confidence that their works will be protected from piracy. In addition, they point out that there is tremendous demand for copyrighted works online, even though section 109 has not been expanded. R-SIIA, R-BMI. They view this as evidence that revision of section 109 is not a prerequisite to having robust growth in e-commerce in copyrighted works.

[277] C-HRRC, at 5-6.

81

referred to as "move" or "forward-and-delete" technology) that will disable access to or delete

entirely the source file upon transfer of a copy of that file. Assuming the technology is effective,

these proposals would ensure that the single act of sending the work to a recipient results in a

copy of the work being retained by the recipient alone. They differ from the Boucher-Campbell

bill, which required an additional affirmative act: the subsequent deletion of the work by the

sender.

Implicit in any argument by analogy is the assertion that the similarities outweigh the

differences. Whether or not the analogy outlined above is compelling from a policy perspective

depends upon whether the differences between the circulation of physical copies and electronic

"transfers" are more significant than the similarities.

Physical copies of works degrade with time and use, making used copies less desirable

than new ones. Digital information does not degrade, and can be reproduced perfectly on a

recipient's computer. The "used"[278] copy is just as desirable as (in fact, is indistinguishable

from) a new copy of the same work. Time, space, effort and cost no longer act as barriers to the

movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in

the world with minimal effort and negligible cost. The need to transport physical copies of

works, which acts as a natural brake on the effect of resales on the copyright owner's market, no

---

[278] The "used" copy refers to the copy on the recipient's computer. In fact, it is not "used" in any sense of the word since it was initially created on the recipient's computer as the end result of the transmission process.

longer exists in the realm of digital transmissions. The ability of such "used" copies to compete for market share with new copies is thus far greater in the digital world.[279]

Even the "lending" of a fairly small number of copies of a work by digital transmission could substitute for a large number of purchases. For example, one could devise an aggregation site on the Internet that stores (or, in a peer-to-peer model, points to) multiple copies of an electronic book. A user can "borrow" a copy of the book for as long as he is actually reading it. Once the book is "closed," it is "returned" into circulation. Unlike a typical lending library, where the book, once lent to a patron, is out of circulation for days or weeks at a time, the electronic book in this scenario is available to other readers at any moment that it is not actually being read. Since, at any given time, only a limited number of readers will actually be reading the book, a small number of copies can supply the demand of a much larger audience. The effect of this activity on the copyright owner's market for the work is far greater than the effect of the analogous activity in the non-digital world.

In addition, unless a "forward-and-delete" technology is employed, transfer of a copy by transmission requires an additional affirmative act by the sender. In applying a digital first sale doctrine as a defense to infringement it would be difficult to prove or disprove whether that act had taken place, thereby complicating enforcement.[280] This carries with it a greatly increased risk

---

[279] T-SIIA, Kupferschmid, at 85.

[280] These differences have already been noted by the Register on a prior occasion. Marybeth Peters, *The Spring 1996 Horace S. Manges Lecture – The National Information Infrastructure: A Copyright Office Perspective,* 20 Colum. V.L.A. Journal 341, 355 (Spring, 1996).

of infringement in a medium where piracy risks are already orders of magnitude greater than in the physical world. Removing, even in limited circumstances, the legal limitations on retransmission of works, coupled with the lack of inherent technological limitations on rapid duplication and dissemination, will make it too easy for unauthorized copies to be made and distributed, seriously harming the market for those works.[281]

Even the use of "forward-and-delete" technology, as advocated by some commenters,[282] is not a silver bullet. Technological measures can be hacked; they are expensive; and they often encounter resistence in the marketplace. In order to achieve a result that occurs automatically in the physical world, a publisher would have to pay for an expensive (and less than 100 percent reliable) technology and pass that cost along to the consumer, while at the same time potentially making the product less desirable in the marketplace. The ability of the market to correct this imbalance would be inhibited because copyright owners would need to apply these measures or face the risk of unauthorized copying under the guise of the first sale doctrine. In addition, technological measures may inadvertently impede legitimate uses of the work, harming consumers. Further, no one has offered evidence that this technology is viable at this time.

One copyright industry representative observed in oral testimony that there had been no "hue and cry, not even so much as a suggestion, that consumers are looking for products that will

---

[281] *Accord* R-Time Warner Inc., at 2-3.

[282] *E.g.*, R-DiMA, at 5.

84

function under the forward-and-delete model."[283]   To the contrary, the Napster phenomenon was cited as evidence that consumers wish to retain, not destroy, the digital copy from which the work is transmitted.[284]   We encountered nothing in the course of preparing this Report that would refute this observation.

Each of these differences between circulation of tangible and intangible copies is directly relevant to the balance between copyright owners and users in section 109.  In weighing the detrimental effect of a digital first sale doctrine on copyright owners' markets against the furtherance of the policies behind the first sale doctrine it must be acknowledged that the detrimental effect increases significantly in the online environment.  "The ultimate question is whether an equivalent to the first sale doctrine *should* be crafted to apply in the digital environment.  The answer must turn on a determination that such a new exception is needed to further the policies behind the first sale doctrine, and that it can be implemented without greater detriment to the copyright owner's market."[285]   We turn now to an evaluation of the policies behind the first sale doctrine.

---

[283]   T-NMPA, Mann, at 157.

[284]   *Id.* at 157-58.

[285]   Peters, *supra*, note 280, at 355-56 (emphasis in original).

### ii. Policies behind the first sale doctrine

"The first sale doctrine was originally adopted by the courts to give effect to the early common law rule against restraints on the alienation of tangible property."[286] As discussed above, it appears to have been motivated as well by competition concerns – specifically, the ability of publishers to use their vending or distribution right to control not only the initial sales of books, but the aftermarket for resales.[287]

The tangible nature of the copy is not a mere relic of a bygone technology. It is a defining element of the first sale doctrine and critical to its rationale. This is because the first sale doctrine is an outgrowth of the distinction between ownership of intangible intellectual property (the copyright) and ownership of tangible personal property (the copy).[288]

The distribution right can be conceptualized as an extension of the copyright owner's exclusive rights to include an interest in the tangible copies. Under common-law principles, the owner of the physical artifact – the copy – has complete dominion over it, and may dispose of possession or ownership of it as he sees fit. The distribution right, nonetheless, enables the

---

[286] S. Rep. No. 162, 98th Cong., 1st Sess. 4 (1983). The legislative history of section 109 and of section 27 of the 1909 law, the first codification of the first sale doctrine, is quite brief. Despite its brevity, it focuses on one important and relevant concept. Repeatedly, the congressional reports refer to the ability of the owner of a *material copy* to dispose of that copy as he sees fit. H.R. Rep. No. 2222, 60th Cong., 2nd Sess. 19 (1909); H.R. 28192, 60th Cong., 2nd Sess. 26 (1909); H.R. Rep. No. 94-1476, 94th Cong., 2nd Sess. 79 (1976).

[287] *See supra*, at 21.

[288] "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object." 17 U.S.C. § 202.

copyright owner to prevent alienation of the copy – up to a point.  That point is when ownership of a lawfully made copy is transferred to another person  – *i.e.*, first sale.  The first sale doctrine upholds the distinction between ownership of the copyright and ownership of the material object by confining the effect of the distribution right's encroachment on that distinction.

The underlying connection between the two concepts is apparent in the 1909 Copyright Act.  Both the first sale doctrine and the doctrine that ownership of copyright is distinct from ownership of a material object are found in section 27.[289]  Notwithstanding their codification in separate sections of the 1976 Act, their origin as part of the same provision of the 1909 Act demonstrates that the concepts are two sides of the same coin.

Digital transmission of a work does not implicate the alienability of a physical artifact.  When a work is transmitted, the sender is not exercising common-law dominion over an item of personal property; he is exercising the central copyright right of reproduction with respect to the intangible work.  Conversely, the copyright owner's reproduction right does not interfere at all with the ability of the owner of the physical copy to dispose of ownership or possession of that copy, since the first sale doctrine applies fully with respect to the tangible object (e.g., the user's hard drive) in which the work is embodied.

Because the underlying purpose of the first sale doctrine is to ensure the free circulation of tangible copies, it simply cannot be said that a transformation of section 109 to cover digital

---

[289] The text of section 27 is quoted, *supra*, note 39.

87

transmissions furthers that purpose.  The concerns that animate the first sale doctrine do not

apply to the transmission of works in digital form.[290]

A number of the comments we received express the view that a digital first sale doctrine

would further the purposes of section 109.  We note that none of those comments are supported

by a historically sound formulation of what those purposes are.  For example, one commenter

argued that the first sale doctrine is based on a calculation of incentives to create.[291]  This view is

not supported by the legislative history of section 109.  Moreover, as is discussed below, the

potential harm to the market and increased risk of infringement that would result from an

expansion of section 109 could substantially reduce the incentive to create.[292]  Thus, this

argument is both historically unsound and unpersuasive as a practical matter.

Another commenter suggested that the original purpose of the first sale doctrine was "to

Promote the Progress of science and Useful Arts [sic]."[293]  This observation does not advance the

argument.  It is a given that the "Progress of Science and useful Arts"[294] is the policy

---

[290]  "The first sale doctrine was developed to avoid restraints on the alienation of physical property, and to prevent publishers from controlling not only initial sales of books, but the after-market for resales.  These concerns do not apply to transmissions of works on the [Internet]."  Peters, *supra*, note 280, at 355-56 (emphasis in original).

[291]  C-DiMA, at 5-6 ("Copyright law secures to the copyright owner the exclusive rights of first distribution to provide an incentive for the creation and dissemination of copyrighted works.  Once the copyright holder has been compensated for the initial distribution of the work, no further incentive is required, so the copyright owner should not be able to extract further profits from that particular copy of the work.").

[292]  *See infra*, at 97-99.

[293]  C-DFC, at 2 ("Historically, the 'first sale' doctrine has contributed to the achievement of that goal by providing a means for the broad secondary dissemination of works of imagination and information.") (quoting without citation, U.S. Const. Art. I, sec. 8).

[294]  U.S. Const. Art. I, sec. 8.

undergirding the *entire* Copyright Act. However, particular provisions of the law may have more precise purposes, as is the case here.

The library associations made the claim that the first sale doctrine is based on a right of access[295] – a right not found in the legislative history of section 109. In support of this argument, they cited to section 109(d)[296] as a demonstration that section 109 applies "according to the scope of the interest that has been transferred, rather than according to the object of that interest."[297] We understand this argument to suggest that because the lease of a tangible object is not activity to which section 109 applies, the fact that a work is embodied in a tangible object must not be the test for the application of section 109. Instead, this argument appears to suggest, the scope of the interest conveyed (ownership versus rental) is the determinative factor for the application of section 109. This interpretation is fundamentally flawed. Section 109 is conditioned on *both* ownership (as opposed to mere possession) and the requirement that such ownership be of a particular physical copy. The failure to satisfy either requirement will preclude the distribution of the copy pursuant to section 109.

The library associations supported their conclusion regarding the first sale doctrine being a proxy for a right of access by proceeding from the premise that the requirement of a particular physical copy should be jettisoned from the doctrine. To support that premise, the library

---

[295] R-Library Ass'ns, at 3-7.

[296] 17 U.S.C. § 109(d) (stipulating that the privileges of this section apply only to ownership of copies, not mere possession).

[297] *Id.* at 3.

associations claim that the requirement of a particular physical copy "was an efficient proxy for distinguishing the copyright owner's exclusive rights in his work from the right to access and use that work . . . ."[298]  The argument is circular.

There is nothing to support the thesis that the first sale doctrine is a stand-in for a right of access to copyrighted works.  Apart from the reference to section 109(d) discussed above, no authority was marshaled in support of this proposition.  Neither the statutory text nor the legislative history of section 109 (or section 27 of the 1909 law) support the proposition.  To the contrary, however, the Supreme Court's decision in *Bobbs-Merrill* and the legislative history of the 1909 Act do refer directly to alienability of tangible property.[299]

A number of the comments also made reference to socially desirable activities, such as library lending, that are furthered by the existing first sale doctrine, and argue that similarly desirable activities would be furthered by a digital first sale doctrine.  Asserting that a digital first sale doctrine would have beneficial effects is not the same as arguing that it would further the purposes of the existing first sale doctrine, since there is no sound basis for asserting that those effects are related to the purpose of the first sale doctrine.  This argument relates not to underlying purpose, but to a balancing of the impact of copyright rights and exceptions.  Even assuming the accuracy of the assertion that a digital first sale doctrine would result in socially desirable activities, the fact that a particular limitation on a copyright owner's exclusive rights

---

[298] *Id.* at 3-4.

[299] *See supra* at 20-24.

90

will promote a public good is not, in itself, a sufficient basis for curtailing copyright protection. The social benefit must be balanced against the harm to the copyright owner's legitimate interests, and thus to the incentive to create. As discussed above, the extension, by analogy, of the first sale doctrine to the online environment has a significantly greater negative impact on copyright owners' legitimate interests than does the traditional first sale doctrine in the realm of tangible copies.

### iii. Development of new business models

Reasoning by analogy always carries with it the risk of becoming captive to the analogy. Assumptions that are implicit in one situation can carry over to the analogous situation even though those assumptions no longer apply. This appears to be the case with the analogy between distribution of tangible copies and online transmissions of works.

Proposals for a digital first sale doctrine endeavor to fit the exploitation of works online within a distribution model that was developed within the confines of pre-digital technology. Digital communications technology enables authors and publishers to develop new business models, with a more flexible array of products that can be tailored and priced to meet the needs of different consumers.[300] Requiring that transmissions of digital files be treated just the same as the sale of tangible copies artificially forces authors and publishers into a distribution model based on outright sale of copies of the work. The sale model was dictated by the technological necessity of manufacturing and parting company with physical copies in order to exploit a work –

---

[300] Jane C. Ginsburg, *From Having Copies to Experiencing Works: the Development of an Access Right in U.S. Copyright Law* 10 (2000) (available online at papers.ssrn.com/paper.taf?abstract_id=222493).

neither of which apply to online distribution.  If the sale model continues to be the dominant method of distribution, it should be the choice of the market, not due to legislative fiat.

### iv.  International considerations

In evaluating the arguments put forward to support a digital first sale doctrine, it is instructive to inquire how the international community is addressing the application of exhaustion of rights[301] to the online transmissions of works.  The 1996 WIPO treaties[302] set international norms for the treatment of copyright and related rights in the Internet environment. The treaties addressed both the circulation of physical goods and the transmission of works.

---

[301] "Exhaustion" is the term that is often used in international agreements to refer to the termination of a copyright owner's distribution right with respect to a particular copy after that copy has been sold with the copyright owner's authorization — i.e., the first sale doctrine.  The distribution right is said to "exhaust" after the first sale.

[302] *See supra*, at 5.

The WCT and the WPPT provide an exclusive distribution right[303] with respect to

tangible copies of works while, with respect to intangible copies (that is, transmissions),

providing a separate exclusive right of making available to the public, that was conceived as a

---

[303]  WCT, art. 6:
(1) Authors of literary and artistic works shall enjoy the exclusive right of authorizing the making available to the public of the original and copies of their works through the sale or other transfer of ownership.
(2) Nothing in this Treaty shall affect the freedom of Contracting Parties to determine the conditions, if any, under which the exhaustion of the right in paragraph (1) applies after the first sale or other transfer of ownership of the original or a copy of the work with the authorization of the owner.*

*Agreed statement concerning Articles 6 and 7:  As used in these Articles, the expressions "copies" and "original and copies," being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.

WPPT, art. 8:
(1) Performers shall enjoy the exclusive right of authorizing the making available to the public of the original and copies of their performances fixed in phonograms through the sale or other transfer of ownership.
(2) Nothing in this Treaty shall affect the freedom of Contracting Parties to determine the conditions, if any, under which the exhaustion of the right in paragraph (1) applies after the first sale or other transfer of ownership of the original or a copy of the fixed performance with the authorization of the performer.*

*Agreed statement concerning Articles 2(e), 8, 9, 12, and 13:  As used in these Articles, the expressions "copies" and "original and copies," being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.;

WPPT, art. 12:
(1) Producers of phonograms shall enjoy the exclusive right of authorizing the making available to the public of the original and copies of their performances fixed in phonograms through the sale or other transfer of ownership.
(2) Nothing in this Treaty shall affect the freedom of Contracting Parties to determine the conditions, if any, under which the exhaustion of the right in paragraph (1) applies after the first sale or other transfer of ownership of the original or a copy of the phonogram with the authorization of the producer of the phonogram.*

*Agreed statement concerning Articles 2(e), 8, 9, 12, and 13:  As used in these Articles, the expressions "copies" and "original and copies," being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.

93

subset of a general right of communication to the public.[304]   The treaties permit members to limit

the distribution right with an exhaustion principle,[305] but there is no requirement to do so.   There

is no provision in either treaty regarding exhaustion of the making available or communication

rights.   This is hardly surprising since exhaustion is a concept that has heretofore only applied to

the right to distribute tangible copies.

Those countries that have implemented protection for online transmissions have largely

done so through the right of communication to the public and thus provide no equivalent of the

first sale limitation to such rights.   We are not aware of any country other than the United States

that has implemented the making available right through application of a combination of the

distribution, reproduction, public performance and public display rights.   In a sense, the only

reason the issue of first sale arises in the U.S. is because we chose to implement the making

---

[304]  WCT, art. 8:

Without prejudice to the provisions of Articles 11(1)(ii), 11*bis*(1)(i) and (ii), 11*ter*(1)(ii) and 14*bis*(1) of the Berne Convention, authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.

WPPT, art. 10:

Performers shall enjoy the exclusive right of authorizing the making available to the public of their performances fixed in phonograms, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them.;

WPPT, art. 14:

Producers of phonograms shall enjoy the exclusive right of authorizing the making available to the public of their phonograms, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them.

[305]  WCT, art. 6(2); WPPT, art. 8(2), art. 12(2).

94

available right through, *inter alia*, the distribution right. Elsewhere, online transmissions are considered communications to the public, and the first sale doctrine simply does not apply.

An important example of this is the European Union's Information Society Directive.[306] This directive, which, among other things, implements the WIPO treaties, provides for a distribution right[307] that is limited by the exhaustion principle, and a separate making available right that is not. The exhaustion principle in the Directive is expressly limited to circulation of tangible copies:

> Copyright protection under this Directive includes the exclusive right to control distribution of the work incorporated in a tangible article. The first sale in the Community of the original of a work or copies thereof by the rightholder or with his consent exhausts the right to control resale of that object in the Community.[308]

The Directive goes further, stating in clear terms that exhaustion does not apply to online transmissions:

> The question of exhaustion does not arise in the case of services and on-line services in particular. This also applies with regard to a material copy of a work or other subject-matter made by a user of such a service with the consent of the rightholder. Therefore, the same applies to rental and lending of the original and copies of works or other subject-matter which are services by nature. Unlike CD-

---

[306] Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001, on the harmonisation of certain aspects of copyright and related rights in the information society (OJ L 167/10 2001) ("Information Society Directive").

[307] Information Society Directive, art. 4:

1.     Member States shall provide for authors, in respect of the original of their works or of copies thereof, the exclusive right to authorise or prohibit any form of distribution to the public by sale or otherwise.

2.     The distribution right shall not be exhausted within the Community in respect of the original or copies of the work, except where the first sale or other transfer of ownership in the Community of that object is made by the rightholder or with his consent.

[308] Information Society Directive, art. 28.

> ROM or CD-I, where the intellectual property is incorporated in a material medium, namely an item of goods, every on-line service is in fact an act which should be subject to authorisation where the copyright or related right so provides.[309]

The decision of the EU not to create an exception to the right of communication to the public that is similar to the doctrine of exhaustion of the right of distribution represents an informed policy decision that such an expansion is not appropriate.  We are not aware of a public outcry in any of the EU countries in opposition to this decision.

The analogy that some in the U.S. have made between the downstream distribution of a tangible copy of a work and an online transmission is attractive because of the broad application of the right of distribution in U.S. copyright law.  As both activities implicate the distribution right, the distinction between the distribution of physical objects and intangible transmissions may at first blush seem small.  They are, however, distinct acts with distinct characteristics that ought not necessarily be treated similarly.  When viewed through an international lens this distinction becomes clearer.

### c. *Recommendations*

Based on the foregoing discussion, and for the reasons set forth below, we recommend no change to section 109 at this time.  Although there is a great deal of speculation about what may happen in the future, we heard no convincing evidence of present-day problems.  However, legitimate concerns have been raised about what may develop as the market and technology evolve.  These concerns are particularly acute in the context of the potential impact on library

---

[309] Information Society Directive, art. 29.

operations. The time may come when Congress may wish to consider further how to address these concerns.

### i. No change to section 109

In order to recommend a change in the law, there should be a demonstrated need for the change that outweighs any negative aspects of the proposal. We do not believe that this is the case with the proposal to expand the scope of section 109 to include a digital first sale doctrine.

Much of the rhetorical force behind the digital first sale proposal stems from the analogy to circulation of goods in the physical realm. On examining the nature of digital transmissions compared to the nature of transfers of material objects, we do not find this analogy compelling for several reasons.

The analogy ultimately rests on the fiction that a transmission of a work is the same as a transfer of a physical copy. In order to get around the fact that a transmission results in two copies, the analogy requires one of two things to happen: either a voluntary deletion of the sender's copy or its automatic deletion by technological means. Both are unworkable at this time.

Relying on voluntary deletion is an open invitation to virtually undetectable cheating, and there is no reason to believe there would be general compliance with such a requirement. If the burden were placed on the copyright owner to demonstrate that there was no simultaneous

deletion of the copy from which the transmission was made, it would erect what would probably be an impossible evidentiary burden. If the burden of establishing the defense were placed on the defendant, and had to be met by demonstrating simultaneous deletion, the defendant would have a similarly impossible evidentiary burden. If the defendant were merely required to demonstrate the absence of a copy of the work on his hard drive, then the simultaneous deletion principle would, as a practical matter, disappear, and section 109 would become a defense that could be asserted whenever a copy was deleted at any time after it had been transmitted one or more times or copied for retention on another medium. The recent phenomenon of the popularity of using Napster to obtain unauthorized copies of works strongly suggests that some members of the public will infringe copyright when the likelihood of detection and punishment is low.

Relying on a "forward-and-delete" technology is not workable either. At present such technology does not appear to be available. Even assuming that it is developed in the future, the technology would have to be robust, persistent, and fairly easy to use. As such, it would likely be expensive – an expense that would have to be borne by the copyright owner or passed on to the consumer. Even so, the technology would probably not be 100 percent effective. Conditioning a curtailment of the copyright owners' rights on the employment of an expensive technology would give the copyright owner every incentive *not* to use it. In the alternative, it would be damaging to the market to expand section 109 in anticipation of the application of technological protection measures, thus giving the copyright owner a choice between significantly increased expenses, significantly increased exposure to online infringement, or not offering works online.

98

Asserting, by analogy, that an online digital transmission is the same as a transfer of a material object ignores the many differences between the two events. Digital transmission has a much greater effect on the market for copies provided by the copyright owners. It is also accompanied by a greatly increased risk of piracy.

The risk that expansion of section 109 will lead to increased digital infringement weighs heavily against such an expansion. Copyright piracy in the online world is not a matter of speculation — it is, unfortunately, an established fact of life. It appears likely that expanding section 109 would encourage infringement of the reproduction right, either in the mistaken belief that the provision allows a user to retain a copy of a work after it has been transmitted one or more times, or in the belief that the defense can be asserted in bad faith to defeat, or at least complicate, an infringement lawsuit. And unlike Napster, the activity would not rely on a central server, so both the infringing activity and the evidence of infringement would be decentralized and therefore difficult to detect and remedy.[310]

Twice since the enactment of the current Copyright Act, Congress has stepped in to *narrow* the scope of the first sale doctrine to safeguard the reproduction right.[311] In both cases there was anecdotal evidence of abuses in the marketplace, combined with conditions that created the opportunity for widespread abuse. The same conditions apply to the proposals to

---

[310] *See* I. Trotter Hardy, Project Looking Forward: Sketching the Future of Copyright in a Networked World 262-63 (Copyright Office, 1998) (analyzing the difficulties involved in preventing, identifying, and remedying decentralized infringement) (available online at www.loc.gov/copyright/docs/thardy.pdf).

[311] *See* discussion *supra*, at 24-25.

99

create a digital first sale doctrine.  Again, the striking popularity of Napster is a strong indication

that many people will infringe copyright if the means to do so is at their disposal.  And the more

convenient the means, the greater the likelihood of infringements.  The risk to the copyright

owners' reproduction right is simply too great.

We do not ignore the claim that an expansion of section 109 would further the pro-

competitive goals of the first sale doctrine.  To the extent that section 109 does not permit the

transmission of copyrighted works, the right holders retain the exclusive right to restrict or

prohibit such activity, thereby barring resales that compete with sales of new copies.  Of course, a

lawfully made and owned copy of a work on a floppy disk, Zip™ disk, CD-ROM or similar

removable storage medium can easily be transferred by physical transfer of the item and that

activity is within the current reach of section 109.  In the final analysis, the concerns about

expanding first sale to limit the reproduction right, harm to the market as a result of the ease of

distribution, and the lessened deterrent effect of the law that could promote piracy, outweigh the

pro-competitive gains that might be realized from the creation of a digital first sale doctrine.  In

addition, there does not appear to be any evidence that the kind of price-fixing behavior that

prompted the Supreme Court to establish the first sale doctrine is occurring.  Should such

behavior become widespread, and should antitrust law fail to afford an appropriate remedy, this

conclusion may have to be revisited.

Implicit in several of the submissions that addressed the first sale issue is a belief that the

analogy of transmissions to physical transfer is so compelling that consumer expectations about

100

transferability of downloaded material have become deeply-rooted. It is said that failure of the law to live up to this expectation will damage commerce in such material. We are aware of no empirical (or even anecdotal) evidence for this proposition, so any assessment of claims concerning consumer expectations and their effect on e-commerce is necessarily conjectural. However, it can be said with confidence that e-commerce and the market for works online has grown quite substantially despite the absence of an expanded section 109. In addition, judging from consumer trends today, there appears to be little or no evidence of desire on the part of consumers to engage in the kind of conduct — transmission and simultaneous deletion — that would be covered in a digital first sale doctrine.

In any event, these issues of consumer expectations and the growth of electronic commerce are precisely what should be left to the marketplace to determine. Straight-jacketing copyright owners into a distribution model that developed around a different technology at a different time is a formula for stifling innovative, market-driven approaches to meeting consumer demand for digital content. If, as has been asserted, the current terms by which copyright owners offer their products are unacceptable to consumers, consumers will stop buying them under those terms and competitors will step into the breach. Such self-correcting market forces should be given an opportunity to address these types of concerns before Congress alters the balance of rights and exceptions in the Copyright Act.

### ii. Further consideration of ways to address library issues related to the first sale doctrine

The fact that we did not recommend adopting a "digital first sale" provision at this time does not mean that the issues raised by libraries are not potentially valid concerns. Similarly, our conclusion that certain issues are beyond the scope of the present study does not reflect our judgment on the merits of those issues.

The library community has raised concerns about how the current marketing of works in digital form affects libraries with regard to five specifically enumerated categories: interlibrary loans, off-site accessibility, archiving/preservation, availability of works, and use of donated copies.[312]  In each case, the concern is that licensing terms for use of the works will effectively prohibit the desired activity.[313]

Concerning interlibrary lending, library associations suggest that the Copyright Act should reaffirm and strengthen rules on interlibrary loan especially for acquired digital works.[314] They state that licenses often prohibit the loaning of works in digital form.  As mentioned elsewhere, the issue of licenses is beyond the scope of this study.

It should be noted that many interlibrary loans are not in fact loans – the temporary lending of a particular copy of a work – but delivery of copies.  The "lending" institution

---

[312]  C-Library Ass'ns, at 11-19.

[313]  *Id.*

[314]  *Id.* at 11-13, 23.

102

reproduces the copyrighted work and sends the reproduction to the "borrowing" library. This copy is given by the borrowing library to its patron, who becomes the owner of that copy. Clearly this activity of libraries is outside of the scope of section 109. As to the library patron, to the extent that such a reproduction and distribution is authorized by section 108,[315] the copy becomes his property and is therefore subject to section 109.

Library concerns about offsite accessibility relate chiefly to licenses that limit access to a particular work to a specific location (e.g., a single building or computer). This means that such works are not available for use offsite, including in a classroom. Libraries seek the ability to make all works in their collections available for classroom use.[316] These are contract issues that are not within the mandate for this study.

Library associations raised a related concern about licensing terms which limit the number of users of a work at any given time, the hours of the day during which works may be used, or other similar limitations.[317] Less restrictive licenses are often available, but at a higher price. As with restrictions on offsite availability of works, these limitations have the effect of reducing the general availability of those works that are subject to the limitations. The library associations believe that these restrictions create substantial burdens to research.[318] This is also a

---

[315] Section 108 was updated in the Digital Millennium Copyright Act of 1998; as updated, section 108 makes it clear that digital copies may not be given to patrons. Copies given to patrons must be in analog form – e.g., photocopies.

[316] C-Library Ass'ns, at 11-13, 23.

[317] Id. at 17.

[318] Id.

103

contract issue that is not within the mandate of the study.  However, we do note that the difficulty identified by the library associations is not new, and is not unique to the digital world.  Libraries have always had make difficult trade-offs between greater availability of particular works (through the purchase of more copies) and other priorities.

Concern was also raised about works that libraries can only offer by means of online access.  The terms of use of a work that is accessed in this way are typically set forth in a subscription agreement.  Online access is achieved by loading the work into the RAM of a computer while it is being accessed; it does not involve the making of a permanent copy.  Here there is no section 109 issue – at the end of the online session the library owns no physical copy that can be transferred.

Preservation and archiving are identified as potential problems because many licenses prohibit copying for such purposes (or for any purpose) and because prohibitions on copying are enforced by technological means.[319]  The library associations propose creating a national system of digital repositories, where specific libraries or institutions would be designated as custodians of specific parts of our nation's digital history and assisted in their efforts to preserve these works.[320]  While these issues are beyond the scope of this study, we acknowledge that they are legitimate concerns that have been recognized as such.[321]  In fact, they are being addressed.  For

---

[319]  C-Library Ass'ns, at 14.

[320]  *Id.* at 23.

[321]  Committee on Intellectual Property Rights and the Emerging Information Infrastructure, The Digital Dilemma 209-10 (2000).

example, the Librarian of Congress, James H. Billington, has appointed a national advisory

committee to assist the Library of Congress in the development of a National Digital Information

Infrastructure and Preservation Program to ensure the long-term availability of digital materials.

That committee held its first meeting on May 1, 2001.

The focus of library concerns regarding donated copies is their ability to use donated CD-

ROMs. Libraries are not able to use CD-ROMs donated to them because the donors are not

owners of the CD-ROMs, only licensees, and thus lack the legal authority to transfer the copy of

the work they possess.[322] Since the license agreement prevents the transfer, the issue is beyond

the scope of this study.

Most of these issues arise from terms and conditions of use, and costs of license

agreements. One arises because, when the library has only online access to the work, it lacks a

physical copy of the copyrighted work that can be transferred.[323] These issues arise from existing

business models and are therefore subject to market forces. We are in the early stages of

electronic commerce. We hope and expect that the marketplace will respond to the various

concerns of customers in the library community. However, these issues may require further

consideration at some point in the future. Libraries serve a vital function in society, and we will

continue to work with the library and publishing communities on ways to ensure the continuation

of library functions that are critical to our national interest.

---

[322]   C-Library Ass'ns, at 18-19.

[323]   *See* Ginsburg *supra* note 300, at 10.